# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

--oOo--

In re: GST TELECOM INC.,  )
et al.,                   )
                          )
    Debtors,              )
                          )
_____)  Case No. 00-1982 (GMS)
GST TELECOM, INC., et al.,)
                          )
    Counterplaintiffs,    )
                          )
        vs.               )
                          )
JOHN WARTA,               )
                          )
    Counderdefendant.     )

DEPOSITION OF JOHN WARTA

Volume I, Pages 1 to 196

Taken in Behalf of Counterplaintiffs

Thursday, February 19, 2004

Reported By:
Janis Brown, CSR, RPR

EXHIBIT B
PAGE ____ OF ____

**Page 2**

```
 1       BE IT REMEMBERED that the deposition of JOHN
 2  WARTA was taken in behalf of the Counterplaintiffs,
 3  pursuant to the Oregon Rules of Civil Procedure, before
 4  Janis Brown, a Certified Shorthand Reporter for Oregon
 5  and Registered Professional Reporter, on Thursday,
 6  February 19, 2004, commencing at the hour of 10:05 a.m.,
 7  in the law offices of KENT CUSTIS, 1500 S.W. Taylor, in
 8  the City of Portland, County of Multnomah, State of
 9  Oregon.
10
11              --oOo--
12
13           APPEARANCES:
14
15  Attorney for Counterplaintiffs:
       LATHAM & WATKINS
16     By:  William J. Gibbons
              -and-
17         Danielle Kemp
       Sears Tower, Suite 5800
18     233 South Wacker Drive
       Chicago, Illinois  60606-6401
19
20  Attorney for Counterdefendant:
       KENT CUSTIS
21     By:  Christopher H. Kent
       1500 S.W. Taylor
22     Portland, OR  97205
23  Also Present: Bruce D. Becker
24
25
```

**Page 3**

```
 1                I N D E X
 2
 3  EXAMINATIONS                           PAGE
 4  By Mr. Gibbons                           4
 5                  * * *
 6
 7  EXHIBITS
 8  1 - Resume                              10
 9  2 - March 1, 1994 Employment Agreement  75
10  3 - Restated and Amended Employment Agreement  75
11  4 - Amendment to Restated and Amended
        Employment Agreement                75
12
    5 - August 1, 1996 Minutes of the Meeting of the
13      Finance Committee of GST Telecommunications,
        Inc.                               143
14
    6 - Limited Liability Company Operating
15      Agreement                          157
16  7 - September 16 & 17, 1996 Minutes of the
        Special Meeting of the Board of Directors
17      of GST Telecommunicatins, Inc.     164
18  8 - Note to Olson, Hanson and Schwartz re
        Morgan Hi Yield                    182
19
    9 - November 12, 1997 Memorandum, Swidler and
20      Berlin to Olson and Wetzel         185
21
22
23
24
25
```

**Page 4**

```
 1          JOHN WARTA
 2       called as a witness in behalf of the
 3       counterplaintiffs, being first duly sworn,
 4       is examined and testifies as follows:
 5
 6          EXAMINATION
 7  BY MR. GIBBONS:
 8     Q. Mr. Warta, my name is Bill Gibbons.  We met
 9  last year and again this morning before convening the
10  deposition.
11        As you know, I represent GST, various GST
12  companies who are debtors in bankruptcy in the district
13  of Delaware.  In particular I represent GST in connection
14  with the claim that you have filed in that bankruptcy
15  proceeding, the objection to that claim and the
16  counterclaim filed by GST against you.  We are here to
17  take your deposition with respect to those matters.  I
18  know you've been deposed before, because I've reviewed
19  some of the transcripts, but if you'll indulge me I'll
20  set up some of what I'll call the ground rules and make
21  sure we're on the same page in this regard.  If you have
22  any questions about it, you can ask me and we'll try to
23  resolve them.
24        First of all, and probably most importantly, I
25  would ask that you allow me to finish my question before
```

**Page 5**

```
 1  beginning your answer.  It's helpful to all of us to have
 2  a readable transcript, but probably most immediately it's
 3  helpful to Janis, who doesn't have to decide whose words
 4  to take down as we're both speaking.  I will try to show
 5  you the same courtesy.  I will try not to interrupt your
 6  answers when you're giving them.  Of course, I understand
 7  it's a natural human tendency at some point in time to
 8  talk over somebody as they're coming to the end of a
 9  thought, so we both could make a mistake.  If I stop you
10  in that regard and suggest that you let me finish the
11  question, I'm only doing it for purposes of making sure
12  we have a clean transcript.  I don't mean any rudeness to
13  you.
14        So far are we okay?
15     A. As far as I know.
16     Q. Well, I'm sure Mr. Kent will jump in if he has
17  a problem with anything I say.
18        If I ask you a question that you don't
19  understand, tell me and I will try to rephrase it and see
20  whether we can reach an understanding.  If at any point
21  in time you need a break, tell me, we can do that.  The
22  only thing that I'd ask is if there's a question pending
23  that you complete your answer to that question before
24  taking a break.  If at any point during the course of the
25  deposition you realize that an answer you gave was either
```

**Page 142**

1  Q. 1996?
2  A. I think that's right. I think the auctions
3  took place the summer, the re-reauctions took place in
4  the summer.
5  Q. You would expect that that authorization and
6  strategy would be reflected in the board minutes, right?
7  A. I would not necessarily expect that because
8  this was a fairly small amount of money compared to the
9  overall budget at the point in time.
10  Q. What you're saying is while it was discussed in
11  a board meeting in May of '96, it may not have worked its
12  way into the minutes because 5 or 6 million dollars at
13  that point in time didn't cross a materiality threshold;
14  is that right?
15  A. I think the issue was we didn't know whether it
16  was five or two in May of '96. We didn't know exactly
17  what licenses the FCC was going to auction that were
18  overlaying our network. Because of that how can you seek
19  preapproval or advanced approval in an amount that is not
20  determined yet, because we didn't know at that point in
21  time what market -- we had an idea. We had no ideas
22  which ones would actually get to the auction.
23  Q. As a theoretical matter, though, you can seek
24  board approval up to some dollar amount limit. Did you
25  do that?

**Page 143**

1  A. I think we had that through the executive
2  committee authorization, so that wasn't an issue.
3  Q. But the executive committee authorization was
4  not preapproved by the board?
5  A. Again, the executive committee had authority
6  levels and we felt this was within the authority levels
7  that were available to the executive committee at the
8  time.
9  Q. Were there specific dollar amount authority
10  levels for the executive committee?
11  A. I think there was from time to time varying
12  dollar levels or dollar amounts. The board entrusted us
13  and empowered us to be able to move forward. This is
14  also in a period of time in which we're transitioning
15  from weekly, monthly to quarterly meetings at the board
16  level, and that's what caused the creation of the
17  executive committee.
18  MR. GIBBONS: I'll ask you to mark this as, I
19  think, Exhibit 5.
20  (EXB 5 marked.)
21  MR. GIBBONS: Q. Mr. Warta, let me show you what
22  we've marked as Deposition Exhibit 5, which are two pages
23  of minutes of the meeting of the finance committee of GST
24  Telecommunications, Inc. held on August 1st, 1996. These
25  aren't the complete set of minutes because we didn't need

**Page 144**

1  them and didn't need to make copies of them, but the
2  first page identifies the date of the meeting and page
3  two identifies the portions of the minutes that I want to
4  ask you about.
5  A. Okay.
6  Q. Let me direct your attention to page two, the
7  last substantial paragraph there which discusses, as it
8  puts there, an arrangement between the company and
9  MagnaCom, which it identifies as a corporation owned by
10  Mr. Warta, which was true, right?
11  A. Well, MagnaCom was owned by Pacwest Network,
12  Inc., and GST had specific rights related to Pacwest
13  Network, Inc., and then that impacted the true ownership
14  of that.
15  Q. What rights did GST have with Pacwest Network,
16  Inc.?
17  A. You should probably look at that agreement, but
18  it provided GST specific rights in terms of transfer of
19  licenses that might be held in that entity from Pacwest
20  Network, Inc. to another entity that GST identified
21  subsequent to my termination.
22  Q. The licenses we're talking about are PCS
23  licenses?
24  A. They are wireless licenses held by that
25  entity. And that is an agreement that was put in place

**Page 145**

1  at the formation of GST Telecom.
2  Q. Give me your understanding of the material
3  terms of that agreement between GST and Pacwest Network,
4  Inc.
5  A. That agreement caused me to transfer those
6  licenses held or ownership held in those licenses to
7  another entity following my termination and GST would be
8  required to nominate the company and Pacwest would be
9  required to transfer.
10  Q. The consideration for that was what?
11  A. It was part of our original deal.
12  Q. So the consideration was stock in GST
13  Telecommunications, Inc.?
14  A. It was part of the original deal. We agreed to
15  do that to accommodate GST's inability to hold the
16  licenses directly themselves.
17  Q. The inability of GST to hold the licenses
18  directly themselves was attributable to foreign ownership
19  requirements?
20  A. It was attributed to two things: One, foreign
21  ownership; two, lack of a petition when things got better
22  by GST to try to get FCC approval to transfer those
23  things.
24  Q. There's no guarantee if they had made such a
25  petition it would have been approved, right?

Page 146

1   A. Well, history has proven that they were
2   approved. You look at T-Mobile, which is now principally
3   owned by Deutsche Telecom, you'll see the FCC over time
4   has relaxed more and more of their ownership
5   requirements.
6   Q. To what degree have the ownership requirements
7   been relaxed currently?
8   A. Well, Deutsche Telecom owns T-Mobile. So it
9   looks like a very substantial change, which has allowed
10  Deutsche Telecom to participate heavily in the ownership
11  of that company.
12  Q. What about in 1996, what were the FCC
13  limitations?
14  A. It was 25 percent at that point in time, but
15  there were always exceptions. But 25 percent was the
16  standard rule. There are examples now that have come to
17  light that showed some people had up to 49 percent. It
18  could have become even more depending on the point in
19  time.
20  Q. Directing your attention again to page two of
21  Exhibit 5, this reports that MagnaCom has succeeded in
22  the auction bidding for C block PCS licenses for the
23  cities of Eugene and Salem, Oregon; Tucson, Arizona;
24  Albuquerque, New Mexico and Santa Fe, New Mexico. The
25  aggregate price is approximately 108 million.

Page 147

1       It goes on to recite that the company
2   anticipates that it will enter into a management and
3   operations agreement.
4       Down about halfway there is a sentence that
5   reads, "In connection with the award of the licenses to
6   MagnaCom, the company advanced to MagnaCom 5.4 million,
7   which was utilized by MagnaCom as a deposit for the
8   license with the Federal Communications Commission." Do
9   you see that?
10  A. Yes.
11  Q. That was an accurate statement, right?
12  A. I think this reflects what I had said earlier,
13  that monies were advanced either directly to the FCC or
14  for the benefit of MagnaCom to the FCC.
15  Q. Right. And MagnaCom was now the prospective
16  owner of licenses, correct?
17  A. Right. And in this time frame, that's correct.
18  Q. They were the prospective owners of licenses
19  that you believe to be valuable property, right?
20  A. Yes, I was being told that by the people who
21  worked for me at GST that that was correct.
22  Q. So what happened here was GST advanced 5.4
23  million dollars utilized by MagnaCom to acquire the
24  rights to licenses while MagnaCom was owned by you and a
25  company wholly owned by you, right?

Page 148

1   A. I think that's correct. I think with all of
2   the other agreements, I think that's correct.
3   Q. Do you know whether there is any documentation
4   of an authorization to spend 5.4 million of GST's money
5   on the C block licenses to be owned by MagnaCom prior to
6   these finance committee minutes?
7   A. I think, again as I mentioned to you, the May
8   meeting was a general discussion. Whether the board
9   approved the actions of the executive committee in mass,
10  I'm not aware of Irwin writing that in that particular
11  fashion.
12  Q. You're not aware of that you said?
13  A. I'm not aware of him seeking blanket approval
14  for all executive committee actions, but we clearly got
15  board approval for that transaction as the board, in
16  fact, did approve that after this August meeting.
17  Q. But that wasn't my question, Mr. Warta. My
18  question was whether prior to this finance committee
19  meeting there is any documentation which reflects board
20  or committee approval of spending 5.4 million dollars of
21  GST's money to acquire licenses by MagnaCom, a company
22  owned by you?
23  A. I don't know if Irwin, in fact, wrote the
24  minutes from the executive committee meeting that we've
25  discussed earlier.

Page 149

1   Q. So you don't know that that exists, right?
2   A. I don't know -- I just don't remember whether
3   that exists or not. The board meeting was May, so what's
4   a quarter from May? That would have been the next
5   logical meeting. In between it was the executive
6   committee's decisions within their authority level to
7   act. And although --
8   Q. I understand that you say the executive
9   committee had authority to act. I'm not --
10  A. I understand your question just to clarify if
11  there's a document, and I don't know if there is a
12  document. As I said, I just don't recall, other than
13  minutes of the May meeting and the executive committee.
14  And, again, I don't recall those specific minutes.
15  Q. This August 1st, 1996 meeting of the finance
16  committee may have been the first time that either the
17  finance committee or the board was informed --
18  A. No.
19  Q. -- that -- you said "no" before I finished my
20  question.
21  A. I'll wait for you to finish.
22  Q. I'll start again.
23      August 1st, 1996 may have been the first time
24  that either the finance committee or the board was
25  informed specifically that the executive committee

**Page 150**

1 authorized advancing 5.4 million dollars of GST's funds
2 to acquire C block licenses to be held by MagnaCom, a
3 company owned by you, right?
4    A. No, that's not right. I think --
5    Q. Tell me where it's wrong.
6    A. Where it's wrong is you said all board members
7 weren't told until the next board meeting, and that's not
8 correct.
9    Q. I didn't say that.
10   A. Well, good, but that's the way I heard it.
11       Ian Watson was apprised. All of the key board
12 members were apprised in June in a document that you
13 probably have that I authored to notify them of our
14 intention to move forward on the basis that is described
15 here. And what Gordon Blankstein, who was chairman of
16 the board, told the rest of the board or not, I do not
17 know. So if Gordon picked up the phone and told them, "I
18 have authorized John to proceed on this," or, "Steve,
19 John and I have authorized him to proceed on this," I do
20 not know.
21   Q. I'm not asking about authorization of a
22 generalized strategy.
23   A. I understand that.
24   Q. My question is about authorization for the
25 advancement of 5.4 million dollars of GST's funds for

**Page 151**

1 MagnaCom.
2    A. I understand that.
3    Q. Okay. You're telling me that with respect to
4 specifically that advancement of 5.4 million of GST's
5 funds for MagnaCom the board or the finance committee was
6 informed prior to August 1st, 1996? I mean, I understand
7 you've said Blankstein and Irwin knew about it because
8 they were on the executive committee.
9    MR. KENT: Objection, compound. What question do
10 you want him to answer?
11   MR. GIBBONS: Q. First of all, the latter wasn't --
12 I was trying to short circuit what I anticipated to be a
13 non-responsive answer. I only offered it by way of
14 clarification.
15   MR. KENT: There you go again. Just ask your
16 question. You asked several questions and you argue with
17 him. I don't know what you want him to do --
18   THE WITNESS: And I haven't answered.
19   MR. KENT: You don't give him a chance to answer.
20   MR. GIBBONS: The record will reflect what it
21 reflects. This deposition has been stunning in its lack
22 of responsiveness, absolutely stunning.
23   MR. KENT: Okay.
24   MR. GIBBONS: We were getting along okay here for
25 the last 45 minutes or so, we were trying to stumble our

**Page 152**

1 way through missing each other and I offered a
2 clarification and you decided to jump in. Okay, that's
3 fine, but it's not productive.
4    MR. KENT: I'll need to state my objections. I'm
5 not going to agree with everything you said.
6    MR. GIBBONS: I'll withdraw the last question and
7 clarification.
8    Q. Are you telling me, Mr. Warta, that prior to
9 August 1st, 1996 either the finance committee or the
10 board was informed as a finance committee or as a board
11 that GST -- strike that.
12   A. The whole thing?
13   Q. The whole thing.
14       Did either the board or the finance committee
15 know before August 1st, 1996 that GST had advanced 5.4
16 million dollars to acquire licenses to be held by
17 MagnaCom, a company owned by you?
18   A. On June, I think 16th, a document was offered
19 by me and was sent to a number of members of the board,
20 many of whom are not only on the board but are on these
21 committees, describing what action we had intended to
22 take to pursue the PCS strategy. I think Ian Watson, who
23 was chairman of the finance committee, was, in fact, on
24 that document. I know Steve Irwin and Gordon Blankstein
25 were, because they were members of the executive

**Page 153**

1 committee. Whether Gordon Blankstein, who was chairman
2 of the company, picked up the phone and called the
3 finance committee, or called his neighbor, I don't know.
4 All I know is that moving forward in this regard was
5 approved by the executive committee and was subsequently
6 approved by the board.
7    Q. And your testimony is that this strategy was
8 approved and passed upon by those people as a result of
9 this June 16th document that you prepared?
10   A. My testimony is exactly as I've stated it, the
11 executive committee approved making the deposit with the
12 full knowledge that the money could be recovered if
13 anybody objected. The board subsequently approved the
14 transaction and at no time at any point in my period of
15 time of employment did anybody question that decision
16 until attorneys grabbed documents later.
17   Q. Prior to August 1st of 1996 did any of the
18 members of the board or the finance committee that you
19 have identified received a copy of your June 16th
20 document say they were in accord with the strategy?
21   A. When you say -- I don't know who you mean
22 "say" to. You mean say Gordon Blankstein --
23   Q. Indicate in any way they were in accord with
24 the strategy?
25   A. Yes.

## Page 154

1  Q. How?
2  A. Steve Irwin, Gordon Blankstein agreed to move
3  forward.
4  Q. I know about them, because they're the members
5  of the executive committee. I'm going beyond Irwin and
6  Blankstein to other members of the board, other members
7  of the finance committee.
8  A. I don't know because I didn't talk to them
9  about it. It wasn't my job to communicate to them.
10  Q. Who was this June 16th document sent to that
11  you've identified?
12  A. I think I already told you who best I can
13  recall; Steve Irwin, Gordon Blankstein, I think Ian
14  Watson got a copy.
15  Q. Was that document specific as to the amount of
16  money that GST was going to advance for the C block
17  licenses?
18  A. I think it was in the realm of what we were
19  looking for, yes, I think that was correct. We didn't
20  know until some day substantially after that whether or
21  not we won any of the licenses.
22  Q. But you knew what they were going to cost if
23  you did win, right?
24  A. If we did win we didn't know what they were
25  going to cost until the bidding stopped, because --

## Page 155

1  Q. When did the bidding take place?
2  A. The bidding took place between June and August,
3  as best I can recall.
4  Q. So on June 16th you couldn't have included the
5  amount of money that it was going to cost because you
6  didn't know, right?
7  A. I'm not sure. Again, I'm not certain. Without
8  seeing the document, I'm not sure.
9  Q. If this strategy had been approved earlier why
10  would the finance committee require, quote, "lengthy
11  discussion" as to whether they would authorize the
12  payment of additional funds beyond the 5.4 million that
13  you and Blankstein and Irwin as the executive committee
14  had approved?
15  A. Well, these licenses were only for a portion of
16  the networks that GST had moved into at the time. For
17  example, Tucson, Albuquerque, Santa Fe, Salem and Eugene,
18  Oregon. There were a lot of other areas that over time
19  GST may have wanted to acquire additional licenses. The
20  lengthy discussion came about when we didn't know when
21  the F block, which was the smaller block of license, a
22  smaller amount of band width, we didn't know when the FCC
23  was going to roll them out exactly. That would have
24  determined to the finance committee whether or not there
25  was funding available for additional advances in the

## Page 156

1  future.
2  Q. MagnaCom needed to come up with another 5.5
3  million dollars or it ran the risk of losing the 5.4,
4  correct?
5  A. MagnaCom was required to put down additional
6  capital.
7  Q. Right.
8  A. And the initial amount was a deposit.
9  Q. Right.
10  A. Once you won the licenses, I think you were
11  required -- I'm not the expert, Bob Olson's the expert --
12  but I think you were required to put up additional
13  funding once you won the licenses.
14  Q. So the advancement of the 5.4 million in effect
15  tied GST's hands with respect to the advancement of
16  future monies, or that ran the risk of that 5.4 million
17  going away, isn't that right?
18  A. The FCC has taken a different strategy with
19  different people at different times, so whether the 5.4
20  would have gone away or would have been refunded, I'm not
21  sure. I don't know.
22  Q. There was at least a risk that it would go
23  away?
24  A. There was the potential that 5.4 would or could
25  go away, and that was always a possibility that was

## Page 157

1  explained to the executive committee early on.
2  Q. The executive committee again being you, Irwin
3  and Blankstein?
4  A. Yes. That whole --
5  MR. KENT: Go ahead. Finish your answer.
6  THE WITNESS: That whole strategy and direction was
7  also discussed in the May board meeting, May of '96, of
8  how the bidding worked, whether it worked, what you had
9  to do, what you could do, what you couldn't do. So all
10  of that had been discussed and laid out for the board, so
11  we didn't just suddenly walk in and say, "Well, you put
12  up the 5.4 and you're stuck with another 5.5."
13  MR. KENT: I'd like to interpose a restroom break
14  request.
15  MR. GIBBONS: Sure.
16       (RECESS TAKEN, 4:20 to 4:28 p.m.)
17       (EXB 6 marked.)
18  MR. GIBBONS: Q. Mr. Warta, let me show you what's
19  been marked as Exhibit 6 to your deposition, which is a
20  Limited Liability Company Operating Agreement of MagnaCom
21  Wireless, LLC. Do you see that?
22  A. Yes.
23  Q. Have you seen that document before?
24  A. I probably have.
25  Q. Let me direct your attention to page 29, which

Page 162

1  Q. And those licenses were a substantial asset,
2  weren't they?
3  A. No, they were all debt at that point in time.
4  Q. They were a -- well, they were a substantial
5  potential asset or you wouldn't have bought them, right?
6  A. Well, yes and no. They were only an asset if
7  you could have taken advantage of them and built out a
8  network and infrastructure. Otherwise they look like 100
9  million dollars of debt.
10  Q. Right. But you didn't buy them without an
11  intention to build out network and infrastructure,
12  right?
13  A. Not personally, no.
14  Q. That was your intention, to build out network
15  and infrastructure?
16  A. No, I said it was not my intention to build out
17  a network and infrastructure personally.
18  Q. I didn't ask personally. I'm asking in
19  connection with the acquisition of the licenses you
20  intended to build out network and infrastructure in order
21  to utilize the licenses, correct?
22  A. GST intended to build out network and
23  infrastructure.
24  Q. Build out network and infrastructure at GST's
25  expense?

Page 163

1  A. No.
2  Q. Whose expense?
3  A. It was subject to development of a business
4  plan and getting additional funding from outside. That
5  was the whole QualCom transaction.
6  Q. Right. Were that to occur the licenses held by
7  MagnaCom would in that event have substantial value,
8  correct, or at least they could have?
9  A. They may have. Again, there are a lot of
10  companies in this arena that have come and gone.
11  Q. That value would have been to you and your
12  company in the event that the network and infrastructure
13  was built out and GST was unable to exercise the option?
14  A. Well, there is some bizarre potential that you
15  could probably fashion that would have allowed me some
16  how, some way to make some money, but that is not the
17  case and it has never been the case, nor was it the case
18  in the formation of this company.
19  Q. When you say it wasn't the case, you mean you
20  didn't make the money?
21  A. No, that's not what I said. That misrepresents
22  my testimony.
23  Q. I'm asking. You said --
24  A. We're talking about intention, and that's what
25  I said. It was never my intent to make money on

Page 164

1  MagnaCom.
2  Q. Okay.
3  (EXB 7 marked.)
4  MR. GIBBONS: Q. Mr. Warta, I'll show you what's
5  been marked as Exhibit 7, which are part of the Minutes
6  of the Special Meeting of the Board of Directors of GST
7  Telecommunications, Inc. held on September 16 and 17,
8  1996.
9  First of all, do you know what makes this a
10  special meeting as opposed to a regular meeting of the
11  board?
12  A. I don't know why it was deemed as being
13  special.
14  Q. Is a special meeting of the board called on
15  other than a regular schedule?
16  A. Could be.
17  Q. Do you have any recollection as to why this
18  meeting was called?
19  A. I don't know. Without reading this and
20  thinking back, I don't really know.
21  Q. Let me direct your attention to what is marked
22  on the bottom as page 20, although it's the second page
23  of the exhibit. About halfway down it says, "The next
24  order of business was a discussion of transactions
25  between the company and MagnaCom Wireless." Do you see

Page 165

1  that?
2  A. Yes.
3  Q. It goes on to say, "MagnaCom is a limited
4  liability company privately owned by John Warta."
5  Roughly speaking, the same language was present in the
6  finance committee minutes that are Exhibit 5. If
7  MagnaCom was formed for the operation of GST, why don't
8  the minutes say so?
9  A. I don't know.
10  Q. Instead they repeatedly say that MagnaCom is a
11  limited liability company owned by you, right?
12  A. Let me address that, because I do have a
13  recollection.
14  Q. Okay.
15  A. My understanding throughout this period of time
16  was that, and this I was getting from advice of counsel,
17  from Steve Irwin and from the folks at Swidler and
18  Berlin, was that it had to be very clear as to what
19  control GST did or did not have of MagnaCom, otherwise we
20  could forfeit the licenses. The documents were drafted
21  in that fashion to ensure that the FCC did not come back
22  after GST in the process of applying for and obtaining
23  these licenses, just like GST concocted a scheme related
24  to the microwave licenses in Hawaii, which may not have
25  reflected the fact that GST was the principal beneficiary

### Page 166

1  of the use of the microwave licenses.
2      Q. I don't mean to be unduly provocative here, but
3  are you telling me that the board minutes were prepared
4  in a manner to mislead the FCC?
5      A. The board minutes were prepared in a manner to
6  reflect a strict compliance with FCC requirements and to
7  ensure there was nothing in the minutes that caused the
8  ire of the FCC to raise any questions about the
9  acquisition of those licenses.
10     Q. But your position here in this deposition I
11 think is that MagnaCom was, in effect, formed for the
12 benefit of and control by GST, right?
13     A. That's correct. This document that we just
14 reviewed, document Exhibit 6, was prepared and developed
15 by GST's attorneys in consultation with GST's regulatory
16 and FCC attorneys. This document we're now looking at
17 was also prepared by Steve Irwin, who was a GST attorney.
18     Q. I understand that attorneys prepared them. But
19 did you have any concern at or about this time that what
20 was going on was misleading to the FCC?
21     A. There was nothing in here that is intentionally
22 misleading to the FCC. The issue and intent was to show
23 a separate entity that met the FCC test. It gave GST the
24 benefit of ownership of this company.
25     Q. How did GST have benefit of the ownership of

### Page 167

1  this company when it could only exercise an option up to
2  24 percent of the company?
3      A. Those were issues that GST could effect then
4  change from time to time by --
5      Q. But can't control.
6      MR. KENT: Wait.
7      MR. GIBBONS: I apologize.
8      MR. KENT: Can the witness finish his answer?
9      THE WITNESS: By GST taking specific actions that
10 would have enabled it to exercise the entire option.
11     MR. GIBBONS: Q. But there is no guarantee that GST
12 could have taken any action which could have enabled it
13 to exercise the entire option, right?
14     A. I think there are two guarantees in life:
15 You're going to be born and you're going to die.
16 Everything else is subject to events.
17     Q. Right. But to say that, Mr. Warta, doesn't
18 mean that everything is of equal probability inbetween
19 birth and death. You're speaking of this GST option as
20 if GST could have taken a couple of steps and exercised
21 the option, but the fact is there were FCC regulations in
22 place which precluded GST from exercising the option
23 that's been crafted. Now, you understood that, right?
24     A. I understood what is written here and I'm not
25 the FCC attorney who advised the company, nor the

### Page 168

1  corporate counsel who advised the company that this
2  transaction was appropriate and could be done.
3          I am telling you that I have offered on
4  numerous occasions to transfer these licenses to GST's
5  designate representative and they have not taken
6  advantage of that.
7      Q. Who did you make such an offer to?
8      A. Bob Ferchat in several e-mail documents.
9      Q. When?
10     A. After my termination.
11     Q. Before or after litigation was initiated?
12     A. Before.
13     Q. Prior to the time that you left the employ of
14 GST, you may have said this earlier, but were the
15 ownership rules relaxed with respect to foreign
16 ownership?
17     A. Prior to this I think they were to the extent
18 of allowing GST to acquire up to 49 percent on an
19 exception basis.
20     Q. I see. In other words, it had to be approved
21 by the FCC. You could apply for it, they might approve
22 it, they might not?
23     A. But the precedent was there to allow it. Now
24 today obviously in the Deutsche Telecom/T-Mobile case the
25 FCC has relaxed the rule.

### Page 169

1      Q. But I was asking about the 1998 time period.
2  In the 1998 time period you could apply for up to 49
3  percent ownership, right?
4      A. Right.
5      Q. Back to, is Exhibit 7 the September 16, 17,
6  1996 minutes?
7      A. Yes.
8      Q. Back to Exhibit 7, second page of the exhibit
9  marked page 20. Towards the bottom again it says, "It
10 was noted that as a foreign corporation, the company was
11 ineligible to bid for and own such licenses since its
12 interest in any such bidding may exceed 24.9 percent. It
13 was the recommendation of the executive committee,
14 without Mr. Warta, that in view of the company's
15 ineligible status to acquire PCS licenses, it was to the
16 company's best interest to enter into agreements with
17 MagnaCom to purchase minutes of PCS capacity so that the
18 company can offer PCS as an enhanced service on its
19 networks." Do you see that?
20     A. Yes.
21     Q. Who first raised that issue of purchasing
22 minutes?
23     A. I think that was advanced by Steve Irwin, or it
24 may have actually come from the Swidler and Berlin firm
25 to Steve and then to us.