# EXHIBIT 1



## EMPLOYMENT AGREEMENT

AGREEMENT made as of this 1st day of March, 1994, by and between GST TELECOM INC., a Delaware corporation with its principal office at 1220 Main Street, Suite 245, Vancouver, Washington 98660 ("Corporation"), and JOHN WARTA, with an office at 1770 Broadway, Suite 307, Vancouver, Washington 98660 (the "Executive").

W I T N E S S E T H :

WHEREAS, Executive is a manager and the principal member of Pacwest Network L.L.C. ("Pacwest"); and

WHEREAS, Greenstar Telecommunications Inc. ("Greenstar") and Pacwest have caused the Corporation to be organized for the purpose of designing, developing, constructing and operating alternate access and other telecommunications networks within and without the United States of America, all as more fully set forth in that certain Shareholder Agreement of even date herewith by and among Greenstar, Pacwest, Executive, Clifford V. Sander and the Corporation (the "Shareholder Agreement"); and

WHEREAS, it was a material inducement to Greenstar to enter into the Shareholder Agreement that Executive agree to be employed and be employed as Chief Executive Officer of the Corporation; and

WHEREAS, the Corporation desires to employ and retain the unique experience, abilities and services of Executive as its Chief Executive Officer, and Executive desires to become the Chief Executive Officer of the Corporation, upon the terms and subject to the conditions of this Agreement;

24359.7    6/21/94

GST 314381

GST-WARTA0001033

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1. <u>Employment of Executive</u>. The Corporation hereby employs Executive as its Chief Executive Officer, to perform the duties and responsibilities incident to such office, subject at all times to the control and direction of the Board of Directors of the Corporation.

2. <u>Acceptance of Employment; Time and Attention</u>. Executive hereby accepts such employment and agrees that throughout the period of his employment hereunder, except as hereinafter provided, he will devote substantially all his time, attention, knowledge and skills, faithfully, diligently and to the best of his ability, in furtherance of the business of the Corporation, and will perform the duties assigned to him pursuant to Paragraph 1 hereof, subject, at all times, to the direction and control of the Board of Directors of the Corporation. As the Chief Executive Officer, Executive shall be the principal executive officer of the Corporation and shall in general manage and control all of the day-to-day operations of the Corporation and its subsidiaries. Executive shall also perform such specific duties and shall exercise such specific authority related to the management of the day-to-day operations of the Corporation consistent with his position as Chief Executive Officer as may be assigned to Executive from time to time by the Board of Directors of the Corporation. Executive shall at all times be subject to, observe and carry out such rules, regulations, policies, directions and restrictions as the Corporation shall from time to time establish. During the

period of his employment hereunder, Executive shall not, except as hereinafter provided, directly or indirectly, accept employment or compensation from, or perform services of any nature for, any business enterprise other than the Corporation and its subsidiaries. The Corporation acknowledges that Executive (i) is a party to that certain Consulting Agreement dated December 29, 1993 with Tomen Telecom International, Inc. ("Tomen"), pursuant to which he has agreed to provide consulting services, (ii) will also provide marketing services to Tomen, (iii) will render services to the Hi-Rim Projects (as such term is defined in the Shareholders Agreement), (iv) will continue to conduct business through Green Arbor Development, PacWest Telecom, Inc. and PacWest Network Inc. and (iv) proposes to engage in charitable activities. Neither the performance of such services, nor such engagement, shall constitute a breach of this Agreement, provided that they do not interfere with the performance by Executive of his duties hereunder, and provided, further, that the services referred to in clauses (i), (ii), (iii) and (iv) hereof do not require the devotion of more than five percent of Executive's working hours in any year. Apart from any travel required to perform Executive's employment duties, Executive shall not be required to be regularly based at any office of the Corporation located outside the metropolitan areas of Portland, Oregon or Vancouver, Washington, without Executive's prior written consent (which may be withheld in Executive's discretion).

       3.   <u>Term</u>. Except as otherwise provided herein, the term of Executive's employment hereunder shall commence as of the date

GST-WARTA0001035

hereof and shall continue to and including the 28th day of February, 1999.

    4. <u>Compensation</u>.  As compensation for his services hereunder, the Corporation shall pay to Executive (i) a base salary at the rate of $120,000 per annum, payable in equal installments no less frequently than semi-monthly and (ii) such incentive compensation and bonuses, if any, as the Board of Directors in its absolute discretion may determine to award Executive; provided that this Agreement shall in no event be construed to require the payment to Executive of incentive compensation or bonuses.  At least annually, the Board of Directors shall review Executive's base salary and shall determine whether any adjustment thereof is warranted.  If the Board of Directors determines to adjust Executive's base salary, such adjustment shall be based upon (i) the nature, magnitude and quality of the services performed by Executive for the Corporation, (ii) the condition (financial and other) and results of operations of the Corporation and (iii) the compensation paid for positions of comparable responsibility and authority within the telecommunications industry, provided that no such adjustment shall reduce such base salary below $120,000 per annum.  All compensation paid to Executive shall be subject to withholding and other employment taxes imposed by applicable law.

    5. <u>Additional Benefits</u>.  In addition to such base salary and any incentive compensation and bonuses awarded Executive, he (and his family) shall be entitled to participate, to the extent he is (and they are) eligible under the terms and conditions thereof, in any profit sharing, pension, retirement, hospitalization, insurance, disability, medical service, stock

option, bonus or other employee benefit plan generally available to the executive officers of the Corporation that may be in effect from time to time during the period of Executive's employment hereunder. The Corporation shall be under no obligation to institute or continue the existence of any such employee benefit plan.

6. <u>Reimbursement of Expenses</u>. The Corporation shall reimburse Executive in accordance with applicable policies of the Corporation for all expenses reasonably incurred by him in connection with the performance of his duties hereunder and the business of the Corporation, upon the submission to the Corporation of appropriate receipts or vouchers.

7. <u>Facilities and Personnel</u>. Executive shall be provided a private office, secretarial services and such other facilities, supplies, personnel and services as shall be required or reasonably requested for the performance of his duties hereunder.

8. <u>Motor Vehicle Allowance</u>. Executive shall be entitled to receive a non-accountable expense allowance of $400 per month to reimburse him for the cost and expense of operating and maintaining a motor vehicle in furtherance of the services rendered by him hereunder, which costs and expenses may include without limitation, vehicle loan and lease payments, insurance premiums, gasoline and repair expenditures and other similar charges.

9. <u>Vacation</u>. Executive shall be entitled to five weeks' paid vacation in respect of each 12-month period during the term of his employment hereunder, such vacation to be taken at times mutually agreeable to Executive and the Board of Directors.

GST-WARTA0001037

Vacation time shall not be cumulative from one 12-month period to the next, but Executive shall receive vacation pay at the then current salary rate for any vacation time not taken by him.

10. <u>D&O Insurance Coverage</u>. Pursuant to the Shareholder Agreement, Greenstar has undertaken to use its best efforts to obtain and maintain, at the Corporation's cost and expense, directors' and officers' liability insurance coverage for the directors and officers of the Corporation, including Executive.

11. <u>Restrictive Covenant</u>. In consideration of the Corporation's entering into this Agreement, Executive agrees that during the period of his employment hereunder and, in the event of termination of this Agreement (i) by Executive otherwise than for Employer Breach (as such term is defined herein) or (ii) by the Corporation for Cause (as such term is defined herein), for a further period ending on the earlier of two years after such termination or February 28, 2000, he will not (a) directly or indirectly own, manage, operate, join, control, participate in, invest in, or otherwise be connected with, in any manner, whether as an officer, director, employee, partner, investor or otherwise, any business entity that is engaged in the design, development, construction or operation of alternate access or other telecommunications networks within or without the United States of America (1) in all locations in which the Corporation is doing business at the time of such termination, and (2) in all locations in respect of which the Corporation is actively planning for and/or pursuing a business opportunity at the time of such termination, whether or not the Corporation theretofore has submitted any bids, provided that if such planning and/or pursuit relates to a business

24359.7    6/21/94    -6-

GST 314386

GST-WARTA0001038

opportunity that is not a competitive access project (a "CAP") such planning and/or pursuit must have involved material efforts on the Corporation's part, (b) for himself or on behalf of any other person, partnership, corporation or entity, call on any customer of the Corporation for the purpose of soliciting, diverting or taking away any customer from the Corporation (1) in all locations in which the Corporation is doing business at the time of such termination and (2) in all locations in respect of which the Corporation is actively planning for and/or pursuing a business opportunity at the time of such termination, whether or not the Corporation theretofore has submitted any bids, provided that if such planning and/or pursuit relates to a business opportunity that is not a CAP, such planning and/or pursuit must have involved material efforts on the Corporation's part, or (c) induce, influence or seek to induce or influence any person engaged as an employee, representative, agent, independent contractor or otherwise by the Corporation, to terminate his or her relationship with the Corporation. At the time of any termination of this Agreement to which the provisions of this Paragraph 11 are applicable, the Corporation will give written notice to Executive of the locations in which the Corporation is then doing business and the locations in respect of which the Corporation is then actively planning for and/or pursuing a business opportunity. If during the term of the restrictive covenant, any of such locations are no longer being actively reviewed and/or pursued by the Corporation, appropriate written notice thereof will be given to Executive. Nothing herein contained shall be deemed to prohibit Executive from (w) investing his funds in securities of an issuer

if the securities of such issuer are listed for trading on a national securities exchange or are traded in the over-the-counter market and Executive's holdings therein represent less than 2% of the total number of shares or principal amount of the securities of such issuer outstanding, (x) holding an equity interest in Hi-Rim's Cuba One project or in Hi-Rim's Honduras Cellular System, (y) holding up to 5,925 shares of Teletek and up to 1,700 shares of Intermedia or (z) owning securities, regardless of amount, of Greenstar.

Executive acknowledges that the provisions of this Paragraph 11 are reasonable and necessary for the protection of the Corporation, and that each provision, and the period or periods of time, geographic areas and types and scope of restrictions on the activities specified herein are, and are intended to be, divisible. In the event that any provision of this Paragraph 11, including any sentence, clause or part hereof, shall be deemed contrary to law or invalid or unenforceable in any respect by a court of competent jurisdiction, the remaining provisions shall not be affected, but shall, subject to the discretion of such court, remain in full force and effect and any invalid and unenforceable provisions shall be deemed, without further action on the part of the parties hereto, modified, amended and limited to the extent necessary to render the same valid and enforceable.

12. <u>Confidential Information</u>. Executive shall hold in a fiduciary capacity for the benefit of the Corporation all information, knowledge and data relating to or concerned with its operations, sales, business and affairs, and he shall not, at any time for a period of two years after termination of his employment

GST 314388

GST-WARTA0001040

hereunder, use, disclose or divulge any such information, knowledge or data to any person, firm or corporation (unless the Corporation no longer treats such information as confidential) other than to the Corporation or its designees and employees or except as may otherwise be required in connection with the business and affairs of the Corporation; provided, however, that Executive may use, disclose or divulge such information, knowledge or data that (i) is known to Executive at the commencement of his employment hereunder; (ii) is or becomes generally available to the public through no wrongful act on Executive's part; or (iii) becomes available to Executive from a person or entity other than the Corporation or its agents not bound by this or a similar agreement with the Corporation; and provided, further, that the provisions of this Paragraph 12 shall not apply to Executive's know how to the extent utilized by him in subsequent employment so long as such employment is not in breach of this Agreement.

   13.  *Equitable Relief*.  The parties hereto acknowledge that Executive's services are unique and that, in the event of a breach or a threatened breach by Executive of any of his obligations under this Agreement, the Corporation shall not have an adequate remedy at law.  Accordingly, in the event of any such breach or threatened breach by Executive, the Corporation shall be entitled to such equitable and injunctive relief as may be available to restrain Executive and any business, firm, partnership, individual, corporation or entity participating in such breach or threatened breach from the violation of the provisions hereof.  Nothing herein shall be construed as prohibiting the Corporation from pursuing any other remedies

GST 314389

GST-WARTA0001041

available at law or in equity for such breach or threatened breach, including the recovery of damages and the immediate termination of the employment of Executive hereunder.

14. <u>Survival of Provisions; Death</u>.  Neither the termination of this Agreement, nor of Executive's employment hereunder, shall terminate or affect in any manner any provision of this Agreement that is intended by its terms to survive such termination.

In the event of termination of Executive's employment hereunder by reason of his death, the Corporation shall pay a benefit (the "Benefit Payment") to such person or persons as Executive shall, at his option, from time to time designate by written instrument delivered to the Corporation, each subsequent designation to revoke all prior designations, or if no such designation is made, to Executive's estate (the "Payment Beneficiary"). The Benefit Payment shall be in an amount equal to one and one-half times Executive's then current base salary, and shall be payable to the Payment Beneficiary in equal quarterly installments over a period of one and one-half years, provided that if the Corporation then maintains a life insurance policy on the life of Executive under which it is the beneficiary, the amount of the death benefit payable thereunder, to a maximum amount equal to the Benefit Payment, less installments of the Benefit Payment theretofore paid, shall be paid to the Payment Beneficiary on the Benefit Payment installment payment date next succeeding the date on which the Corporation receives such death benefit proceeds, which shall satisfy in full the Corporation's obligations under this Paragraph 14.

15. <u>Disability</u>. In the event that during the term of his employment by the Corporation Executive shall become Disabled (as such term is hereinafter defined) he shall continue to receive the full amount of the base salary to which he was theretofore entitled for a period of six months after he shall be deemed to have become Disabled (the "First Disability Payment Period"). If the First Disability Payment Period shall end prior to February 28, 1999, Executive thereafter shall be entitled to receive salary at an annual rate equal to one-half of his then current base salary for a further period ending on the earlier of (i) one year thereafter, or (ii) February 28, 1999 (the "Second Disability Payment Period"). Upon the expiration of the Second Disability Payment Period, Executive shall not be entitled to receive any further payments on account of his base salary until he shall cease to be Disabled and shall have resumed his duties hereunder and provided that the Corporation shall not have theretofore terminated this Agreement as hereinafter provided. The Corporation may terminate this Agreement and Executive's employment hereunder at any time after Executive is Disabled, upon at least 10 days' prior written notice. For the purposes of this Agreement, Executive shall be deemed to have become Disabled when (x) by reason of physical or mental incapacity, Executive is not able to perform a substantial portion of his duties hereunder for a period of 135 consecutive days or for 135 days in any consecutive 225-day period or (y) when Executive's physician or a physician designated by the Corporation shall have determined that Executive shall not be able, by reason of physical or mental incapacity, to perform a substantial portion of his duties hereunder. In the event that

GST 314391

Executive shall dispute any determination of his Disability pursuant to clauses (x) or (y) above, the matter shall be resolved by the determination of three physicians qualified to practice medicine in the State of Washington, one to be selected by each of the Corporation and Executive and the third to be selected by the designated physicians. If Executive shall receive benefits under any disability policy maintained by the Corporation, the Corporation shall be entitled to deduct the amount equal to the benefits so received from base salary that it otherwise would have been required to pay to Executive as provided above.

The foregoing provisions regarding disability shall be adjusted during the term hereof to match the most favorable disability benefits provided to any other senior executive of the Corporation.

16. <u>Termination for Cause</u>. The Corporation may at any time upon written notice to Executive terminate Executive's employment for Cause. For purposes of this Agreement, the following shall constitute Cause: (i) the willful and repeated failure of Executive to perform any material duties hereunder or gross negligence of Executive in the performance of such duties, and if such failure or gross negligence is susceptible of cure by Executive, the failure to effect such cure within 20 days after written notice of such failure or gross negligence is given to Executive; (ii) unexplained, willful and regular absences of Executive from the Corporation unrelated to the Corporation's business or the activities of Executive permitted by Paragraph 2 hereof; (iii) excessive use of alcohol or illegal drugs, interfering with the performance of Executive's duties hereunder;

24359.7    6/21/94               -12-

GST 314392

GST-WARTA0001044

(iv) theft, embezzlement, fraud, misappropriation of funds, other acts of dishonesty or the violation of any law or ethical rule relating to Executive's employment; (v) the conviction of a felony or other crime involving moral turpitude by Executive; or (vi) the breach by Executive of any other material provision of this Agreement, and if such breach is susceptible of cure by Executive, the failure to effect such cure within 20 days after written notice of such breach is given to Executive. For purposes of this Agreement, an action shall be considered "willful" if it is done intentionally, purposely or knowingly, distinguished from an act done carelessly, thoughtlessly or inadvertently. In any such event, Executive shall be entitled to receive his base salary to and including the date of termination. Should Executive in good faith dispute his termination for Cause, he shall give prompt written notice thereof to the Corporation, in which event such dispute shall be submitted to and determined by arbitration in Seattle, Washington before an arbitrator appointed pursuant to the rules of the American Arbitration Association (the "Arbitrator"). Such arbitration shall be conducted in accordance with such rules as shall be promulgated by the Arbitrator, which shall include a discovery period not to exceed 30 days in length and which may include any or all of the rules then obtaining of the American Arbitration Association. Any award or decision of the Arbitration shall be conclusive in the absence of fraud and judgment thereon may be entered in any court having jurisdiction thereof. The costs of such arbitration shall be borne by the party against whom any award or decision is rendered. Executive shall not be entitled to

receive any compensation for periods subsequent to his dismissal pursuant to this Paragraph 16.

17. <u>Termination for Employer Breach</u>. Executive may upon written notice to the Corporation terminate this Agreement (a termination for "Employer Breach") in the event of the breach by the Corporation or Greenstar of (i) any material provision of this Agreement, and if such breach is susceptible of cure, the failure to effect such cure within 20 days after written notice of such breach is given to the Corporation; or (ii) any material provision of the Shareholder Agreement, the stock option agreement between the Corporation and Executive and the Tucson Stock Purchase Agreement between Greenstar and Pacwest, after the expiration of any applicable cure or grace periods.

18. <u>Liquidated Damages</u>. In the event that the Corporation terminates this Agreement otherwise than by reason of Cause, the Corporation shall pay to Executive, as liquidated damages, a sum equal to the total of salary payments (at the then current salary rate) to become due to Executive from the date of termination to and including February 28, 1999 (the "Termination Payment") in a single payment within 10 days after such termination. Upon such payment, Executive shall deliver to the Corporation his resignation as an officer and director of the Corporation. Should the Corporation terminate this Agreement for Cause, which termination results in an arbitration proceeding pursuant to Paragraph 16 hereof, the Corporation shall have the option in its sole discretion to deposit the Termination Payment with an independent entity, as escrow agent, for disposition pursuant to decision of the Arbitrator. Upon such deposit with

GST-WARTA0001046