incentive plans for Members, employees, and agents of the Company;

(i) the purchase of liability and other insurance to protect the Company's business and Property;

(j) the participation in partnership agreements, joint ventures, or other associations of any kind with any Person or Persons;

(k) the indemnification of any Person;

(l) the establishment of reserve funds of the Company to provide for future requirements for operations, contingencies or any other purpose that the Managing Member deems necessary or appropriate; and

(m) the making of such elections under the Code and Tax Regulations and other relevant tax laws as to the treatment of items of Company income, gain, loss, deduction and credit, and as to all other relevant matters as the Managing Member deems necessary or appropriate including, without limitation, elections referred to in Section 754 of the Code, the determination of which items of cash outlay shall be capitalized or treated as current expenses, and the selection of the method of accounting and bookkeeping procedures to be used by the Company.

7.4 **Actions of the Managing Member.** The Managing Member has the power to bind the Company as provided in this Article VII. No Person dealing with the Company shall have any obligation to inquire into the power or authority of the Managing Member acting on behalf of the Company.

7.5 **Compensation of Managing Member.** The Managing Member shall be reimbursed for all reasonable expenses incurred in managing the Company and shall be entitled to compensation, in an amount to be determined from time to time in accordance with Section 6.1 hereof. The Managing Member shall not be required to devote full time to the management of the Company business, but only so much time as shall be necessary or appropriate for the proper management of such business.

7.6 **Managing Member's Standard of Care.** The Managing Member shall discharge his duties to the Company and the other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances. In discharging its duties, the Managing Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports or statements by any Person as to matters the Managing Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company including, without limitation, information, opinions, reports or statements as to the

105127.5                              -11-

ATER 003946
CONFIDENTIAL

value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid. The Company shall indemnify and hold harmless the Managing Member against any loss, damage or expense (including attorneys' fees) incurred by the Managing Member as a result of any act performed or omitted on behalf of the Company or in furtherance of the Company's interests without, however, relieving the Managing Member of liability for failure to perform his duties in accordance with the standards set forth herein. The satisfaction of any indemnification and any holding harmless shall be from and limited to Company Property and the other Members shall not have any personal liability on account thereof.

7.7 **Resignation; Removal of Managing Member.** Subject to Section 11.6, the Managing Member shall not have a right to resign and may not be removed by the Members other than by a vote or consent of all of the Members. To the extent that the removal of the Managing Member would cause a transfer of control of the Licenses, no such action shall be effective without first complying with applicable FCC regulations regarding prior approval of a transfer of control by the FCC.

ARTICLE VIII
CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1 **Initial Contributions.** Each Member shall make the Initial Capital Contribution described for that Member on Schedule A and shall receive the Sharing Ratio described for that Member on Schedule B. No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in the Agreement. The Managing Member shall make additional contributions from time to time to the extent necessary to maintain the Managing Member's Capital Account balance at least equal to 1.01% of the total positive balances of the Capital Accounts of the other Members determined under this Article VIII.

8.2 **Additional Contributions.** In addition to the Initial Capital Contributions, the Members shall make such Additional Contributions as shall be determined by the Managing Member with the prior written consent or approval of Members holding at least 95% of the Membership Interests. Upon making such a determination, the Managing Member shall give written notice, setting forth the amount of the proposed Additional Contribution, the purpose for which it is needed, and the proposed contribution date, to all Members at least ten Business Days prior to such contribution date. Subject to the prior written consent or approval of Members holding at least 95% of the Membership Interests, the Members shall make such Additional Contributions in accordance with the terms set forth in such notice.

8.3 **Capital Account.** A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of Section 1.704-1(b)(2)(iv) of the Tax

-12-

ATER 003947
CONFIDENTIAL

Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

    (a) To each Member's Capital Account there shall be credited (i) the amount of money contributed by such Member to the Company (including liabilities of the Company assumed by such Member as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations); (ii) the fair market value of any Property contributed to the Company by such Member (net of liabilities secured by such contributed Property that the Company is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Profits and items of income and gain that are specially allocated.

    (b) To each Member's Capital Account there shall be debited (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the fair market value of Property distributed to such Member (net of liabilities secured by such distributed Property that such Member is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Losses or items of loss or deduction that are specifically allocated.

    (c) The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

    (d) In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Tax Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Tax Regulations, and shall be interpreted and applied in a manner consistent with such Tax Regulations. In the event the Managing Member shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed Property or that are assumed by the Company or any Member), are computed in order to comply with such Tax Regulations, the Managing Member may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article XIII hereof upon the dissolution of the Company. The Managing Member also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Tax Regulations and (ii) make any

115127 5             -13-

ATER 003948
**CONFIDENTIAL**

appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Tax Regulations.

8.4 **No Obligation to Restore Deficit Balance.** Except as required by law, no Member shall be required to restore any deficit balance in its Capital Account.

8.5 **Withdrawal; Successors.** A Member shall not be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as specifically provided in the Agreement. Any Member, including any additional or Substitute Member, who shall receive an interest in the Company or whose interest in the Company shall be increased by means of a transfer to it of all or part of the interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired except as otherwise required to account for any step up in basis resulting from a termination of the Company under Section 708 of the Code by reason of such interest transfer.

8.6 **Interest.** Except as provided in this Agreement, no Member shall be entitled to a preferred return or interest on such Member's Capital Contribution or on any Profits retained by the Company.

8.7 **Investment of Capital Contributions.** The Capital Contributions of the Members shall be invested by the Managing Member in (i) demand, money market or time deposits in U.S. commercial banks having shareholders' equity of at least $100,000,000 and maturing not in excess of one year from the date of acquisition, (ii) obligations backed by the full faith and credit of the United States of America maturing not in excess of one year from the date of acquisition and (iii) commercial paper maturing not in excess of one year from the date of acquisition and rated P-1 by Moody's Investor Service or A-1 by Standard & Poor's Corporation on the date of acquisition, until such time as such funds shall be used by the Managing Member for Company purposes. Such investments shall be made by the Managing Member for the benefit of the Company.

8.8 **No Personal Liability.** The Managing Member shall have no personal liability for the repayment of any Capital Contributions of any Member.

ARTICLE IX
ALLOCATIONS AND DISTRIBUTIONS

9.1 **Profits and Losses.** Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article IX.

-14-

ATER 003949
CONFIDENTIAL

9.2 **Profits**. After giving effect to the special allocations set forth in Section 9.4 hereof and 9.5 hereof, Profits for any Fiscal Year shall be allocated in the following order of priority:

(a) First, to the Members, if any, who received any allocation of Losses under Section 9.3(c), in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to such Members pursuant to Section 9.3(c) for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Members pursuant to this Section 9.2(a) for all prior Fiscal Years;

(b) Second, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(b) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to each Member pursuant to this Section 9.2(b) for all prior Fiscal Years;

(c) Third, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(a)(ii) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Member pursuant to this Section 9.2(c) for all prior Fiscal Years;

(d) Fourth, the balance of the Profits remaining, if any, among the Members, in accordance with their respective Sharing Ratios.

9.3 **Losses**. After giving effect to the special allocations set forth in Section 9.4 hereof and 9.5 hereof, Losses shall be allocated as set forth in Section 9.3(a) hereof, subject to the limitation in Section 9.3(b) below, and, if applicable, as provided in Section 9.3(c) hereof:

(a) Losses for any Fiscal Year shall be allocated in the following order of priority:

(i) First, to the Members in proportion to and to the extent of the excess, if any, of (A) the cumulative Profits allocated to each such Partner pursuant to Section 9.2(d) hereof for all prior Fiscal Years, over (B) the cumulative Losses allocated to such Partner pursuant to this Section 9.3(a)(i) for all prior Fiscal Years; and

(ii) the balance, if any, among the Members in accordance with their respective Sharing Ratios.

(b) The Losses allocated pursuant to Section 9.3(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some, but not all, of the Members would have Adjusted

195127.5                              -15-

ATER 003950
CONFIDENTIAL

Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.3(a) hereof, the limitation set forth in this Section 9.3(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to the Members under Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations.

(c) In the event that there are any remaining Losses in excess of the limitations set forth in Section 9.3(b), such remaining Losses shall be allocated among the Members in accordance with their respective Sharing Ratios.

9.4 **Special Allocations**. The following special allocations shall be made in the following order:

(a) <u>Minimum Gain Chargeback</u>. Except as otherwise provided in Section 1.704-2(f) of the Tax Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Tax Regulations Section 1.704-2(g) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Tax Regulations. This Section 9.4(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Tax Regulations and shall be interpreted consistently therewith.

(b) <u>Partner Minimum Gain Chargeback</u>. Except as otherwise provided in Section 1.704-2(i)(4) of the Tax Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Tax Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Tax Regulations. This Section 9.4(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Tax Regulations and shall be interpreted consistently therewith.

-16-

ATER 003951
**CONFIDENTIAL**

(c) <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Tax Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.4(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.4(c) were not in this Agreement.

(d) <u>Gross Income Allocation</u>. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amounts such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Tax Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.4(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article IX have been made as if Section 9.4(c) and this Section 9.4(d) were not in this Agreement.

(e) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in accordance with their Sharing Ratios.

(f) <u>Partner Nonrecourse Deductions</u>. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Tax Regulations.

(g) <u>Mandatory Allocations Under Section 704(c) of the Code</u>. Notwithstanding the foregoing provisions of this Section 9.4, in the event Section 704(c) of the Code or Section 704(c) of the Code principles applicable under Section 1.704-1(b)(2)(iv) of the Tax Regulations require allocations of Profits or Losses in a manner different than that set forth above, the provisions of Section 704(c) of the Code and the Tax Regulations thereunder shall control such allocations among the Members. Any item of Company income, gain, loss and deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company or which has been revalued for Capital Account purposes pursuant to Section 1.704-1(b)(2)(iv) of the Tax Regulations) and which is required or permitted to be allocated to such Member for income tax purposes under Section 704(c) of the Code so as to take into account the variation between the tax basis

135127 5                            -17-

ATER 003952
CONFIDENTIAL

of such Property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under Section 704(c) of the Code using the "traditional method" described in Section 1.704-3(b) of the Tax Regulations; provided, however, that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed Property shall be made in accordance with Section 1.704-3(c) of the Tax Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Members' book and tax Capital Accounts attributable to such Property; further provided, however, that any other method allowable under applicable Tax Regulations may be used for any contribution of Property as to which there is agreement between the contributing Member and the Managing Member.

9.5  **Curative Allocations.**  The allocations set forth in Section 9.4(a) through (g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Tax Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 9.5. Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Managing Member shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 9.2 hereof and Section 9.3 hereof. In exercising its discretion under this Section 9.5, the Managing Member (i) shall take into account future Regulatory Allocations under Section 9.4(a) hereof and Section 9.4(b) hereof that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 9.4(e) hereof and Section 9.4(f) hereof and (ii) may reallocate Profits and Losses for prior open years (or items of gross income and deduction of the Company for such years) among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years. This Section 9.5 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

9.6  **Other Allocation Rules.**

(a)  For purposes of determining the Profits, Losses, or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Managing

103127 5                                  -15-

ATER 003953
**CONFIDENTIAL**

Member using any permissible method under Section 706 of the Code and the Tax Regulations thereunder.

   (b)  The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

   (c)  Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Partnership within the meaning of Section 1.752-3(a)(3) of the Tax Regulations, the Members' interests in Company profits are in proportion to their Sharing Ratios.

   (d)  To the extent permitted by Section 1.704-2(h)(3) of the Tax Regulations, the Managing Member shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would not cause or increase an Adjusted Capital Account Deficit for any Partner.

   (e)  Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

   (f)  For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article IX, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members. This Section 9.6(f) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

   (g)  Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a Person related to such Member under Section 1.752-4(b) of the Tax Regulations) bearing the economic risk of loss (within the meaning of Section 1.752-2 of the Tax Regulations) with respect to such liability unless such arrangement has been approved by all Members. To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other Members shall be afforded the opportunity to guarantee such Member's *pro rata* share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

  9.7  **Minimum 1% Interest of Managing Member.**  Notwithstanding anything in this Article IX to the contrary other than the Regulatory Allocations, the Managing Member shall at all times have

115127 5                                -19-

ATER 003954
CONFIDENTIAL

a minimum 1% allocation of each material item of income, gain, loss, deduction and credit of the Company.

9.8  **Distribution of Net Cash Flow.**

(a) *Amounts and Timing.* Net Cash Flow shall be distributed to the Members in proportion to their respective shares of Profits allocated to each of them for such period (and prior periods) under Section 9.2 hereof, to the extent that such amounts have not been distributed previously under this Section 9.8. Such distributions, shall be made within 90 days of the end of each Fiscal Year to those Persons recognized on the books of the Company as Members or as Assignees on the last day of such Fiscal Year.

(b) *Amounts Withheld.* All amounts withheld pursuant to the Code and Tax Regulations or any provision of any state or local tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 9.8 for all purposes under this Agreement. The Managing Member is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, or local government any amounts required to be so withheld pursuant to the Code and Tax Regulations or any provisions of any other federal, state, or local law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

(c) *Draws for Payment of Estimated Taxes.* The Company may pay to each Member a quarterly draw, not to exceed the amount reasonably necessary to provide for payment by the Members of any federal, state and local estimated taxes with respect to Profits allocated to the Members pursuant to this Article IX, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed repaid by reducing the amount of each subsequent distribution to the Member receiving such draw pursuant to this Section 9.8(c) by the lesser of (a) the entire amount otherwise distributable to the Member receiving such draw and (b) the entire amount of any unrepaid draws pursuant to this Section 9.8(c). All draws hereunder shall be made to the Members pro rata based on their estimated respective shares of Profits allocated to each of them for such Fiscal Year under this Article IX. Any draw by any Member made pursuant to this Section 9.8(c) shall not result in any decrease in the Sharing Percentage of such Member.

ARTICLE X
TAXES

10.1 **Tax Matters Partner.** The Managing Member designated on Schedule A shall be the Tax Matters Partner of the Company pursuant to Section 6231(a)(7) of the Code. The Managing Member shall not resign as the Tax Matters Partner unless, on the effective date of such resignation, the Company has designated another Member as Tax Matters Partner and such Member has given its consent in writing to

-20-

ATER 003955
**CONFIDENTIAL**

its appointment as Tax Matters Partner. The Tax Matters Partner shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Partner in such capacity shall be borne by the Company. The Tax Matters Partner is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties. In addition, the Managing Member shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

10.2 **Mandatory Section 754 Election.** Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the distribution of any Company Property to one or more Members, the Managing Member, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's Property to be adjusted for federal income tax purposes in the manner prescribed in Section 734 or Section 743 of the Code, as the case may be. The cost of preparing such election, and any additional accounting expenses of the Company occasioned by such election, shall be borne by such transferees or distributees.

ARTICLE XI
TRANSFER OF MEMBERSHIP INTEREST

11.1 **Compliance with Securities Laws.** No Membership Interest has been registered under the Securities Act or under any applicable state securities laws. A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, without limitation, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) all or any part of such Member's Membership Interest, except upon compliance with the applicable federal and state securities laws. The Managing Member shall have no obligation to register any Member's Membership Interest under the Securities Act or under any applicable state securities laws, or to make any exemption therefrom available to any Member.

11.2 **Transfer of Economic Interest.** The right to receive allocations of Profits and Losses and to receive Distributions may not be transferred, in whole or in part, unless the following terms and conditions have been satisfied:

The transferor shall have:

(a) assumed all costs incurred by the Company in connection with the transfer;

(b) furnished the Company with a written opinion of counsel, satisfactory in form and substance to counsel for the Company, that such transfer complies with applicable federal

-21-

ATER 003956
**CONFIDENTIAL**

and state securities laws and the Agreement and that such transfer, for federal income tax purposes, will not cause the termination of the Company under Section 708(b) of the Code, cause the Company to be treated as an association taxable as a corporation for income tax purposes or otherwise adversely affect the Company or the Members; and

    (c) complied with such other conditions as the Managing Member may reasonably require from time to time.

Transfers will be recognized by the Company as effective only upon the close of business on the last day of the calendar month following satisfaction of the above conditions. Any transfer (i) in contravention of this Article XI or (ii) which if made would cause a termination of the Company for federal income tax purposes under Section 708(b) of the Code shall be void *ab initio* and without force and effect and shall not bind the Company or the other Members.

    11.3 **Transfer of Membership Interest and Admission of Substitute Member.** Subject to Section 6.1(f) hereof, except for the right to receive allocations of Profits and Losses and to receive Distributions, a Membership Interest of any Member may not be transferred, in whole or in part, and a transferee shall not have a right to become a Member unless:

    (a) The transferee shall have assumed the obligations, if any, of the transferor to the Company; and

    (b) The transferor and the transferee shall have complied with such other requirements as the non-transferring Members may reasonably impose, including the conditions that the transferee:

    (i) adopt and approve in writing all the terms and provisions of this Agreement then in effect;

    (ii) pay such fees as may be reasonable to pay the costs of the Company in effecting such substitution; and

    (iii) comply with applicable FCC regulations regarding prior approval by the FCC of any transfer of control.

    11.4 **Status of Transferee.** A transferee of a Membership Interest who is not a Substitute Member shall be entitled only to receive that share of Profits, Losses and Distributions, and the return of Capital Contribution, to which the transferor would otherwise be entitled with respect to the interest transferred, and shall not have the rights of a Member of the Company under the Act or this Agreement including, without limitation, the right to obtain any information on account of the Company's transactions, to inspect the Company's books or to vote with the Members on, or to grant or withhold consents or approvals of, any matter. The Company shall, however, if a transferee and transferor jointly

ATER 003957
**CONFIDENTIAL**

advise the Company in writing of a transfer of the Membership Interest, furnish the transferee with pertinent tax information at the end of each Fiscal Year.

11.5 **Dispositions not in Compliance with this Article Void.** Any attempted Disposition of a Membership Interest, or any part thereof, not in compliance with this Article shall be void *ab initio* and without force and effect and shall not bind the Company.

11.6 **Option Granted to Prospective New Member.** Notwithstanding anything in this Agreement to the contrary, the Members hereby agree to the following:

(a) Subject to Section 9.7, each Member hereby grants to the Prospective New Member an option to acquire up to 99% of the aggregate Membership Interests, which shall become effective at the time the Company and the Prospective New Member enter into an agreement for the construction and/or operation of the Company's facilities. Such option may be exercised from time to time, in whole or in part, upon 10 days' prior written notice.

(b) Such option shall be subject to compliance with all applicable FCC regulations relating to prior approval of any transfer of control of the Licenses, including those relating to foreign ownership or control of the Licenses. Accordingly, until such time as may be permitted by FCC regulations or administrative action, the option granted pursuant to Section 11.6(a) shall initially be limited to 24% of the Membership Interests.

(c) Such option shall expire immediately prior to the expiration of this Agreement in accordance with Section 2.4. The price to be paid by the Prospective New Member for the Membership Interests which may be acquired from time to time shall be a pro rata share of the Initial Contributions and any Additional Contributions made by the Members.

(d) In the event the Prospective New Member acquires at least 50% of the Membership Interests, it shall have the sole right to designate and remove the Managing Member and the Tax Matters Partner, and all references in this Agreement to any vote or consent of the Membership Interests shall be amended in the sole discretion of the Prospective New Member to any lower percentages which the Prospective New Member may select, but in no event can those percentages be re-set at less than 50.1%.

ARTICLE XII
DEATH, DISSOLUTION, BANKRUPTCY OR INCOMPETENCY OF A MEMBER

Upon the death, dissolution, adjudication of bankruptcy or adjudication of incompetency of a Member, such Member's successors, executors, administrators or legal representatives shall have all the rights of a Member (except as provided in the last sentence of this Article XII), including such power as such Member possessed to substitute a successor as a transferee of such Member's Membership Interest and to join with such transferee in making the application

105127 5                                    -23-

ATER 003958
CONFIDENTIAL

to substitute such transferee as a Member. However, such successors, executors, administrators or legal representatives will not have the right to become a Substitute Member in the place of their predecessor in interest unless each of the remaining Members shall so consent.

## ARTICLE XIII
## EVENT OF DEFAULT; DISSOLUTION AND WINDING UP

13.1 **Event of Default; Dissolution.** The Company shall (i) cause any and all Capital Contributions theretofore made to the Company by any Member to be immediately returned to such Member, together with any preferred return thereon up to and including the date of such Event of Default and (ii) thereafter be dissolved and its affairs wound up, upon the first to occur of any of the following events (each of which shall constitute an "Event of Default"):

(a) the revocation or termination of the Licenses by the FCC or the existence of any Proceeding or other circumstances which could result in the revocation or termination of such Licenses;

(b) the Company shall take any of the actions set forth in Section 6.1 hereof without the prior written consent or approval of the Members holding the percentage of Membership Interests specified therein;

(c) a breach of the covenant set forth in Section 6.2 hereof;

(d) the Managing Member shall become a Bankrupt Person;

(e) the expiration of the term of the Agreement, unless the Company is continued with the vote or consent of Members holding at least 95% of the Membership Interests;

(f) the unanimous written consent of all of the Members;

(g) at any time when there is but one Member.

If the Company shall fail to make any payment pursuant to clause (i) of this Section 13.1 within five Business Days, interest shall accrue thereon at the rate of 8% per annum.

13.2 **Effect of Dissolution.** Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of cancellation has been filed with the Office of the Secretary of State of the State of Delaware.

13.3 **Distribution of Assets on Dissolution.** Upon the winding up of the Company, the Managing Member (or, if there is no Managing Member then remaining, such other Person(s) designated by the

-24-

ATER 003959
CONFIDENTIAL

Members holding at least a majority of the Membership Interests,) shall take full account of the assets and liabilities of the Company, shall liquidate the assets (unless the Managing Member determines that a distribution of any Company Property in-kind would be more advantageous to the Members than the sale thereof, as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a) first, to the payment of the debts and liabilities of the Company to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

(b) second, subject to Section 6.1(c) hereof, to the setting up of any reserves which the Managing Member may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company. Such reserves may be paid over by the Managing Member to an escrow agent or trustee selected by the Managing Member to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Managing Member shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c) then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's taxable year in which the liquidation occurs. Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Managing Member.

To the extent that the liquidation of Company Property involves the conveyance of any License, no such action shall be taken without first complying with applicable FCC regulations regarding prior approval of a transfer of control by the FCC. If at the time of liquidation the Managing Member shall determine that an immediate sale of some or all Company Property would cause undue loss to the Members, the Managing Member may, in order to avoid such loss and with the prior written consent or approval of Members holding at least 80% of the Capital Account balances, defer liquidation.

105127 5                                -25-

ATER 003960
CONFIDENTIAL

13.4 **Winding Up and Filing Certificate of Cancellation.** Upon the commencement of the winding up of the Company, a certificate of cancellation shall be delivered by the Company to the Secretary of State of the State of Delaware for filing. The certificate of cancellation shall set forth the information required by the Act. The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Company Property has been distributed to the Members.

ARTICLE XIV
MISCELLANEOUS

14.1 **Notices.** Notices to the Managing Member shall be sent to the Principal Office of the Company. Notices to the other Members shall be sent to their addresses set forth on Schedule A. Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 14.1. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, given by prepaid telegram or mailed first class, postage prepaid, delivered by courier, or sent by facsimile, to such Members at such address.

14.2 **Regulations.** The Members hereby adopt the Regulations attached hereto as Appendix I, which contain various provisions relating to the conduct of meetings, the election of the Managing Member and various other matters.

14.3 **Headings.** All Article and section headings in the Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or section.

14.4 **Entire Agreement.** This Agreement, together with the schedules and appendices attached hereto, constitutes the entire agreement between the parties and supersedes any prior agreement or understanding between them respecting the subject matter of this Agreement.

14.5 **Binding Agreement.** The Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

14.6 **Saving Clause.** If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby. If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

105127.5

-26-

ATER 003961
**CONFIDENTIAL**

14.7 **Counterparts**. The Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart. Any counterpart of either the Agreement shall for all purposes be deemed a fully executed instrument.

14.8 **Governing Law**. The Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

14.9 **No Partnership Intended for Nontax Purposes**. The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership, either general or limited, under the Delaware Revised Uniform Limited Partnership Act. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another Person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

14.10 **No Rights of Creditors and Third Parties under Agreement**. The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

14.11 **General Interpretive Principles**. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b) accounting terms not otherwise defined herein have the meanings given to them in the United States in accordance with generally accepted accounting principles;

(c) references herein to "Sections," "paragraphs," and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

(d) a reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions;

-27-

ATER 003962
CONFIDENTIAL

(e) the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f) the term "include" or "including" shall mean without limitation by reason of enumeration.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands as of the Effective Date.

**PACWEST NETWORK, INC.**

By: _____
    Name: John Warta
    Title: President

                                                                            JOHN WARTA

**MAGNACOM WIRELESS, LLC**

By: _____
    Name: John Warta
    Title: Managing Member

ATER 003964
**CONFIDENTIAL**

SCHEDULE A

| Name and Address of Member | Initial Capital Contribution | Initial Membership Interest |
| --- | --- | --- |
| Pacwest Network, Inc.<br>1701 Broadway, Suite 348<br>Vancouver, Washington 9866 | $990 | 99.0% |
| John Warta (who shall serve as Tax Matters Partner)<br>1701 Broadway, Suite 348<br>Vancouver, Washington 98663 | $ 10 | 1.0% |

\* \* \* \* \* \*

Prospective New Member:

GST USA, Inc.
4317 N.E. Thurston Way
Vancouver, Washington  98662

105127.5                                -30-

ATER 003965
CONFIDENTIAL