cost and availability of PCS infrastructure and subscriber equipment and general economic conditions.

The Company will incur significant operating losses and generate negative cash flow from operating activities during the next several years while it seeks to develop and construct its PCS networks and build a customer base. These losses and negative cash flow could be substantial and increase during the initial years of the build-out and operation of its PCS networks. There can be no assurance that the Company can successfully launch its services, or that it will achieve or sustain profitability or positive cash flow from operating activities in the future. If the Company cannot achieve operating profitability or positive cash flow from operating activities, it may not be able to meet its debt service or working capital requirements and, consequently, the Shares may have little or no value.

**Substantial Debt Obligations to the U.S. Government**

The Company has or must execute notes to the U.S. Government documenting the Company's installment payment obligations and a security agreement creating a first priority security interest in favor of the FCC in the PCS licenses (and the proceeds of any sale thereof) in the event of a default. The aggregate debt obligation of the Company to the U.S. Government pursuant to the Government Financing will be approximately $119,561,674 million[, assuming the FCC approves the grant to the Company of the 13 F-Block licenses for which it was the winning bidder]. The Company will be required to make interest expense payments based on various interest rates ranging from 6% to 7%. In the case of the Company's C-Block licenses, it will be required to make quarterly payments of interest only for the first six years of the license and payments of interest and principal over the remaining four years of the term. In the case of the Company's F-Block licenses, it will be required to make quarterly payments of interest only for the first two years of the license and payments of interest and principal over the remaining eight years of the term. In the event that the Company is unable to meet its obligations under the Government Financing, or it (or any of its affiliates) is involved in certain insolvency or bankruptcy proceedings, or otherwise violates regulations applicable to holders of FCC licenses, the FCC could take a variety of actions, including requiring immediate repayment of amounts due under the Government Financing, repayment of certain bidding credits, revoking the Company's PCS licenses and fining the Company an amount equal to the difference between the price at which the Company acquired the licenses and the amount of the winning bids at their reauction, plus an additional penalty of 3% of the lesser of the subsequent winning bid and the Company's bid amount.

On March 31, 1997, the FCC suspended interest payments on installment payment obligations with respect to C- and F-Block PCS licenses while it determined whether to give any relief to license holders with respect to the installment payment terms. The FCC's principal concern is the reported financial problems encountered by certain C-Block PCS licensees. While the FCC has declined to provide any similar options for F-Block bidders, it has offered four options to C-Block bidders. Such options include provisions for bidders to: (i) resume installment payments on the full bid amount; (ii) disaggregate one-half of their spectrum of all the Rand McNally & Co.'s ("Rand McNally") Basic Trading Areas ("BTAs") within any or all Rand McNally Major Trading Areas ("MTAs") in exchange for forgiveness of 50% of their down payments on such licenses; (iii) relinquish all licenses awarded for reauction; or (iv) pre-pay in full for those licenses that the bidder can afford and return the remainder for reauction. The Company has not determined which option it will accept. The FCC has set January 15, 1998 as the date by which bidders must select one of the four options. Licensees electing disaggregation or prepayment of certain licenses may not participate in reauctions of relinquished spectrum.

There can be no assurance that the Company will be able to meet its obligations under the Government Financing or, in the event of a failure to meet

160721.5                                          -5-

such obligations, the FCC will not require immediate repayment of amounts due under the Government Financing or revoke the Company's PCS licenses. In either such event the Company may be unable to meet its obligations to other creditors.

**Ability to Service Debt; Substantial Leverage; Significant Capital Requirements; Restrictive Covenants**

The Company's leverage is substantial in relation to its equity. Following consummation of this Offering and the QUALCOMM Transactions, the Company's total indebtedness and initial stockholders' deficit will be $[ ] million and $[ ] million, respectively.

Based upon interest rates ranging from 6% to 7%, the Company will need (i) approximately $7.6 million per year to pay interest on the Government Financing in years one through six, and approximately $31.0 million per year to pay interest and principal on the Government Financing in years seven through ten, in the case of the Company's C-Block licenses and (ii) approximately $777,000 per year to pay interest on the Government Financing in years one and two, and $1.9 million per year to pay interest and principal on the Government Financing in years three through ten, in the case of the Company's F-Block licenses. The Company does not expect to have any revenue from operations [through December 31, 1999] and does not know when, if ever, it may have positive cash flow from operations. Unless the Company raises additional funds, it cannot meet its interest obligations on the Government Financing when payments, which are currently suspended, are resumed. The Company will have to raise funds shortly in order to make interest payments on the Government Financing and for working capital and general corporate purposes. There can be no assurance that additional financing will be available to the Company or, if available, that it can be obtained on terms acceptable to the Company.

In addition, the Company's development and build out of its PCS licenses will require substantial additional funds. Any borrowings from third parties including QUALCOMM are likely to contain various restrictions, including restrictions that significantly limit or prohibit, among other things, the ability of the Company to incur indebtedness, make prepayments of certain indebtedness, pay dividends, make investments, engage in transactions with stockholders and affiliates, create liens, sell assets and engage in mergers and consolidations. If the Company fails to comply with the restrictive covenants with respect to such borrowings, the Company's obligation to repay such obligations may be accelerated. In addition to the restrictive covenants, such borrowings may require the Company to maintain certain financial ratios. The failure of the Company to maintain such ratios would constitute events of default, notwithstanding the ability of the Company to meet its debt service obligations. An event of default would allow the lender to accelerate the maturity of such indebtedness.

The Company's ability to satisfy its debt service obligations once its PCS networks are operational will be dependent upon the Company's future performance, which is subject to a number of factors that are beyond the Company's control. There can be no assurance that the Company's PCS networks can be completed or that, once completed, the Company will generate sufficient cash flow from operating activities to meet its debt service and working capital requirements. Any failure or delay in meeting these debt service requirements, and in particular, the requirements of the Government Financing, could have a material adverse effect upon the Company's business, results of operations and financial condition.

The Company's ability to obtain any additional necessary financing or refinancing will depend on, among other things, its financial condition, any restrictions governing its indebtedness and other factors, including market conditions, that are beyond the control of the Company. Further, in the event the implementation of its PCS networks is delayed or the Company does not

160721.5                                       -6-

generate sufficient cash flow to meet its debt service or capital requirements, the Company will need to seek additional financing. There can be no assurance that any such financing or refinancing could be obtained on terms that are favorable to the Company, or at all. In the absence of such financing or refinancing, the Company could be forced to dispose of assets in order to make up for any shortfall in the payments due on its indebtedness under circumstances that might not be favorable to realizing the highest price for such assets. A substantial portion of the Company's assets consist of intangible assets, principally PCS licenses granted by the FCC, the value of which will depend upon a variety of factors. The Company's C- and F-Block licenses may only be transferred to other entities that meet the FCC requirements for C- and F-Block license holders during the first five years of the initial license term, which may significantly impact the ability of the Company to realize the value of such licenses. Further, transfers to entities not meeting such requirements in years six through ten of the initial license term will subject the Company to substantial unjust enrichment penalties. There can be no assurance that the Company's assets could be sold, or sold quickly enough, or for a sufficient amount, to enable the Company to meet its obligations. See "— License Requirements" and "— Foreign Ownership Limitations."

**Management of Growth; Need to Establish Infrastructure**

Implementation of the Company's plans will place substantial demands on the Company's executive resources. As of the date hereof, the Company has [six] employees, and the Company's directors and officers provide a limited amount of time to the affairs of the Company. If the Company is to successfully develop its PCS licenses, it will need to hire a significant number of employees, including a Chief Financial Officer. There can be no assurance that the Company will be able to manage effectively the development of its operations and facilities, to attract and retain qualified personnel or to achieve the rapid execution necessary to exploit fully the market opportunity for the Company's wireless communications services. Any inability to manage growth effectively could have a material adverse effect on the Company's business, results of operations and financial condition. See "— Dependence on Key Personnel" and "Management."

[**Uncertainty of Final Award of F-Block Licenses**

In connection with the F-Block auction, the Company failed to timely make certain payments then due to the FCC in respect of its F-Block licenses. The FCC has not yet advised the Company what action will be taken, if any, with regard to such payments. The FCC may, among other things, impose a monetary penalty upon the Company or revoke some or all of the F-Block licenses for which the Company was the winning bidder. Therefore, there can be no assurance that the Company will ultimately be awarded such F-Block licenses. Such failure and/or the imposition of a significant monetary penalty would have a material adverse effect on the Company's business, results of operations and financial condition.]

*[handwritten margin note: has this problem been fixed?]*

**PCS Network Construction and Implementation Risks**

The Company's construction and implementation of its PCS networks will involve a high degree of risk including, without limitation, network design, site selection and acquisition, equipment availability and microwave relocation. See "— Relocation of Incumbent Fixed Microwave Licenses." The Company intends to rely on third parties to undertake substantially all of the construction and implementation of its PCS networks. There can be no assurance that the Company can successfully develop and implement its PCS networks and any failure to do so would have a material adverse effect upon the Company. If the Company's construction plan is not properly implemented on a timely basis, the Company may not be able to provide services competitive with those provided by the cellular and other PCS providers in its markets. In such event, the Company's PCS subscriber growth would be limited and the Company's business, results of

160721.5                                -7-

operations and financial condition would be materially adversely affected. Successful development of a PCS operation will be dependent, among other things, (i) on proper network design, (ii) the ability to lease or acquire numerous sites for the location of base station transmitter equipment and (iii) the availability for purchase of infrastructure equipment, which may be in short supply.

In addition, each of the Company's C-Block licenses is subject to an FCC requirement that the Company construct PCS networks that provide adequate service to at least (i) one-third of the population of the applicable license within five years of the date on which such license was granted (the "License Grant Date") and (ii) two-thirds of the population within ten years of the License Grant Date. Similarly, each of the Company's F-Block licenses is subject to an FCC requirement that the Company (i) construct PCS networks that provide adequate service to at least one-quarter of the population of the applicable license within five years of the License Grant Date or (ii) make a showing of substantial service in its licensed area within five years of such License Grant Date. There can be no assurance that this required coverage will be achieved by the Company in accordance with FCC requirements, and failure to comply with these requirements in any market could cause revocation of the Company's C- and/or F-Block licenses, as applicable, or the imposition of fines or other sanctions by the FCC. See "— Government Regulation" and "Business — Legislation and Government Regulation." In addition, winners of A-Block and B-Block PCS licenses, which were granted in June 1995, and certain C-Block licenses which were granted between September 1996 and January 1997 have a significant head-start in constructing their networks. Likewise, the incumbent cellular licensees in each market have been operating their networks for five-to-10 years, and are upgrading their networks to use digital technology. Thus, the construction and implementation of the Company's PCS networks must be completed on a timely basis, and any delays could have a material adverse effect on the Company.

[margin note: FCC Service requirements]

**Dependence on Third Parties**

In connection with the Company's development of its PCS networks, the Company will rely significantly upon third parties such as QUALCOMM and GST to provide equipment and services, to distribute the Company's products and services and to provide certain functions such as customer billing. There can be no assurance that QUALCOMM, GST and such other third parties will provide acceptable equipment and services on a timely basis and any failure to do so will have a material adverse effect upon the Company's business, results of operations and financial condition. See "Business — QUALCOMM Transactions."

**Ability to Offer Roaming Services**

Based on public announcements of other PCS licensees, the Company believes that CDMA will be widely deployed in the U.S. Nevertheless, such PCS licensees are under no regulatory obligation to use any particular technology and there can be no assurance that PCS licensees planning to use CDMA technology will not elect to use Time Division Multiple Access ("TDMA"), Global System for Mobile Communications ("GSM") or some other technology in the future.

A risk associated with the Company's selection of CDMA technology is the ability of the Company to offer PCS roaming service to its subscribers when they are in other markets. To provide contiguous service outside of the Company's markets, the Company will have to enter into roaming agreements with other PCS and cellular carriers. With regard to roaming agreements with other PCS carriers, the Company will be limited to establishing such agreements with carriers that use compatible CDMA technology rather than other competitive technologies. As a result of the introduction of dual mode (i.e., CDMA and analog) phones, the Company believes that it will be able to enter into roaming agreements with existing cellular carriers, thereby allowing the Company's customers to utilize cellular networks when outside of the Company's markets. However, there can be no assurance that the Company will be able to establish

160721.5                                -8-

GST-WARTA0013254

such roaming agreements and the Company's failure to do so may have a material adverse effect on the Company's business, results of operation and financial condition.

### Need to Enter into Interconnection Agreements

In order to complete calls that will originate on the Company's PCS network and terminate on a wireline network, the Company will be required to interconnect its network to existing wireline telecommunications providers. Negotiating interconnection agreements and physically interconnecting networks is a lengthy process, often lasting six months or more. Subject to applicable FCC regulations, the Company intends to utilize GST's existing interconnection agreements with local exchange carriers ("LECs") in the Company's markets, thereby foregoing the need to negotiate separate agreements with each such LEC. However, there can be no assurance that the Company will be able to utilize such interconnection agreements or that the Company will be able to successfully negotiate interconnection agreements with such LECs in a timely manner and the failure to do so may have a material adverse effect on the Company's business, results of operations and financial condition.

### Absence of PCS Operating History in the United States

PCS systems have no significant operating history in the United States and there can be no assurance that these businesses will become profitable. In addition, the extent of potential demand for PCS in the Company's markets cannot be estimated with any degree of certainty. The inability of the Company to establish PCS services in a timely manner will have a material adverse effect on the Company's business, results of operations and financial conditions.

### Relocation of Incumbent Fixed Microwave Licensees

For a period of up to five years after the grant of a PCS license, PCS licensees may be required to share spectrum with existing fixed microwave licensees operating on the C- and F-Block spectrum. The Company may also need to pay to relocate existing microwave paths to alternate spectrum locations or transmission technologies. In an effort to balance competing interests of existing microwave users and newly authorized PCS licensees, the FCC has adopted (i) a transition plan to relocate such microwave incumbents and (ii) a cost sharing plan so that if the relocation of an incumbent benefits more than one PCS license, the benefitting PCS licensees are required to share the costs of the relocation. The transition and cost sharing plans expire on April 4, 2005, at which time remaining microwave incumbents in the PCS spectrum will be responsible for their costs to relocate to alternate spectrum locations. There can be no assurance that the Company will be able to reach timely agreements to relocate these incumbents on terms acceptable to the Company. Any delay in the relocation of such licensees may adversely affect the Company's ability to commence timely commercial operation of its PCS networks. Furthermore, depending on the terms of such agreements, if any, the Company's ability to operate its PCS networks profitably may be adversely affected. See "Business — Legislation and Government Regulation."

### Competition

PCS is a new technology and service and, as a result, the level and timing of development of a customer base for PCS applications, on which the Company's future revenues depend significantly, is uncertain. In the development of the PCS market, the Company and other PCS licensees will be competing with the more established cellular industry, as well as other wireless communications technologies, existing and future, with similar service offerings. Many of the Company's PCS and cellular telephone competitors, including joint ventures involving the nation's largest local and long distance telephone carriers and cable television companies, have substantially greater access to capital than the

160721.5                                -9-

GST-WARTA0013255

Company, substantially greater financial, technical, marketing, sales and distribution resources than those of the Company, and significantly more experience than the Company in providing wireless services. Several of the Company's competitors are expected to market other services, such as cable television service, landline telephone service and internet access with their wireless communications service offerings. In addition, several competitors are operating, or planning to operate, through joint ventures, franchise relationships and affiliation arrangements, wireless communications networks that cover most of the United States. Several of the larger telecommunications providers in the United States, including Sprint Corporation ("Sprint") and AT&T Corporation ("AT&T"), have recently announced plans to enter into PCS franchising relationships. Such franchising relationships will likely provide the franchisor with a means to quickly and efficiently expand into smaller markets, such as those served by the Company, and may have a material adverse effect upon the Company's business, results of operations and financial condition.

Following the development of its PCS licenses, the Company will compete directly with up to 5 other PCS facilities-based providers in each of its markets. Providers holding the A- and B-Block licenses auctioned by the FCC will have an advantage over the C-, D-, E- and F-Block licensees because the A- and B-Block licenses were granted on June 23, 1995, giving these companies a significant head start in building out and operating their PCS networks. C-Block licenses were awarded in September 1996 and January 1997 and will have a lesser time advantage over D-, E- and F-Block licensees. Other PCS licensees in the Company's markets include Aerial Communications, Inc., AT&T Wireless Services, Inc. ("AT&T Wireless"), GTE Mobilnet ("GTE"), PrimeCo Personal Communications, L.P. ("PrimeCo"), Sprint Spectrum L.P. ("Sprint PCS") and Western Wireless Corporation ("Western Wireless"). The FCC recently modified its rules to permit the partitioning and disaggregation of broadband PCS licenses into licenses to serve smaller service areas, which could allow other new entrants to enter wireless markets served by the Company. Licensees are also allowed to disaggregate spectrum, permitting additional competitors to provide PCS in the same area. Additionally, the Company will compete with existing cellular providers in its markets, most of which have infrastructure in place, have an established brand identity, have generated positive cash flow and have been operational for as many as ten years or more. The Company expects that many cellular operators will upgrade their networks to provide comparable digital services in competition with the Company. Cellular operators in the Company's markets include AirTouch Communications, Inc. ("AirTouch"), AT&T Wireless and GTE.

The success of the Company's PCS business will depend upon its ability to compete, especially with respect to pricing, service, reliability and availability of features, such as data and voice transmission, call waiting, call forwarding and short messaging capability. In addition to PCS and cellular operators, the Company may also face competition from other existing communications technologies, such as specialized mobile radio ("SMR") service, enhanced SMR ("ESMR") service, paging services (including two-way digital paging), and domestic and global mobile satellite service ("MSS"). In the future, cellular and PCS service will also compete more directly with traditional landline telephone service operators, energy utilities, local multipoint distribution service ("LMDS") providers, other wireless local loop providers and cable and wireless cable operators seeking to offer communications services by leveraging their existing infrastructure. The FCC in the spring of 1997 also auctioned 30 MHz of spectrum in the 2.3 GHz band for wireless communications services ("WCS"). The FCC has proposed that WCS providers be permitted to offer a broad range of fixed, mobile radio location and satellite broadcast services, some of which could be in competition with the Company's service offerings. The FCC has also announced rules for the auction of 1300 MHz of spectrum in the 27.5 — 29.5 GHz and 31.0 — 31.3 GHz bands for LMDS commencing in February 1998. The FCC contemplates that the LMDS spectrum would provide very high subscriber capacity for two-way video telecommunications. In 1998, the FCC also intends to

160721.5                                    -10-

GST-WARTA0013256

auction spectrum in the 39 GHz band for fixed and mobile local services. The Company may also face competition from new technologies.

**10 MHz Licenses**

Cellular telephone licenses are for 25 MHz of spectrum each and the PCS licenses in the A-, B- and C-Blocks are for 30 MHz of spectrum each. The D-, E- and F-Block licenses, which have only 10 MHz of spectrum, therefore have less capacity with which to provide wireless communications services. This may eventually limit growth opportunities as demand increases in the future for mobile PCS services. In addition, the cost to build out a digital mobile PCS system to an equivalent standard may be greater with a 10 MHz license than with either a 25 MHz cellular or 30 MHz PCS license. Potential lenders may also require that 10 MHz licensees have arrangements for additional spectrum. [Assuming the Company receives FCC approval, it will hold 13 F-Block licenses.] As a result, the Company may either initially, or at a later time, have to joint venture or make other arrangements with holders of additional spectrum in order to provide the amount or breadth of service to be or remain competitive in its F-Block markets. The ability of the Company to enter into certain arrangements is limited by FCC regulations, and there can be no assurance that the Company will be able to enter into such arrangements on terms favorable to it or at all.

**Government Regulation**

The spectrum licensing, construction, operation, sale and interconnection arrangements of wireless communications networks are regulated to varying degrees by the FCC, Congress, the courts and other governmental bodies. There can be no assurance that any of these governmental bodies having jurisdiction over the Company will not adopt or change regulations or take other actions that would adversely affect the Company's business, financial condition or results of operations. Although the FCC has issued rules regarding the C- and F-Block auctions and numerous other matters, not all of them have been subject to FCC or judicial interpretation. Accordingly, for certain matters (such as the structure of its Board of Directors and management), the Company is relying on non-binding FCC staff interpretation of the rules. The FCC is not bound by such informal interpretation of its rules and there can be no assurance that the FCC or the courts will agree with the staff's interpretation. Many of these rules also require ongoing compliance that the Company may not be able to satisfy despite diligent efforts. A failure to comply with FCC rules could subject the Company to serious penalties and have a material adverse effect upon the Company's business, results of operations and financial condition. In addition, although the Company's PCS licenses are renewable after the expiration of their 10-year terms and the Company is entitled to an FCC "renewal expectancy" for the licenses it holds if it provides substantial service during its past license terms and has substantially complied with the FCC's rules and policies and the Communications Act of 1934, as amended (the "Communications Act"), there can be no assurance that the Company's licenses will be renewed.

The Telecommunications Act of 1996 (the "1996 Act") mandates significant changes in existing regulation of the telecommunications industry that are intended by Congress to promote competitive development of new service offerings, to expand public availability of telecommunications services and to streamline regulation of the industry. Included in these mandates are requirements that LECs must (i) permit other competitive carriers, which may include PCS licensees, to interconnect to their networks; (ii) establish reciprocal compensation agreements with competitive carriers to terminate traffic on each other's networks and (iii) offer resale of their telecommunications services. In addition, incumbent LECs are required to offer interconnection and access to unbundled network elements at cost-based rates (plus a reasonable profit), as well as significant resale discounts. The implementation of these mandates by the FCC and state authorities potentially involves numerous changes in

established rules and policies that could adversely affect the Company's business, results of operations and financial condition.

The FCC has proceedings in process that could open up other frequency bands for wireless telecommunications and PCS-like services. There can be no assurance that these proceedings will not adversely affect the Company and the Company's ability to offer a full range of PCS services. See "— Licensing Requirements," "— Foreign Ownership Limitations," "— Control by Certain Stockholders" and "Business — Legislation and Government Regulation."

License Requirements

When the FCC allocated spectrum to public auction for PCS, it designated the C- and F-Blocks as the "Entrepreneurs' Blocks." FCC rules require C- and F-Block applicants and licensees (collectively, "Entrepreneurs") to meet various qualifications.

The FCC has determined that Entrepreneurs that qualify as a "Small Business" or "Very Small Business" and win PCS licenses are eligible to receive a loan from the U.S. Government for 90% and 80% of the dollar amount of their winning bids in the C- and F-Block Auctions, respectively (each an "Entrepreneurs' Blocks Loan"). The Government Financing provided to the Company are Entrepreneurs' Blocks Loans. See "Description of Certain Indebtedness." In order to ensure continued compliance with FCC rules, the FCC has announced its intention to conduct random audits during the initial 10-year PCS license terms. There can be no assurance that the Company will continue to satisfy any of the Entrepreneurs' Blocks license requirements, and the failure to do so would have a material adverse effect on the Company.

*Entrepreneurs Requirements.* In order to hold an Entrepreneurs' Blocks license, an entity must have (i) less than $125 million in gross revenues (the "Entrepreneurs Revenues Limit") for the two years preceding the auction and (ii) less than $500 million in total assets (excluding the value of C-Block licenses) (the "Entrepreneurs Asset Limit" and, together with the Entrepreneurs Revenues Limit, the "Entrepreneurs Requirements"). To qualify for the Entrepreneurs' Blocks Auctions, an entity had to have met the Entrepreneurs Revenues Limit for each of the two years prior to the applicable auction and the Entrepreneurs Asset Limit at the time it filed its application to qualify for the Entrepreneurs' Blocks Auctions on FCC Form 175 (the "Short Form"). For at least five years after obtaining an Entrepreneurs' Blocks license, a licensee must continue to meet the Entrepreneurs Requirements, which are modified for such five-year period to exclude certain assets and revenues from being counted toward the Entrepreneurs Asset Limit and the Entrepreneurs Revenues Limit, respectively. Additional amounts are excluded if the licensee maintains an organizational structure that satisfies the Control Group Requirements described below. In calculating a licensee's gross revenues for purposes of the Entrepreneurs Requirements, the FCC includes the gross revenues of the licensee's affiliates, those persons or entities that hold interests in the licensee, and the affiliates of such persons or entities.

By claiming status as an Entrepreneur, the Company qualified for the Entrepreneurs' Blocks Auctions. If the FCC were to determine that the Company did not satisfy the Entrepreneurs Requirements at the time it participated in the Entrepreneurs' Blocks Auctions or that the Company fails to meet the ongoing Entrepreneurs Requirements, the FCC could revoke the Company's Entrepreneurs' Blocks licenses, fine the Company or take other enforcement actions, including imposing the Unjust Enrichment Penalties (as hereinafter defined). See "Business — Legislation and Government Regulation." Although the Company believes it has met the Entrepreneurs Requirements, there can be no assurance that it will continue to meet such requirements or that, if it fails to continue to meet such requirements, the FCC will not take action against the Company, which could include revocation of its PCS licenses.

160721.5

-12-

*Small Business and Very Small Business Requirements*. An entity that meets the Entrepreneurs Requirements may also apply to receive certain preferential financing terms if it meets certain requirements to qualify as a Small Business or a Very Small Business (the "Small Business Requirements" or "Very Small Business Requirements"). The preferential financing terms for Small Businesses and Very Small Businesses include a 25% bidding credit (the "Bidding Credit") and the ability to make quarterly interest-only payments on its Entrepreneurs' Blocks Loans for the first six years and first two years of the license term in the case of C- and F-Block licenses, respectively. To meet the Very Small Business Requirements, a licensee must have had annual average gross revenues of not more than $15 million for the three calendar years preceding the date it filed its Short Form. In calculating a licensee's gross revenues for purposes of the Very Small Business Requirements, the FCC includes the gross revenues of the licensee's affiliates, those persons or entities that hold interests in the licensee, and the affiliates of such persons or entities.

By claiming status as a Small Business and Very Small Business in the case of the C- and F-Block auctions, respectively, the Company qualified for the Bidding Credit and the most favorable installment payment terms. If the FCC were to determine that the Company does not qualify as a Small Business or Very Small Business, the Company could, at a minimum, be forced to give up any benefits for which it was not eligible. Further, the FCC could revoke the Company's Entrepreneurs' Blocks licenses, fine the Company or take other enforcement actions, including imposing the Unjust Enrichment Penalties. Although the Company has structured itself to meet the Small Business and Very Small Business Requirements, there can be no assurance that it will remain in compliance with these requirements or that, if it fails to continue to meet such requirements, the FCC will not take action against the Company, which could include revocation of its PCS licenses.

*Control Group Requirements*. If an Entrepreneurs' Blocks licensee maintains an organizational structure in which at least 25% of its total equity on a fully diluted basis is held by a control group (the "Control Group") that meets certain requirements (the "Control Group Requirements"), the FCC excludes certain assets and revenues from such licensee's total revenues and assets, thereby making it easier for the licensee to meet the Entrepreneurs Requirements and the Small Business and Very Small Business Requirements. The Control Group Requirements mandate that the Control Group, among other things, have both actual and legal control of the licensee. Further, the FCC permits licensees to qualify under the Control Group Requirements pursuant to an alternative structural option (the "Qualifying Investor Option"), in which (i) an established group of investors meeting certain financial qualifications (the "Qualifying Investors") that own at least 15% of the total equity interest on a fully diluted basis and 50.1% of the voting power in the Entrepreneurs' Blocks licensee and (ii) additional members ("Additional Control Group Members") that hold at least 10%, on a fully diluted basis, of the total equity interest in the Entrepreneurs' Blocks licensee. Additional Control Group Members must be either (a) the same Qualifying Investors of the Control Group, (b) members of the licensee's management or (c) non-controlling institutional investors, including venture capital firms. To take advantage of the FCC's Qualifying Investor Option, an Entrepreneurs' Blocks licensee must have met the Qualifying Investor Option requirements at the time it filed its Short Form and must continue to meet the Qualifying Investor Option requirements for five years following the License Grant Date. Commencing the fourth year of the license term, the FCC rules allow the licensee to reduce the minimum required equity interest held by the Control Group's Qualifying Investors from 15% to 10%. At that time, the remaining 15% of the Control Group's former equity may be held by non-qualifying investors in compliance with the FCC's 25% non-attributable equity limitations.

In order to meet the Control Group Requirements, the Company's Certificate of Incorporation provides that the Class A Common Stock, as a class, must constitute 50.1% of the voting power of the Company. There can be no assurance

160721.5                                           -13-

that the Company will remain in compliance with the Control Group Requirements or, if it fails to continue to meet such requirements, that the FCC will not take action against the Company, that could include revocation of its Entrepreneurs' Blocks licenses. Although the Company has taken these and other steps to meet the Control Group Requirements, there can be no assurance that the Company has or will continue to meet the Control Group Requirements, and the failure to meet such requirements would have a material adverse effect on the Company.

*Asset and Revenue Calculation*. In determining whether an entity qualifies as an Entrepreneur and/or as a Small Business or Very Small Business, the FCC counts the gross revenues and assets of the entity's "financial affiliates" toward the entity's total gross revenues and total assets. Financial affiliation can arise from common investments, familial or spousal relationships, contractual relationships, voting trusts, joint venture agreements, stock ownership, stock options, convertible debentures and agreements to merge. Affiliates of non-controlling investors with ownership interests that do not exceed the applicable FCC non-attributable investor ownership thresholds are not attributed to Entrepreneurs' Blocks licensees for purposes of determining whether such licensees financially qualify for the applicable Entrepreneurs' Blocks Auction preferences. The Entrepreneurs Requirements and the Small Business and Very Small Business Requirements provide that, to qualify as a non-attributable investor, an entity may not own more than 25% of the Company's total equity on a fully diluted basis. Although the Company will use its best efforts to comply with the FCC's Entrepreneur Requirements, there can be no assurance that the Company will not exceed these passive investor limits or otherwise violate the Entrepreneur Requirements and/or the Small Business or Very Small Business Requirements.

In addition, if an entity makes bona fide loans to a Entrepreneurs' Blocks licensee, the assets and revenues of the creditor would not be attributed to the licensee unless the creditor is otherwise deemed an affiliate of the licensee, or the loan is treated by the FCC as an equity investment and such treatment would cause the creditor/investor to exceed the applicable ownership interest thresholds (for purposes of both the financial affiliation and foreign ownership rules). Although the FCC permits a creditor/investor to use standard terms to protect its investment in Entrepreneurs' Blocks licensees, such as covenants, rights of first refusal and super-majority voting rights on specified extraordinary issues, the FCC has stated that it will be guided, but not bound, by criteria used by the Internal Revenue Service to determine whether a debt investment is bona fide debt. The FCC's application of its financial affiliation rules is largely untested and there can be no assurance that the FCC or the courts will not treat certain of the company's lenders or investors as financial affiliates of the Company.

*Transfer Restrictions*. In addition, the FCC prohibits Entrepreneurs' Blocks licensees from assigning or transferring control of any of their Entrepreneurs' Blocks licenses for a period of at least five years from the License Grant Date to any entity that fails to satisfy the Entrepreneurs Requirements during such period. After the fifth year, all transfers and assignments remain subject to the Unjust Enrichment Penalties. The effect of this prohibition will likely deter or delay unsolicited changes in control of the Company. See "Business — Legislation and Government Regulation" and "Description of Capital Stock — Antitakeover Effects of Provisions of the Certificate of Incorporation, Bylaws, Delaware Law and Control Group Requirements."

The Company (i) believes that it has structured itself to satisfy the Entrepreneurs Requirements, (ii) intends to diligently pursue and maintain its qualification as a Small Business and Very Small Business and (iii) has structured the Class A Common Stock and Class B Common Stock in a manner intended to ensure compliance with the applicable FCC Rules. The Company has relied on representations of its investors to determine its compliance with the FCC's rules applicable to Entrepreneurs' Blocks licensees. There can be no assurance,

160721.5            -14-

[handwritten margin notes: "financial affiliates", "were these restrictions explained or disclosed to GST Board in advance of purch. ↓ prepayments?"]

however, that the Company's investors or the Company itself will continue to satisfy these requirements during the term of any Entrepreneurs' Blocks license granted to the Company or that the Company will be able to successfully implement divestiture or other mechanisms included in the Company's Certificate of Incorporation that are designed to ensure compliance with FCC rules. Any non-compliance with FCC rules could subject the Company to serious penalties, including revocation of its Entrepreneurs' Blocks licenses. See "Business — Legislation and Government Regulation" and "Description of Capital Stock — Antitakeover Effects of Provisions of the Certificate of Incorporation, Bylaws, Delaware Law and Control Group Requirements."

### Foreign Ownership Limitations

The FCC must determine that it is in the public interest for more than 25% of the capital contribution of the parent of a PCS licensee to be owned, directly or indirectly, or voted by non-U.S. citizens or their representatives, by a foreign government or its representatives or by a foreign corporation (and such licensees are so held). The restrictions on foreign ownership could also adversely affect the ability of the Company to attract additional equity financing from entities that are, or are owned by, non-U.S. entities. The FCC Form 600 (the "Long Form") filed by the Company with the FCC after the completion of the Entrepreneurs' Blocks Auctions indicates that the Company's foreign ownership does not exceed 25%. However, if the foreign ownership of the Company were to exceed 25% in the future, the FCC could revoke the Company's PCS licenses. Further, the Company's Certificate of Incorporation enables the Company to <u>redeem shares from holders of the Common Stock whose acquisition of shares results in a violation of such limitation.</u> The restrictions on foreign ownership could adversely affect the Company's ability to attract additional equity financing from entities that are, or are owned by, non-U.S. entities. See "Business — Legislation and Government Regulation" and "Description of Capital Stock — Antitakeover Effects of Provisions of the Certificate of Incorporation, Bylaws, Delaware Law and Control Group Requirements."

The recent World Trade Organization ("WTO") agreement on basic telecommunications services could eliminate or loosen foreign ownership limitations but could also increase the Company's competition. Under this agreement, the United States and other members of the WTO committed themselves to opening their telecommunications markets to competition and foreign ownership and to adopting regulatory measures to protect competitors against anticompetitive behavior by dominant telephone companies, effective as early as January 1, 1998. Under the WTO agreement, the United States agreed to eliminate the foreign ownership limits if the alien investment is domiciled in another WTO country. Pursuant to the WTO Agreement, the FCC will permit foreign entities to hold up to a <u>100% indirect ownership</u> interest in common carrier radio licensees, subject to prior FCC approval. The 20% limitation on direct foreign ownership interests in such licensees remains unaffected.

[handwritten margin note: redemption rights in articles to cure violation of restriction]
[handwritten margin note: WTO]

### Dependence on Dividends From Subsidiaries

In order to meet its obligations, including its debt service obligations, as a holding company, the Company will be dependent upon the cash flow of its subsidiaries and the payment of funds by these subsidiaries to the Company in the form of dividends, repayment of loans or otherwise. The Company's vendor financing agreements including the proposed Credit Facilities will contain restrictions on the ability of the Company's subsidiaries to pay dividends or repay loans to the Company. There can be no assurances that funds available from the Company's subsidiaries together with funds provided from this Offering and other financings by the Company, will be sufficient to meet the Company's operating or debt service needs.

160721.5                    -15-

GST-WARTA00013261

05/15/98(FRI) 13:51 [TX/RX NO 8153]