### Dependence on Key Directors and Officers

The Company presently has [six] employees. Accordingly, the Company's future performance depends in substantial part upon the continued contributions of its directors and officers. The loss of the services of these directors and/or officers, who have no obligation to continue as such, could have a material adverse effect upon the Company's business, results of operations and financial condition. The Company believes there is and will continue to be intense competition for personnel with experience in the wireless industry as the emerging PCS market develops. There can be no assurance that the Company can attract, assimilate or retain other highly qualified personnel in the future. See "Management."

### Health Risks

Allegations have been raised that the use of hand-held cellular/PCS telephones may pose health risks to humans due to radio frequency ("RF") emissions from the handsets. Studies performed by wireless telephone equipment manufacturers dispute these allegations, and a major industry trade association and certain governmental agencies have stated publicly that the use of such phones poses no undue health risk. Regardless of the truth of these allegations, they could have an adverse effect on the Company. In addition, digital wireless telephones have been shown to cause interference to some electronic devices, such as hearing aids and pacemakers.

Concerns over RF emissions also may have the effect of discouraging the use of wireless communication devices, such as the PCS phones to be used with the Company's networks. The FCC has adopted more restrictive standards on RF emissions from devices such as hand-held PCS telephones. Although CDMA handsets operate at lower power than other wireless handsets and therefore comply with the new standards, the same concerns about RF emissions could remain present with CDMA handsets. These concerns could have an adverse effect on the Company's financial condition and the results of its operations.

### Antitrust Investigation

The United States Department of Justice has initiated an investigation to determine whether there has been bid rigging and market allocation for licenses auctions by the FCC for PCS. The Company, together with various other bidders in the PCS auctions, has received a civil investigative demand ("CID") requesting documents and information relating to bidding, and in May 1997, the Company complied with the CID. The Company has not heard from the Justice Department since that date and does not know what further action, if any, the Justice Department may take.

*CID?*

### Potential Sales Limitations; Possible Adverse Effect on Future Market Prices

It is not presently intended that Class B Common Stock will be listed or registered on any national securities exchange or on the NASDAQ market. Accordingly, there is no assurance that a trading market will develop for Class B Common Stock, and the ability to buy or sell shares of Class B Common Stock may be limited. Sales of substantial amounts of Class B Common Stock in the trading market, if developed, could materially adversely affect the market price of Class B Common Stock. Such sales also might make it more difficult for the Company to sell equity or equity-related securities in the future at a time and price the Company deems appropriate.

### Closing on Minimum Number of Shares.

The Offering is structured on a "minimum $2.0 million, maximum $5.0 million" basis, as a result of which a closing of subscriptions will occur at such time as at least $2.0 million of subscription proceeds are received by the

160721.5          -16-

08/19/98 FRI 16:29 FAX 604 643 7900   MCARTHY TETRAULT   5-15-98 1:48pm p. 24 of 55   ☒024

Company. There is no assurance that the entire $5.0 million of Shares offered will be sold or even that subsequent to the initial closing of subscriptions, additional subscriptions for Shares will be received. The Company expects that the net proceeds of this Offering, if the minimum number of Shares is sold, will enable the Company to fund its operating expenses until [ ]. Investors whose subscriptions are accepted in the initial or other early stage closings will bear this additional risk. Such investors may lose the entire amount of their investment should the proceeds of this Offering be insufficient to fund the Company's operations. Further, if the Company does not obtain additional subsequent financing, the Company will not have the funds available to maintain the Company's present level of operations, in which event the Shares will likely become worthless.

Future Offerings.

It is likely that the Company will offer additional shares of Common Stock and other securities in the future, from time to time, at any purchase price determined by the Board of Directors. There can be no assurance given that the Company will not offer Shares for sale, even in the near future, at a purchase price less than the Shares being offered hereby.

Control by Certain Stockholders.

The FCC requires Entrepreneurs' Blocks licensees utilizing the equity structure selected by the Company to have members of their Control Groups hold no less than 25% of the Company's total equity and 50.1% of its total voting power, and have both de facto and de jure control of the Company. After consummation of the Offering, the Company's Control Group will satisfy such FCC requirements. As a result of its equity ownership and the corporate governance provisions regarding voting set forth in its Certificate of Incorporation, the holders of the Class A Common Stock will have the right to elect a majority of the Board of Directors and will have majority voting control of the Company, with the exception of certain extraordinary corporate actions which require approval of the holders of the Class B Common Stock voting together as a class. Although the Company believes its structure and governance fully comply with FCC requirements, there can be no assurance that the Company has or will continue to satisfy such requirements, and the failure to do so would have a material adverse effect on the Company. See "Description of Capital Stock — Antitakeover Effects of Provisions of the Certificate of Incorporation, Bylaws, Delaware Law and Control Group Requirements."

[Antitakeover Effect of Provisions of the Certificate of Incorporation, Bylaws, Delaware Law and Control Group Requirements.]

The Bylaws of the Company provide that the Company's stockholders may call a special meeting of stockholders only upon a request of stockholders owning at least a majority of the Company's capital stock. These provisions could discourage potential acquisition proposals and could delay or prevent a change in control of the Company. In addition, the Certificate of Incorporation provides that any stockholder action may only be taken at a duly called meeting of stockholders and that special meetings of stockholders may be called only by the Board of Directors. These provisions are intended to enhance the likelihood of continuity and stability in the composition of the Board of Directors and in the policies formulated by the Board of Directors and to discourage certain types of transactions that may involve an actual or threatened change of control of the Company. These provisions are designed to reduce the vulnerability of the Company to an unsolicited acquisition proposal. These provisions are also intended to discourage certain tactics that may be used in proxy fights. However, such provisions could have the effect of discouraging others from making tender offers for the Company's shares and, as a consequence, they also may inhibit fluctuations in the market price of the Company's shares that could

160721.5                           -17-

GST-WARTA0013263

05/15/98(FRI) 13:51   [TX/RX NO 8153]

result from actual or rumored takeover attempts. Such provisions also may have the effect of preventing changes in the management of the Company.

The Company is subject to Section 203 of the Delaware General Corporation Law ("Section 203"), which, subject to certain exceptions, prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years following the date that such stockholder became an interested stockholder, unless: (i) prior to such date, the Board of Directors of the corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder; (ii) upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned (a) by persons who are directors and also officers and (b) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer, or (iii) on or subsequent to such date, the business combination is approved by the Board of Directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66⅔% of the outstanding voting stock that is owned by the interested stockholder.

Section 203 defines business combination to include: (i) any merger or consolidation involving the corporation and the interested stockholder; (ii) any sale, transfer, pledge or disposition of 10% or more of the assets of the corporation involving the interested stockholder, (iii) subject to certain exceptions, any transaction that results in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder; (iv) any transaction involving the corporation that has the effect of increasing the proportionate share of the stock of any class or series of the corporation beneficially owned by the interested stockholder; or (v) the receipt by the interested stockholder of the benefit of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation. In general, Section 203 defines an interested stockholder as an entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation and any entity or person affiliated with or controlling or controlled by such entity or person.

In order to meet the Control Group Requirements, the Company's Certificate of Incorporation provides that the Company's Class A Common Stock, as a class, must constitute 50.1% of the voting power of the Company. The structure that the Company has adopted to ensure compliance with the Control Group Requirements will likely deter and delay unsolicited changes in control of the Company. See "Description of Capital Stock — Antitakeover Effect of Provisions of the Certificate of Incorporation, Bylaws, Delaware Law and Control Group Requirements."]

160721.5                               -18-

GST-WARTA0013264

06/19/98 FRI 16:30 FAX 604 643 7900    MCARTHY TETRAULT                                            ☒026

## USE OF PROCEEDS

The net proceeds to the Company from the sale of the [ ] Shares offered hereby are estimated to be $[ ] million, assuming an offering price of $[ ] and after deducting estimated offering expenses of $[ ] ($[ ] million if the Company sells the maximum number of Shares offered hereby.) The Company will use the net proceeds of the Offering to fund pre-construction activities related to its PCS networks, such as site planning and acquisition, system design, and planning for and implementing relocation of incumbent fixed microwave licenses. The remainder of the net proceeds of the Offering, if any, will be used for working capital and general corporate purposes. Pending such uses, the net proceeds of the Offering will be invested in investment grade, interest-bearing securities.

## DIVIDEND POLICY

The Company has not paid or declared any cash dividends on its Common Stock and does not expect to pay cash dividends in the foreseeable future. The Company currently intends to retain any future earnings to develop, construct and operate its PCS networks (including the payment of debt service pursuant to the Government Financing), for working capital and for other corporate purposes.

## DILUTION

Purchasers of Class B Common Stock offered hereby will incur immediate and substantial dilution in net tangible book value per share. The net tangible book value of the Company as of December [ ], 1997, was $[ ] million, or $[ ] per share of Common Stock. Net tangible book value per share of Common Stock is equal to the Company's total tangible assets less total liabilities, divided by the total number of shares of Common Stock outstanding. After giving effect to the sale of the [ ] shares of Class B Common Stock offered hereby at an assumed offering price of $[ ] per share, and after deducting the estimated offering expenses, the pro forma net tangible book value of the Company as of December [ ], 1997 would have been $[ ] million, or $[ ] per share of Common Stock. This represents an immediate increase in pro forma net tangible book value of $[ ] per share to existing stockholders and an immediate dilution of $[ ] per share to new investors purchasing shares of Class B Common Stock in the Offering. The following table illustrates this per share dilution as of December [ ], 1997.

| | |
|---|---|
| Assumed offering price per share of Class B Common Stock | $[ ] |
| Net tangible book value per share of Common Stock | $[ ] |
| Increase per share of Common Stock attributable to the Offering | $[ ] |
| Pro forma net tangible book value per share of Common Stock after the Offering | $[ ] |
| Dilution of net tangible book value per share of Class B Common Stock to new investors | $[ ] |

If the Company sells the maximum number of shares of Class B Common Stock offered hereby, the pro forma net tangible book value per share of Common Stock after giving effect to this Offering would be $[ ] per share, and the dilution to new investors purchasing shares of Class B Common Stock in the Offering would be $[ ] per share.

## CAPITALIZATION

[To Be Provided]

160721.5

-19-

GST-WARTA0013265

05/15/98(FRI) 13:51 [TX/RX NO 8153]

## BUSINESS

### Industry Overview

Wireless telecommunications technology was introduced commercially in 1983. The demand for wireless telecommunications services has increased steadily since 1983 and available wireless telecommunications services have expanded to include affordable mobile telephony and paging, as well as other telecommunications services. Improvements to wireless telecommunications technology and intense competition have served to stimulate market growth. The Company believes the demand for wireless telecommunications will continue to grow dramatically and that PCS will capture a significant share of the wireless market. Currently, wireless penetration in the U.S., including cellular and PCS, is estimated to be 13% and, according to Paul Kagan Associates, Inc., is expected to exceed 47% by 2006. As reported by the Cellular Telecommunications Industry Association ("CTIA"), the compound annual growth rate of cellular subscribers exceeded 45% from 1993 through 1995. The Company believes that PCS's potential lower cost, higher quality and improved functionality and convenience will encourage further growth in the wireless market.

Current wireless telecommunications services use either analog or digital technology with most cellular services transmitting voice and data signals over analog-based networks. However, analog technology is limited by its capacity constraints, inconsistent service quality and vulnerability to "eavesdropping," "cloning" and other forms of fraud. Digital wireless telecommunications systems, such as PCS, are not subject to the same limitations as analog systems since digital systems digitize and compress voice or data signals prior to transmission, thus allowing a single radio channel to carry multiple concurrent transmissions. As a result, digital systems can provide new and advanced services including greater call privacy, fraud protection, single number service, integrated voice and paging and enhanced wireless data transmission services such as e-mail, facsimile, superior data and video transmission and wireless connections to computer networks.

PCS networks operate in the 1850-1990 MHz frequency band with a spectrum of either 10 MHz or 30 MHz, while cellular networks operate in the 800-900 MHz frequency band with a spectrum of 25 MHz spectrum. PCS is geographically segmented among 51 regional service areas based upon Rand McNally's MTAs (comprising the A-Block and B-Block) and 493 local service areas based upon Rand McNally's BTAs (comprising the C-, D-, E- and F-Blocks) while cellular licenses are distributed among the U.S. Census Bureau's 306 metropolitan statistical areas and 428 rural statistical areas.

### FCC Auctioning of PCS Licenses

PCS licenses were allocated through a competitive bidding process administered by the FCC. In March 1995, the FCC completed its first auction, known as the A- and B-Block auctions, resulting in the award of two licenses for 30 MHz each of spectrum in each of 51 MTAs. The terms of the licenses required each licensee to construct networks serving at least one-third of the population in each respective market within five years of the License Grant Date of the applicable license and at least two-thirds of the population within ten years. The C-Block Auction and Reauction, comprised of 30 MHz BTA licenses, were completed in May 1996 and July 1996, respectively, and the auctions of the 10 MHz D-, E- and F-Block BTA licenses were completed in January 1997.

In conjunction with the PCS license auctions, Congress directed the FCC to create special provisions for certain groups which might otherwise lack access to capital. The FCC reserved a portion of the broadband PCS spectrum available via auction (C- and F-Blocks) for entities meeting certain financial criteria. C-Block represents 30 MHz BTA licenses and F-Block represents the 10 MHz BTA licenses, with both sets of licenses being auctioned on a nationwide basis.

Together, these two blocks make up the "Entrepreneurs' Block." The FCC has established additional preferences to assist qualified participants in their efforts to attract capital necessary to obtain a broadband PCS license at auction and build out their networks. These preferences include bidding credits and installment payments.

*PCS Technology*

Wireless service areas contain multiple overlapping regions (known as cells) ["Cells"], each containing a base station comprising a low-power transmitter, a receiver and signaling equipment. Each cell's base station is connected to a base station controller, which in turn is connected to a switching office by microwave, fiber optic cable, telephone wires or a hard-wired interface to a switching office. The switching office controls the operation of the wireless telephone networks for the entire service area, performing inter-base station hand-offs, managing call delivery to handsets, allocating calls among the cells within the networks and connecting calls to and from the local landline telephone system or to a long-distance telephone carrier. Wireless service providers integrate wireless telephone networks with landline telecommunications systems by way of interconnection agreements with various local exchange carriers and long-distance carriers, thus allowing subscribers origination and receipt capacity for both local and long distance calls from their wireless telephones.

PCS and cellular networks use similar technologies and hardware but operate on different frequencies and often use various frequency management technologies, or protocols. While the FCC has mandated that licensed cellular networks in the U.S. utilize compatible analog signaling protocols, the FCC has intentionally avoided mandating a universal digital signaling protocol for PCS. The two most widely accepted means of digital wireless communications are based on TDMA and CDMA. TDMA, and a related protocol GSM, provide for multiple communications over the radio channel by dividing data into distinct time slots and transmitting user-specific data in each time slot, while CDMA assigns specific codes to each packet of user data that, in conjunction with many other users' data, comprise a signal. GSM, which is a version of TDMA that is currently used in Europe, has the advantage of being the most proven PCS technology in international markets. TDMA, while currently being offered by cellular providers in certain U.S. cities, has, in the Company's opinion, often been associated with poor sound quality and numerous dropped calls. CDMA has been widely adopted by PCS providers both domestically and internationally. Based on public announcements by PCS licensees providing coverage to over 90% of the U.S. population, including virtually all of the top 100 markets in the U.S., the Company believes that CDMA will be the preeminent PCS protocol. The Company believes CDMA networks eventually will offer end-users significant advantages over other technologies, including increased security when compared to analog cellular networks, land-line voice quality and fewer dropped calls when compared to analog and other digital technologies.

Because GSM, TDMA and CDMA are incompatible with each other and analog cellular, a subscriber of networks utilizing GSM technology, for example, will be unable to use his handset when traveling in an area covered only by a CDMA or TDMA based network unless he carries a dual-mode/dual-band handset that permits the subscriber to use the cellular networks in that area. The Company has been advised that dual-band phones have recently become available, however, there can be no assurance that such phones will be widely adopted.

The Company

The Company was formed on December [ ], 1997 as a proposed holding company for PCS Plus following the consummation of its Merger with Magnacom, the owner of 24 of the Company's PCS licenses. The Merger and the Reorganization are each subject to the prior approval of the FCC.

Magnacom was the winning bidder for five (30 MHz) C-Block PCS licenses and 13 (10 MHz) F-Block PCS licenses in the C-Block reauction and F-Block auction held by the FCC and ending in July 1996 and January 1997, respectively. These licenses grant the Company the right to develop and operate PCS networks in 18 markets located in Arizona, Hawaii, Idaho, New Mexico, Oregon and Washington. The FCC has granted the Company the five C-Block licenses [and the grant of the 13 F-Block licenses is subject to FCC approval. There can be no assurance that the Company will ultimately be awarded the F-Block licenses.]

On February 13, 1997, PCS Plus Pacific acquired from Poka Lambro one (30 MHz) A-Block PCS license. This license grants the Company the right to develop and operate a PCS network in one market consisting of Guam and the Northern Mariana Islands. The Company believes that this market is attractive because of its outstanding connectivity with the continental United States and Hawaiian Island as well as demographics that would suggest higher than average use of wireless telephony.

On October 16, 1997, PCS Plus purchased from Telecom Wrap-Up six additional C-Block PCS licenses. These licenses grant the Company the right to develop and operate PCS networks in six markets located in Arkansas, New Mexico and Utah.

Set forth below are the markets and the aggregate number of persons located in each such market ("POPs") for each of the Company's PCS licenses:

| Market | POPs |
| --- | --- |
| Guam-Northern Mariana Islands | 5,280,000 |
| Albuquerque, NM | 20,658,360 |
| Eugene-Springfield, OR | 8,487,360 |
| Farmington, NM - Durango, CO | 4,883,280 |
| Gallup, NM | 3,668,310 |
| Harrison, AR | 2,233,770 |
| Hot Springs, AR | 3,523,170 |
| Russellville, AR | 2,455,890 |
| St. George, UT | 2,497,890 |
| Salem-Albany-Corvallis, OR | 13,201,860 |
| Santa Fe, NM | 5,235,780 |
| Tucson, AZ | 20,006,400 |
| Boise-Nampa, ID | 4,165,030 |
| Hilo, HI | 1,203,170 |
| Honolulu, HI | 8,362,310 |
| Kahului-Wailuku-Lahaina, HI | 1,505,040 |
| Lewiston-Moscow, ID | 1,100,280 |
| Lihue, HI | 511,770 |
| Longview, WA | 854,460 |
| Medford, OR | 2,090,380 |
| Portland, OR | 16,909,300 |
| Roseburg, OR | 946,490 |
| Spokane, WA | 6,128,620 |
| Walla Walla, WA | 1,515,630 |
| Yakima, WA | 2,155,480 |

160721.5                    -22-

GST-WARTA0013268

05/15/98(FRI) 13:51    [TX/RX NO 8153]

### Strategy

The Company intends to develop and operate digital networks through which it will provide wireless communications services. The principal components of the Company's business strategy are to (i) leverage its existing relationships in the telecommunications industry, (ii) initially build-out its network systems in its markets that the Company believes are presently underserved or in which it can gain an immediate competitive advantage, (iii) employ CDMA technology in its PCS networks and (iv) offer value-added wireless products and services as well as mobile and local services on a single platform.

*Leverage its Existing Relationships in the Telecommunications Industry.*

The Company intends to leverage its existing relationships in the telecommunications industry with entities such as QUALCOMM, GST, McKenzie Telecommunications Group, Inc. ("MTG") and certain electric and power utilities located in its markets.

QUALCOMM Agreements.

The Company is presently in negotiations with QUALCOMM in respect of the terms of the proposed $240,000,000 Equipment Loan Facility and the proposed $40,000,000 Working Capital Facility, pursuant to which the Company intends to acquire infrastructure equipment and related equipment and services on a turn-key basis from QUALCOMM and other vendors in connection with the build-out of the Company's PCS networks.

As currently contemplated, the Equipment Loan Facility will have the following principal terms: (a) nine year final maturity date with principal amounts being payable quarterly in increasing principal amounts, commencing three months after the third anniversary of the effective date of the related loan documentation, (b) an interest rate, at the Company's choice, based on either a percentage over LIBOR or a percentage over the prime rate and (c) mandatory prepayment from the proceeds of asset dispositions and from 75% of the Company's excess cash flow.

As currently contemplated, the Working Capital Facility will have the following principal terms: (a) principal amounts being payable on the third anniversary of the effective date of the related loan documentation and (b) an interest rate, at the Company's choice, based on either a percentage over LIBOR or a percentage over the prime rate. The Company will have the option to extend the maturity date of the Working Capital Facility for one year in consideration of the Company's delivery to QUALCOMM of warrants to acquire a number of shares of Class B Common Stock equal to the "Extension Percentage" (as hereinafter defined) of PCS Plus Holdings Corporation's outstanding Common Stock (on a fully diluted basis). As used herein, the "Extension Percentage" means 2% multiplied by a fraction, the denominator of which is $40,000,000 and the numerator of which is the amount outstanding under the Working Capital Facility as of the effective date of the extension.

The definitive documents evidencing the terms of the Credit Facilities will be subject to customary conditions to lending and will contain representations, warranties, covenants (including financial covenants) and default provisions customary for these types of lending transactions. Without limiting the foregoing, the Credit Facilities will (a) be prepayable at the option of the Company (subject to the payments of any applicable breakage costs and yield protection) and (b) be subject to conversion to high yield securities of the Company under certain circumstances. Subject to applicable FCC regulations, the obligations of the Company under the Credit Facilities will be secured by a first priority lien on substantially all of the assets of, and guaranties of, each of PCS Plus and its subsidiaries.

160721.5                    -23-

GST-WARTA0013269

In connection with its commitment to provide financing under the Equipment Loan Facility, it is currently anticipated that QUALCOMM will be issued warrants to purchase, for a nominal price, shares of Class B Common Stock equal to 6% of the outstanding Common Stock (on a fully-diluted basis, after taking into account all outstanding options, warrants and other rights to acquire Common Stock) (the "Company Warrants"). In addition to customary anti-dilution provisions, the Company Warrants shall provide that, in the event of additional equity issuances by the Company, QUALCOMM shall maintain its 6% interest in the outstanding Common Stock (on a fully-diluted basis) until such time as the Company has raised additional cash equity, all of which is contributed to the capital of PCS Plus, equal to the aggregate amount of indebtedness outstanding under the Working Capital Facility (the "Maximum Loan Amount"). The Company Warrants shall be exercisable for a period of five years from the date of issuance. The Company shall grant QUALCOMM piggy-back and Form S-3 registration rights (but not demand registration rights) covering the shares of Class B Common Stock issuable upon exercise of the Company Warrants.

*[handwritten margin note: Qualcomm warrants in PCS + Ltd]*

In connection with its commitment to provide financing under the Working Capital Facility, it is currently anticipated that QUALCOMM will be issued warrants to purchase 4% of the outstanding common shares, without par value (the "GST Common Shares"), of GST issued and outstanding as of the closing date of the Working Capital Facility (excluding outstanding options, warrants and other rights to acquire GST Common Shares) (the "GST Warrants"). The GST Warrants shall have an exercise price equal to 120% of the average closing sale price of GST Common Shares for the twenty trading days preceding the closing date of the Working Capital Facility. The GST Warrants shall be exercisable for a period of 18 months from the date of issuance. The GST Warrants will contain customary anti-dilution provisions and GST shall grant QUALCOMM piggy-back and Form S-3 registration rights (but not demand registration rights) covering GST Common Shares issuable upon exercise of the GST Warrants.

*[handwritten margin note: Qualcomm warrants for GST stock 120%]*

In connection with its commitment to provide financing under the Credit Facilities, it is currently anticipated that QUALCOMM will make the $20,000,000 Equity Investment in the Company in consideration of the issuance to QUALCOMM of 10% mandatory cumulative convertible stock of the Company (the "Preferred Stock"). The Preferred Stock shall have a liquidation preference, shall be convertible into shares of Class B Common Stock equal to 19% of the outstanding Common Stock (on a fully diluted basis) and shall provide for mandatory conversion upon the issuance by the Company for cash of additional equity, on an aggregate basis, of at least $40,000,000, and the contribution of all of such proceeds to the capital of PCS Plus. In addition to customary anti-dilution provisions, the Preferred Stock shall provide that additional equity issuances by the Company shall not dilute the holder's right to acquire a 19% equity interest in the Company upon conversion of the Preferred Stock until such time as the Company has raised additional cash equity, all of which is contributed to the capital of PCS Plus, equal (on an aggregate basis) to the Maximum Loan Amount, at which time the Preferred Stock shall only be subject to dilution to the extent the Company issues additional equity in excess of the Maximum Loan Amount. The Company shall grant QUALCOMM piggy-back and Form S-3 registration rights (but not demand registration rights) covering shares of Class B Common Stock issuable upon conversion of the Preferred Stock. All proceeds of the sale of the Preferred Stock shall be contributed by the Company to the capital of PCS Plus.

*[handwritten margin note: 10% preferred cumulative stock. How does this compare to GST's rights? — on preference — on antidilution]*

In addition, the Company is presently in negotiations with QUALCOMM in respect of the Supply Agreement, pursuant to which the Company intends to purchase from QUALCOMM substantially all of its infrastructure equipment and related equipment and services in connection with the construction of its PCS networks. The Supply Agreement shall provide for the pricing of QUALCOMM and permitted third party vendor equipment and will provide for the Company's commitment, subject to certain exceptions, to acquire its requirements for PCS handsets for a period of three and a half years.

160721.5                                   -24-

GST-WARTA0013270

GST.

Along with QUALCOMM, the Company intends to leverage its relationship with GST, a publicly-held, full service telecommunications company with commercially operational networks and networks under construction located in many of the Company's markets. To this end, the Company has entered into the Reseller Agreement, providing for, among other things, that (i) GST will serve as a non-exclusive reseller of PCS minutes in the markets in which the Company has obtained licenses and (ii) [where technically and economically feasible,] the Company will utilize GST [on an exclusive basis] to provide switched local and long distance services as well as other enhanced telecommunications services to all of the Company's resellers located in markets in which GST has operational networks, in each case for a period of 12 years. The Company and GST are also presently negotiating the Preferred Provider Agreement, pursuant to which the Company and GST will [purchase certain products and services from each other at preferred rates.] See "Certain Transactions."

Subject to applicable FCC regulations, the Company intends to further leverage its relationship with GST. In addition, the Company intends to engage in the joint marketing of wireless communication services with GST as well as co-locate its equipment in GST facilities and utilize GST's existing interconnection agreements with various local exchange and long distance carriers. The Company also believes it can benefit from GST's knowledge of the customers located in the Company's and GST's mutual markets, thereby saving the time and expense associated with conducting demographic studies. [This section needs to be expanded now that Swidler has provided guidance as to the range of permissible activities.]

*[handwritten margin note: leveraging of GST relationship]*

MTG.

MTG is a provider of turnkey engineering services for the wireless industry that is controlled by Rhonda McKenzie. MTG, which recently received the Small Business of the Year award from the State of Arizona, has provided services to wireless companies such as AirTouch, AT&T Wireless and Sprint PCS in the Southwestern United States. The Company intends to leverage its existing relationship with Ms. McKenzie by engaging MTG to provide initial engineering services to the Company throughout its markets located in the Southwestern United States. Such services are expected to include site identification and acquisition, microwave relocation and project management.

Electric and Power Utilities.

The Company also intends to leverage its relationships with electric and power utilities located in its markets. The Company believes it can minimize the expense and time associated with the deployment of wireless communications equipment by co-locating such equipment with such utilities' facilities. The Company also intends to engage in joint marketing activities with such utilities, thereby gaining access to their significant customer bases.

*Initially Build-Out its Network Systems in Selected Markets.*

The Company intends to build-out its network systems in its markets that the Company believes are presently underserved or in which it can gain an immediate competitive advantage. The Company believes that this deployment strategy will permit it to initially serve approximately 70% of the population located in such markets as well as the principal transportation fairways located therein. This strategy will also permit the Company to select the most favorable sites within its markets upon which to construct and install wireless communications equipment, thereby minimizing the need to reconfigure existing network systems following their build-out.

*Employ CDMA Technology in its PCS Networks.*

160721.5                              -25-

The Company intends to employ CDMA technology throughout its wireless networks. The Company believes that CDMA technology will, among other things, be less costly to deploy and will provide better quality, greater capacity and more flexibility than either TDMA or GSM. CDMA, TDMA and GSM technology are presently incompatible with one another. Since PCS licensees providing coverage to over 90% of the U.S. population, including virtually all of the top 100 markets in the U.S., have announced an intent to utilize CDMA technology, the Company believes that its implementation of CDMA technology, coupled with its successful negotiation of roaming agreements with CDMA-based PCS providers, will permit the Company to offer its customers use of a virtually seamless wireless network.

*Offer Value-Added Wireless Products and Services and Mobile and Local Services on a Single Platform*

The Company intends to offer a variety of value-added wireless products and services including enhanced calling features such as caller identification, voicemail and numeric paging; messaging and wireless data transmission and greater call security and privacy. The Company believes that it will be well positioned to offer new products and services that will be developed to capitalize upon advancements in CDMA technology.

In addition, the Company intends to offer mobile and local services on a single platform. The Company believes that as the PCS industry matures, PCS will become a substitute for traditional land line telecommunications services. The Company intends to position its fixed wireless services to take advantage of such opportunities.

**Network Development and Build-out**

The Company intends to build-out its network systems in a manner that will permit it to initially serve approximately 70% of the population located in its markets. The Company estimates that the build-out of all of its PCS networks will take approximately 14 to 18 months following the commencement of construction with costs estimated to range from $200,000,000 to $250,000,000. There can be no assurance that the Company will ultimately build out its PCS networks or, if constructed, that the related costs will not exceed the Company's estimate.

To successfully implement its deployment strategy, the Company intends to engage (i) QUALCOMM as its principal equipment vendor to design its PCS networks and (ii) MTG to provide systems engineering. Key components of the Company's deployment strategy include:

*Site Identification and Acquisition.*

The successful build-out of the Company's PCS networks will be, in part, a function of the Company's ability to acquire or lease appropriate sites for the location of its base station equipment. The Company intends to engage engineering services companies such as MTG to assist it in identifying such sites. Additionally, the site selection process will also require the successful negotiation of use agreements for, or the acquisition of, numerous additional sites, and may require the Company to obtain zoning variances or other regulatory approvals. Factors such as delays in the site selection process and construction delays could adversely affect the implementation of the Company's deployment strategy and there can be no assurance that such strategy will be successfully implemented.

*RF Engineering.*

RF engineering will dictate which sites are selected by the Company for the deployment of PCS equipment. This process will include cell site coverage and