08/19/98 FRI 16:34 FAX 604 643 7900    MCARTHY TETRAULT    ☒034

channel capacity planning and will consider both PCS and microwave interference issues. Successful radio frequency engineering will ensure that the Company provides high quality service once its PCS networks are operational.

*Zoning and Permitting.*

The Company intends to identify areas where zoning delays may impact site development and, where possible, seek alternative sites prior to the deployment of its wireless communications equipment. If alternative sites are not available to the Company or, if available, are not economically viable alternatives, the Company intends to identify ways to reduce or eliminate the need for zoning approvals by modifying designs or adjusting locations to co-locate with existing wireless providers and thereby minimize the necessity of tower construction.

*Incumbent Microwave Relocation.*

The Company intends to engage engineering companies such as MTG to analyze and determine the extent to which the Company will be required to relocate the microwave links of incumbent microwave licensees such as utility companies, public safety agencies and other wireless licensees within the Company's spectrum allocation. In many locations in which other PCS licensees are operating, such licensees have already paid to have incumbent microwave users relocated out of the spectrum in which PCS operates. In such markets, the Company will be obligated to reimburse such licensees for its pro rata share of such relocation costs. In markets in which no other PCS licensee has previously relocated incumbent microwave users, the Company will be obligated to pay the associated relocation costs and will be reimbursed for a portion of these costs as other PCS licensees build-out in such markets.

*Systems and Operations Management.*

The Company intends to implement advanced information systems to coordinate the build-out of its PCS networks. Such systems will facilitate communication among personnel and enable the Company to quickly respond to network faults.

CDMA Technology

The Company believes that CDMA technology is fundamental to accomplishing its business objective of providing high volume, high quality airtime at a low cost. CDMA has been widely adopted by PCS providers both domestically and internationally. In the U.S., AirTouch has commenced commercial CDMA service in the Los Angeles market, and Bell Atlantic NYNEX Mobile has launched commercial CDMA service in selected cities in the State of New Jersey. Most of the other leading cellular service providers, including ALLTEL Mobile, Ameritech [Corporation] ("Ameritech"), Comcast Cellular Communications, GTE, NextWave Telecom, Inc. ("NextWave"), 360 Communications and U.S. WEST, have announced plans for commercial deployment of CDMA networks in their markets. In addition, Sprint PCS, PrimeCo, GTE and Ameritech have announced plans for build-out and operation of CDMA systems in their PCS markets. The Company believes that CDMA provides important system performance benefits, although there can be no assurance that CDMA will be adopted on a widespread basis in the United States or internationally.

*Voice Quality.* CDMA systems offer more powerful error correction, less susceptibility to fading and reduced interference. Using the 13 kbps vocoder, CDMA systems achieve voice quality that is comparable to the typical wireline telephone. This CDMA vocoder technology also employs adaptive equalization which filters out annoying background noise more effectively than existing wireline or analog cellular phones.

*Greater Capacity.* CDMA technology allows a greater number of calls within one allocated frequency and reuses the entire frequency spectrum in each cell,

GST-WARTA0013273

05/15/98(FRI) 13:51  [TX/RX NO 8153]

rather than using only one-seventh of the available spectrum in each cell, which is typically the case with analog, TDMA and GSM systems. CDMA systems are expected to provide capacity gains of up to 10 times over the current analog system, while TDMA and GSM systems are expected to increase capacity by only two to three times.

CDMA technology is designed to provide flexible or "soft" capacity which will permit a system operator to temporarily increase the number of telephone calls that can be handled within a cell. When capacity limitations in analog, TDMA and GSM systems are reached, additional callers in a given cell must be given a busy signal. Using CDMA technology, the system operator will be able to allow a small degradation in voice quality to provide a temporary increase in capacity. This is expected to reduce blocked calls and increase the probability of a successful cell-to-cell hand-off.

*Soft Hand-off*. CDMA systems transfer calls throughout the network using a technique referred to as a soft handoff, which connects a mobile customer's call with a new cell site while maintaining a connection with the cell site then in use. CDMA networks monitor the quality of the transmission received by both cell sites simultaneously to select a better transmission path and to ensure that the network does not disconnect the call in one cell until it is clearly established in a new one. As a result, fewer calls are dropped compared to analog, TMDA and GSM networks, which use a "hard handoff" and disconnect the call from the current cell site before connecting it with a new one.

*Fewer Cell Sites*. Because of efficient digital modulation, soft hand-off capabilities and other technological advantages, networks using CDMA are able to achieve a greater radius of coverage and therefore require fewer cells than analog, TDMA or GSM systems when the system is lightly loaded. Recent network build-outs by cellular CDMA operators indicate that 50% fewer cells are required for CDMA systems as compared to analog systems. Similarly, CDMA systems are expected to require 30-50% fewer cells than TDMA or GSM networks under similar lightly loaded conditions. The need for fewer cells results in significant reductions in overall capital requirements, lower ongoing maintenance and operating costs, fewer cell sites to be acquired and greater flexibility in network design.

*Advanced Services and Features*. CDMA will permit the Company to offer advanced features such as simultaneous voice and data transmission and, ultimately, high-speed wireless applications such as video, multimedia and ISDN-rate data services.

*Privacy and Security*. One of the benefits of CDMA technology is that it combines a constantly changing coding scheme with a low power signal to enhance security and privacy. Vendors are currently developing additional encryption capabilities which are expected to further enhance overall network security.

*Simplified Frequency Planning*. Frequency planning is the process by which wireless service providers analyze and test alternative patterns of frequency use within their systems to minimize interference and maximize capacity. Currently, cellular service providers spend considerable cost and time on frequency planning. Because TMDA and GSM based systems have frequency reuse constraints similar to present analog systems, frequency reuse planning for TDMA and GSM based systems is expected to be comparable to planning for the current analog systems. With CDMA technology, however, the same subset of allocated frequencies can be reused in every cell, substantially reducing the need for costly frequency reuse patterning and constant frequency plan management.

160721.5                              -28-

GST-WARTA00013274

06/19/98 FRI 16:35 FAX 604 643 7900    MCARTHY TETRAULT    @036
To: BYRON GIBSON    From: DANIEL J GALLAGHER    5-15-98 1:49pm p. 30 of 55

### Products and Services

The Company intends to offer a variety of wireless communications products and services throughout its PCS networks such as:

#### Enhanced Features

Enhanced features will include caller identification, voice mail and numeric paging; custom calling features such as call waiting, conference calling and call forwarding; and increased call security and privacy.

#### Wireless Data Transmission

The Company intends to offer voice and data communications through a single handset. Applications of data transmission will include alphanumeric paging service; mobile office applications such as facsimile, electronic mail and connecting notebook computers with conventional computer networks; and connecting wireless point-of-sales terminals to host computers.

#### Over-the-Air Activation and Subscriber Profile Management

The Company intends to utilize handsets that will simplify the activation process by permitting a new subscriber to simply call an activation center and have service initiated over-the-air. Similarly, changes in a subscriber's service package will be simplified by over-the-air processing.

#### Wireless Local Loop

In addition, the Company intends to offer wireless local loop technology, which it believes provides a viable alternative to wireline networks. A subscriber will install in his home or office a small home base station that will be connected to the standard telephones and other communications equipment located there. Voice and data transmissions will be routed to the home or office via a neighboring tower, thereby bypassing the incumbent LEC's wireline network.

### Marketing and Sales

The Company intends to aggressively market PCS by targeting current cellular users as well as non-wireless users located within its markets, utilizing demographic profiling to identify the needs of its customers. Based on this information, the Company intends to customize its service offerings by packaging PCS with specific users in mind. Customer service will be emphasized throughout the marketing and sales process, thereby enabling the Company to effectively acquire, serve and retain its customers. To this end, each of the Company's salespersons will be required to complete a training course that will require salespersons to actively seek to interact with, and understand the needs of, target customers located in his or her specific territory.

In addition to a direct sales force, the Company intends to distribute its products and services through retail mass marketers such as Walmart, Office Depot and Staples and wireless service stores in second tier cities. Although it intends to engage in television, radio and print advertising, the Company believes that joint marketing activities with industry partners such as GST and electric and power utilities will generate greater sales than traditional mass marketing activities and be significantly more cost-effective.

Competition

The wireless communications market in the United States is expected to become increasingly competitive. Cellular operators and other wireless services providers are already exploiting existing wireless technology and have established and continue to augment wireless telecommunications networks that will directly compete with many of the services to be offered by the Company. Additionally, other PCS providers are expected to compete with the Company in each market. The success of the Company will depend largely upon its ability to satisfy the mass consumer and business markets, which the Company believes have not been adequately served by existing cellular service operators. The Company plans to compete with cellular and other PCS providers on the basis of affordable pricing, superior customer service and voice transmission quality.

*Cellular Operators.* The Company will compete with established cellular telephone service providers in the Company's markets. Principal cellular providers in the Company's markets are AirTouch, AT&T Wireless and GTE. Under FCC rules, cellular telephone service licensees have enjoyed a duopoly because the FCC only permits two licensees in each market. Cellular licensees to date have faced limited competition from businesses that "resell" cellular telephone service to customers, but the Company could face additional competition from resellers of PCS and cellular telephone services.

The introduction of digital transmission technologies to supplant traditional analog cellular systems will increase the capacity and quality of existing cellular telephone systems once deployed. However, the Company believes that upgrading from analog to digital is expensive and that it will likely be several years before cellular networks are fully converted to digital technology. The Company expects the analog infrastructure to continue to be used for the foreseeable future due in part to a lack of a national digital technology standard. The Company further expects that many cellular licensees or their affiliates will also attempt to acquire an additional 10 MHz PCS license in the "after-market" in areas in which they currently provide cellular telephone services, as permitted by the FCC under its PCS licensing rules. This would provide the cellular operators with greater capacity and potentially allow them to add additional customers and offer more advanced services in their markets in the near term. The Company believes that by providing low-priced services and new wireless features on its digital PCS networks, it will be competitive with cellular services.

*Other PCS Operators.* The Company will compete with A- and B-Block licensees, many of whom are cellular-affiliated companies that will utilize PCS spectrum in new markets to expand their national or regional coverage as well as other C-Block licensees. Principal A-, B- and C-Block licensees in the Company's markets are GTE, NextWave, Sprint PCS and Western Wireless, whose A- and B-Block licenses were granted in June 1995, and whose C-Block licenses were granted in [September 1996] have all had substantial lead-time to develop their networks and some of these parties, particularly the A- and B-Block licensees have significantly greater financial, technical, marketing and other resources than the Company.

In addition, the Company will compete with the D- and E-Block license winners (principally, AT&T Wireless, PrimeCo, Sprint PCS, Western Wireless, Central Oregon Cellular, Inc., Guam Telephone Authority and Touch America, Inc. to the extent that such licenses are not acquired by existing cellular or A-, B- or C-Block PCS licensees. Although the D- and E- and F-Block licenses are for only 10 MHz (as are the Company's F-Block licenses) entities can, subject to FCC's rules limiting entities to 45 MHz of cellular, broadband PCS and SMR spectrum in a given market, acquire 10 MHz licenses and consolidate them so as to design a 20 MHz or 30 MHz PCS system which could have more capacity than the Company's.

160721.5                              -30-

GST-WARTA0013276

*SMR and "Enhanced" SMR Services.* As a result of advances in digital technology, some service providers have begun to design and deploy digital mobile networks, which are referred to as "Enhanced SMR" or "ESMR." ESMR networks increase the capacity of SMR system frequencies to a level that may be competitive with that of analog cellular networks. SMR service providers offer or plan to offer fleet dispatch services, short messaging, data services and interconnected voice telephony services over wide geographic service areas. Given similar developments in the deployment of digital technology in the cellular providers' networks, it is unclear at this time whether the quality and capacity of SMR-based digital mobile networks will be able to compete effectively with analog and digital cellular and PCS networks.

*Other Competition.* The FCC has adopted rules to authorize additional wireless mobile services. First, the FCC has authorized the use of the 39 GHz bands for the provision of fixed and mobile communications services. The FCC auctioned 30 MHz of spectrum in the 2.3 GHz band for WCS which auction ended in May 1997. FCC rules permit WCS providers to offer a broad range of fixed, mobile, radio location and satellite broadcast services, some of which could be in competition with the Company's service offerings. Second, in May 1996 the FCC adopted final rules to permit Interactive Video and Data Service ("IVDS") licensees to provide mobile two-way data services. Because of the limited amount of spectrum allocated for IVDS, however, it is expected to be technically infeasible to provide voice services to IVDS customers for the foreseeable future. Third, the FCC authorized the use of LMDS licenses to provide certain fixed and mobile services. Fourth, the FCC has proposed to reallocate former federal government spectrum located at 4 GHz for a broad range of wireless fixed and mobile services, and is expected to reallocate additional former federal government spectrum for wireless mobile services in the future. The Company may also face competition from MSS. Finally, the FCC recently modified its rules to permit the partitioning of service areas and disaggregation of spectrum of broadband PCS licenses into licenses to serve smaller service areas, and/or use smaller spectrum blocks. The purpose of the FCC's rule change was to permit existing PCS licensees and new PCS entrants to have greater flexibility to determine how much spectrum and geographic area they need or desire in order to provide PCS service. The FCC's action could also result in A-, B-, C-, D-, and/or E- Block PCS licensees in the Company's PCS markets partitioning or disaggregating their licenses in a manner that provides increased competition to the Company. See "— Legislation and Government Regulation."

In addition, as a result of the enactment of the 1996 Act, regional energy utility companies are expected to enter the wireless and wireline telecommunications markets by leveraging their significant capital assets, brand-name value, existing customer base and infrastructure advantages in their geographical areas of operation. Similarly, the 1996 Act also eliminates barriers for cable television system operators to provide wireline local loop services over their existing wireline infrastructure.

Legislation and Government Regulation

As a recipient of licenses acquired through the C- and F-Block auctions, the Company's ownership structure and operations are and will be subject to substantial FCC regulation.

*Overview*

<u>FCC Authority</u>.

The Communications Act grants the FCC the authority to regulate the licensing and operation of all non-federal government radio-based services in the United States. The scope of the FCC's authority includes (i) allocating radio frequencies, or spectrum, for specific services, (ii) establishing qualifications

160721.5                                    -31-

GST-WARTA0013277

Case 1:04-cv-01380-GMS   Document 45-4   Filed 04/05/2005   Page 6 of 11

06/19/98 FRI 16:36 FAX 804 643 7900   MCARTHY TETRAULT                                   ☒039
To: BYRON GIBSON                  From: DANIEL J GALLAGHER    5-15-98  1:48pm  p. 39 of 55

for applicants seeking authority to operate such services, including PCS applicants, (iii) approving initial licenses, modifications thereto, license renewals, and the transfer or assignment of such licenses, (iv) promulgating and enforcing rules and policies that govern the operation of spectrum licensees, (v) the technical operation of wireless services, interconnection responsibilities between and among PCS, other wireless services such as cellular, and landline carriers and (vi) imposition of fines and forfeitures for any violations of those rules and regulations. Under its broad oversight authority with respect to market entry and the promotion of a competitive marketplace for wireless providers, the FCC regularly conducts rulemaking and adjudicatory of proceedings to determine and enforce rules and policies potentially affecting broadband PCS operations.

### Regulatory Parity.

The FCC has adopted rules designed to create symmetry in the manner in which it and the states regulate similar types of mobile service providers. According to these rules, all "commercial mobile radio service" ("CMRS") providers that provide substantially similar services will be subject to similar regulation. A CMRS service is one in which the mobile radio service is provided for a profit, interconnected to the public switched telephone networks, and made available to the public. Under these rules, providers of PCS and SMR services are subject to regulations similar to those governing cellular carriers if they offer an interconnected commercial mobile service. The FCC announced that it would forbear from applying several regulations to these services, including its rules concerning the filing of tariffs for the provision of interstate services. Congress specifically authorized the FCC to forbear from applying such regulation in the Omnibus Budget Reconciliation Act of 1993. With respect to PCS, the FCC has stated its intent to continue monitoring competition in the PCS service marketplace. The FCC also concluded that Congress intended to preempt state and local rate and entry regulation of all CMRS providers, including PCS, but established procedures for state and local governments to petition the FCC for authority to continue or initiate such regulation.

### Commercial Mobile Radio Service Spectrum Ownership Limit.

The FCC has limited the amount of broadband CMRS spectrum (including cellular, broadband PCS and SMR) in which an entity may hold an attributable interest in overlapping geographic areas to 45 MHz. For these purposes only PCS and other CMRS licensees are attributed to an entity where its investments exceed certain thresholds or the entity is an officer or director of a broadband PCS, cellular or SMR licensee. Thus, entities with attributable interests in cellular licenses (which are for 25 MHz) in certain markets cannot hold more than 20 MHz of PCS spectrum in the same markets. The Company's ability to raise capital from entities with attributable broadband CMRS interests in certain geographic areas is likely to be limited by this restriction.  [QUALCOMM?]

### Other FCC Requirements.

The FCC had been conducting rulemakings to address interconnection issues among CMRS carriers and between CMRS and LECs. These proceedings were significantly affected by the 1996 Act and FCC rulemakings conducted pursuant to the 1996 Act. See "— 1996 Act" and "— FCC Interconnection Proceedings."

The FCC has adopted rules that prohibit broadband PCS, cellular and certain SMR licensees from unreasonably restricting the resale of their services. The FCC has determined that the availability of resale will increase competition at a faster pace by allowing new entrants to the wireless market quickly through the resale of their competitors' services while they are building out their own facilities. This prohibition will expire five years after the FCC concludes its initial licensing of broadband PCS spectrum, which concluded in 1997. Additionally, the FCC requires CMRS carriers to provide manual roaming service

160721.5                                    -32-

to subscribers of other such carriers, through which traveling subscribers of other carriers may make calls after establishing a method of payment with a host carrier. The FCC is considering automatic roaming requirements among CMRS carriers.

The FCC has revised its rules to permit CMRS operators, including PCS licensees, to use their assigned spectrum to provide fixed local loop and other services on a co-primary basis with mobile services. The FCC is continuing its rulemaking proceeding to determine the extent to which such fixed services fall within the scope of CMRS regulation.

The FCC has imposed number portability requirements on broadband PCS, cellular, and certain SMR providers. By December 31, 1998, such licensees, as well as LECs, must provide their customers with the ability to change carriers while retaining phone numbers. CMRS providers subject to the number portability requirements must have the capability of delivering calls from their networks to ported numbers anywhere in the United States. By June 30, 1999, such providers must be able to offer number portability without impairment of quality, reliability, or convenience when switching service providers, including the ability to support roaming throughout their networks. The FCC has solicited further comment on the appropriate cost-recovery methods regarding long-term number portability.

FCC rules that took effect in October 1997 require cellular, PCS, and certain SMR carriers to transmit 911 emergency calls from handsets that transmit mobile identification numbers to Public Safety Answering Points ("PSAPs") without any credit checks or validation and require that such carriers must be capable of transmitting 911 calls from individuals with speech or hearing disabilities through means such as text telephone devices. By April 1998 such carriers must relay the mobile telephone number of the originator of a 911 call as well as the location of the cell that is handling the call. By October 2001, such carriers must be able to provide the PSAP with the location of the mobile caller within a radius of 125 meters. Several parties filed petitions currently pending at the FCC requesting, among other things, that the FCC reconsider the requirement that wireless carriers transmit calls that do not have a code identification of PSAPs. The FCC has issued a Further Notice seeking additional comment on the future of mobile emergency calling technology and capabilities.

In August 1996 the FCC adopted new guidelines and methods for evaluating the effects of radio frequency emissions from transmitters including PCS mobile telephones and base stations. The new guidelines, which are generally more stringent than previous requirements, were effective immediately for hand-held devices and otherwise became effective January 1, 1997.

<u>Other Federal Regulations</u>.

Wireless networks are subject to certain Federal Aviation Administration and FCC guidelines regarding the location, lighting and construction of transmitter towers and antennas. In addition, the FCC has authority to enforce certain provisions of the National Environmental Policy Act and the National Historic Preservation Act as they would apply to the Company's facilities. The Company intends to use common carrier point-to-point microwave and traditional landline facilities to connect base station sites and to link them to their respective main switching offices. These microwave facilities have historically been separately licensed by the FCC on a first-come, first-served basis (although the FCC has proposed to auction certain such licenses) and are subject to specific service rules.

Wireless providers also must satisfy a variety of FCC requirements relating to technical and reporting matters. One such requirement is the coordination of proposed frequency usage with adjacent wireless users, permittees and licensees in order to avoid electrical interference between adjacent networks. In addition,

Case 1:04-cv-01380-GMS    Document 45-4    Filed 04/05/2005    Page 8 of 11

06/19/98 FRI 16:37 FAX 604 643 7900   MCARTHY TETRAULT                          ☒041
To: BYRON GIBSON              From: DANIEL J GALLAGHER   5-15-98  4:48pm  p. 41 of 55

the height and power of base station transmitting facilities and the type of signals they emit must fall within specified parameters.

### State and Local Regulation.

The scope of state regulatory authority covers such matters as the terms and conditions of interconnection between LECs and wireless carriers under FCC oversight, customer billing information and practices, billing disputes, other consumer protection matters, certain facilities construction issues, transfers of control, the bundling of services and equipment and requirements relating to making capacity available to third party carriers on a wholesale basis. In these areas, particularly the terms and conditions of interconnection between LECs and wireless providers, the FCC and state regulatory authorities share regulatory responsibilities with respect to interstate and intrastate issues, respectively.

The FCC and a number of state regulatory authorities have initiated proceedings or indicated their intention to examine access charge obligations, mutual compensation arrangements for interconnections between LECs and wireless providers, the pricing of transport and switching facilities provided by LECs to wireless providers, the implementation of "number portability" rules to permit telephone customers to retain their telephone numbers when they change telephone service providers, and alterations in the structure of universal service funding, among other matters.

Proceedings with respect to the foregoing policy issues before the FCC and state regulatory authorities could have a significant impact on the competitive market structure among wireless providers and the relationships between wireless providers and other carriers.

### General PCS Regulations

In June 1994, the FCC allocated spectrum for broadband PCS services between the 1850 to 1990 MHz bands. Of the 140 MHz available for licensed and unlicensed PCS services, the FCC created six separate licensed blocks of spectrum identified as the A-, B-, C-, D-, E- and F-Blocks. The A-, B- and C-Blocks are each allocated 30 MHz of spectrum, the D-, E- and F-Blocks are allocated 10 MHz each. For each block, the FCC adopted a 10-year PCS license term with an opportunity to renew. The remaining 20 MHz of spectrum within the PCS band is reserved for unlicensed use.

The FCC adopted a "rebuttable presumption" that all PCS licensees are common carriers, subject to Title II of the Communications Act. Accordingly, each PCS licensee deemed to be a common carrier must provide services upon reasonable request and the rates, terms and conditions of service must not be unjustly or unreasonably discriminatory.

### Structure of PCS Block Allocations.

The FCC defines the geographic contours of the licenses within each PCS block based on the MTAs and BTAs developed by Rand McNally. The FCC awarded A- and B-Block licenses in 51 MTAs. The C-, D-, E- and F-Block spectrum were allocated on the basis of 493 smaller BTAs. In addition, there are spectrum aggregation caps on PCS licensees limiting them to 45 MHz of broadband CMRS spectrum (e.g., no more than one 30 MHz PCS license and one 10 MHz PCS license) in any given market.

All but three of the 102 total A-Block licenses and all B-Block licenses were auctioned in 1995. The three A-Block licenses were awarded separately pursuant to the FCC's "pioneer's preference" program. The auctioned A- and B- Block licenses were awarded in June 1995. The C- and F-Block spectrums are reserved for Entrepreneurs. See "— License Requirements." The FCC completed its auction for C-Block licensees in May, 1996 and reauctioned 18 C-Block licenses

160721.5                                -34-

on which initial auction winners defaulted in an auction that ended in July 1996. The FCC completed its auction for the D-, E-, and F-Block licenses in January 1997.

In December 1996, the FCC adopted rules permitting broadband PCS carriers to partition any service areas within their license areas and/or disaggregate any amount of spectrum within their spectrum blocks to entities that meet the eligibility requirements for the spectrum blocks. The purpose of the FCC's rule change was to permit existing PCS licensees and new PCS entrants to have greater flexibility to determine how much spectrum and geographic area they need or desire in order to provide PCS service. Thus, A-, B-, D-, and E-Block licensees may sell or lease partitioned or disaggregated portions of their licenses at any time to entities that meet the minimum eligibility requirements of the Communications Act. Entrepreneurs (C- and F-) Blocks licensees, such as the Company, may only sell or lease partitioned or disaggregated portions of their licenses to other qualified Entrepreneurs during the first five years of their license terms. Thereafter, if Entrepreneurs Blocks licensees partition or disaggregate to non-entrepreneurs, they must repay a proportional share of the outstanding balance on their installment payments and a share of any bidding credits that they received.

*1996 Act*

On February 8, 1996, President Clinton signed the 1996 Act, which effected a sweeping overhaul of the Communications Act. In particular, the 1996 Act substantially amended Title II of the Communications Act, which governs telecommunications common carriers. The policy underlying this legislative reform was the opening of the telephone exchange service markets to full competition. The 1996 Act makes all state and local barriers to competition unlawful, whether they are direct or indirect. It directs the FCC to initiate rulemaking proceedings on local competition matters and to preempt all inconsistent state and local laws and regulations. The 1996 Act requires incumbent wireline LECs to open their networks to competition through interconnection and access to unbundled network elements and prohibits state and local barriers to the provision of interstate and intrastate telecommunications services.

The 1996 Act prohibits state and local governments from enforcing any law, rule or legal requirement that prohibits or has the effect of prohibiting any person from providing interstate or intrastate telecommunications services. States retain jurisdiction under the 1996 Act to adopt laws necessary to preserve universal service, protect public safety and welfare, ensure the continued quality of telecommunications services and safeguard the rights of consumers.

Implementation of the provisions of the 1996 Act will be the task of the FCC, the state public utility commissions and a joint federal-state board. Much of the implementation of the 1996 Act is being completed in numerous rulemaking proceedings with short statutory deadlines. These proceedings address issues and proposals that were already before the FCC in pending rulemaking proceedings affecting the wireless industry as well as additional areas of telecommunications regulation not previously addressed by the FCC and the states.

Some specific provisions of the 1996 Act which are expected to affect wireless providers are summarized below:

Expanded Interconnection Obligations.

The 1996 Act establishes a general duty of all telecommunications carriers, including Entrepreneurs Blocks licensees, to interconnect with other carriers, directly or indirectly. The 1996 Act also contains a detailed list of requirements with respect to the interconnection obligations of LECs. These "interconnect" obligations include resale, number portability, dialing parity, access to rights-of-way and reciprocal compensation.

160721.5                              -35-

GST-WARTA0013281

LECs designated as "incumbents" (determined as a carrier providing landline local exchange telephone service and a member of the Exchange Carrier Association at the time the 1996 Act was adopted or a successor to such a carrier) have additional obligations including: to negotiate in good faith; to interconnect on terms that are reasonable and non-discriminatory at any technically feasible point at cost-based rates (plus a reasonable profit); to provide non-discriminatory access to facilities and network elements on an unbundled basis; to offer for resale at wholesale rates any service that LECs provide on a retail basis; and to provide actual co-location of equipment necessary for interconnection or access.

The 1996 Act establishes a framework for state regulatory commissions to mediate and arbitrate negotiations between incumbent LECs and carriers requesting interconnection, services or network elements. The 1996 Act establishes deadlines, policy guidelines for state commission decision making and federal preemption in the event a state commission fails to act.

Review of Universal Service Requirements.

The 1996 Act contemplates that interstate telecommunications providers, including CMRS providers, will "make an equitable and non-discriminatory contribution" to support the cost of providing universal service. The FCC recently determined that telecommunications providers would base their contributions on end user interstate and intrastate revenues. CMRS providers can receive federal universal service funding after demonstrating compliance with the federal universal service eligibility criteria. CMRS providers may also be able to receive funding in certain states, provided that state eligibility requirements do not preclude CMRS carriers from receiving such funding.

Prohibition Against Subsidized Telemessaging Services.

The 1996 Act prohibits incumbent LECs from subsidizing telemessaging services (i.e., voice mail, voice storage/retrieval, live operator services and related ancillary services) from their telephone exchange service or exchange access and from discriminating in favor of its own telemessaging operations.

Conditions on RBOC Provision of In-Region InterLATA Services.

The 1996 Act generally requires that before engaging in landline long distance services in the states in which they provide landline local exchange service referred to as in-region interLATA services, the Regional Bell Operating Companies ("RBOCs") must (i) provide access and interconnection to one or more unaffiliated competing facilities-based providers of telephone exchange service, or after 10 months after enactment of the 1996 Act, no such provider requested such access and interconnection more than three months before the RBOCs has applied for authority and (ii) demonstrate to the FCC its satisfaction of the 1996 Act's "competitive checklist."

The specific interconnection requirements contained in the competitive checklist, which the RBOCs must offer on a non-discriminatory basis, include interconnection and unbundled access; access to poles, ducts, conduits and rights-of-way owned or controlled by the RBOCs; unbundled local loops, unbundled transport and unbundled switching; access to emergency 911, directory assistance, operator call completion and white pages; access to telephone numbers, databases and signaling for call routing and completion; number portability; local dialing parity; reciprocal compensation; and resale.

The 1996 Act eliminates the previous prohibition on RBOC provision of out-of-region interLATA services and all interLATA services associated with the provision of CMRS service, including in-region CMRS service.

### RBOC Commercial Mobile Joint Marketing.

The RBOCs are permitted to market jointly and sell wireless services in conjunction with telephone exchange service, exchange access, intraLATA and interLATA telecommunications and information services.

### CMRS Facilities Siting.

The 1996 Act limits the rights of states and localities to regulate placement of CMRS facilities so as to "prohibit" or prohibit effectively the provision of wireless services or to "discriminate" among providers of such services. It also eliminates environmental effects from RF emissions (provided the wireless system complies with FCC rules) as a basis for states and localities to regulate the placement, construction or operation of wireless facilities. The FCC's implementation of these provisions and the scope thereof have neither been adopted by the agency nor reviewed by the courts.

### Equal Access.

The 1996 Act provides that wireless providers are not required to provide equal access to common carriers for toll services. The FCC is authorized to require unblocked access subject to certain conditions.

### Deregulation.

The FCC is required to forebear from applying any statutory or regulatory provision that is not necessary to keep telecommunications rates and terms reasonable or to protect consumers. A state may not apply a statutory or regulatory provision that the FCC decides to forebear from applying. In addition, the FCC must review its telecommunications regulations every two years and change any that are no longer necessary.

*FCC Interconnection Proceedings*

In August 1996 the FCC adopted rules to implement the interconnection provisions of the 1996 Act. In its interconnection order, the FCC determined that CMRS-to-CMRS interconnection may be accomplished indirectly through the interconnection of each CMRS provider to an incumbent LEC's network. The FCC determined that LECs are required to enter into reciprocal compensation arrangements with all CMRS providers for the transport and termination of LEC-originated traffic. Additionally, the FCC established default "proxy" rates for reciprocal compensation, interconnection and unbundled network elements to be used unless or until a state develops rates for these items based on the Total Element Long Run Incremental Cost ("TELRIC"). The proxy rates for CMRS-to-LEC interconnection would result in significant savings when compared with rates that CMRS providers, principally cellular carriers, have been paying to LECs.

In July 1997 the U.S. Court of Appeals for the Eighth Circuit, acting on consolidated petitions for review of the FCC's interconnection order, vacated the rate-related portions of the order. The court found that the FCC is without jurisdiction to establish pricing regulations regarding intrastate telephone service. The FCC is entitled to appeal the decision.

The portions of the FCC's interconnection order that are not related to pricing issues have gone into effect. In addition to the federal circuit court, several parties have petitioned the FCC for reconsideration of its decision. It is not possible to determine the final outcome of the court proceedings or the petitions for reconsideration or the effect such outcome will have on CMRS carriers, including the Company.

160721.5     -37-

GST-WARTA0013283