*Relocation of Incumbent Fixed Microwave Licensees*

In an effort to balance the competing interests of existing microwave users and newly authorized PCS licensees in the spectrum allocated for PCS use, the FCC has adopted (i) a transition plan to relocate fixed microwave operators that currently are operating in the PCS spectrum, and (ii) a cost sharing plan so that if the relocation of an incumbent benefits more than one PCS licensee, the benefiting PCS licensees will help defray the costs of the relocation. PCS licensees will only be required to relocate fixed microwave incumbents if they cannot share the same spectrum. The transition and cost sharing plans expire on April 4, 2005, at which time remaining incumbents in the PCS spectrum will be responsible for their costs to relocate to alternate spectrum locations.

Relocation generally involves a PCS provider compensating an incumbent for costs associated with system modifications and new equipment required to move to alternate, readily available spectrum. This transition plan allows most microwave users to operate in the PCS spectrum for a one-year voluntary negotiation period and an additional one-year mandatory negotiation period. For public safety entities dedicating a majority of their system communications for police, fire, or emergency medical service operations, the voluntary negotiation period is three years. Parties unable to reach agreement within these time periods may refer the matter to the FCC for resolution, but the existing microwave user is permitted to continue its operations until final FCC resolution of the matter.

The FCC's cost-sharing plan allows PCS licensees that relocate fixed microwave links outside of their license areas to receive reimbursements from later-entrant PCS licensees that benefit from the clearing of their spectrum. A non-profit clearinghouse will be established to administer the FCC's cost-sharing plan.

*License Requirements*

When the FCC allocated spectrum to public auction for PCS, it designated the C- and F-Blocks as the "Entrepreneurs' Blocks." FCC rules require C- and F-Block Entrepreneurs to meet various qualifications to hold C- and F-Block licenses or to receive certain financing preferences. Among these are: (i) the various structural requirements governing equity investments, including the Entrepreneurs Requirements, Small Business Requirements and Control Group Requirements, all of which apply specifically to Entrepreneurs, and the Foreign Ownership Limitations, which apply to all communications entities governed by the FCC; (ii) transfer restrictions limiting, among other things, the sale of Entrepreneurs' Blocks licenses; and (iii) other ongoing requirements that mandate network build-out schedules and limit cross-ownership of cellular and other wireless investments. The FCC also determined that Entrepreneurs that qualify as a "Small Business" or "Very Small Business" would be eligible to receive a loan from the federal government for 90% and 80% of the dollar amount of their winning bids in the C- and F-Block auctions respectively. The Government Financing provided to the Company are Entrepreneurs' Blocks Loans. See "Description of Certain Indebtedness." In order to ensure continued compliance with the FCC rules, the FCC has announced its intention to conduct random audits during the initial 10-year PCS license terms. There can be no assurance that the Company will continue to satisfy any of the FCC's qualifications or requirements, and the failure to do so would have a material adverse effect on the Company.

<u>Structural Requirements</u>.

*Entrepreneurs Requirements.* In order to hold an Entrepreneurs' Blocks license, an entity must: (i) meet the Entrepreneurs Revenues Limit by having less than $125 million in gross revenues and (ii) meet the Entrepreneurs Asset Limit by having less than $500 million in total assets (excluding the value of C-Block licenses). To qualify for the Entrepreneurs' Blocks Auctions, an entity had to

GST-WARTA0013284

06/19/98 FRI 16:40 FAX 604 643 7900    MCARTHY TETRAULT                    ⌀046

have met the Entrepreneurs Revenues Limit for each of the two years prior to the applicable auction and the Entrepreneurs Asset Limit at the time it filed its Short Form. For at least five years after obtaining an Entrepreneurs' Blocks license, a licensee must continue to meet the Entrepreneurs Requirements, which are modified for such five-year period to exclude certain assets and revenues from being counted toward the Entrepreneurs Asset Limit and the Entrepreneurs Revenues Limit, respectively. Additional amounts are excluded if the licensee maintains an organizational structure that satisfies the Control Group Requirements described below. In calculating a licensee's gross revenues for purposes of the Entrepreneurs Requirements, the FCC includes the gross revenues of the licensee's affiliates, those persons or entities that hold interests in the licensee and the affiliates of such persons or entities.

By claiming status as an Entrepreneur, the Company qualified for the Entrepreneurs' Blocks Auctions. If the FCC were to determine that the Company did not satisfy the Entrepreneur Requirements at the time it participated in the Entrepreneurs' Blocks Auctions or that the Company fails to meet the ongoing Entrepreneurs Requirements, the FCC could revoke the Company's Entrepreneurs' Blocks licenses, fine the Company or take other enforcement actions, including imposing the Unjust Enrichment Penalties. Although the Company believes it has met the Entrepreneurs Requirements, there can be no assurance that it will continue to meet such requirements or that, if it fails to continue to meet such requirements, the FCC will not take action against the Company, which could include revocation of its PCS licenses.

*Small Business and Very Small Business Requirements.* An entity that meets the Entrepreneurs Requirements may also receive certain preferential financing terms if it meets the Small Business or Very Small Business Requirements. These preferential financing terms include a 15% bidding credit for Small Businesses and a 25% Bidding Credit for Very Small Businesses (such as the Company) and the ability to make quarterly interest-only payments on its Entrepreneurs' Blocks Loan for the first six years and first two years of the license term in the case of C- and F-Block licenses, respectively. To meet the Small Business or Very Small Business Requirements, a licensee must have had annual average gross revenues of not more than $40 million or $15 million, respectively, for the three calendar years preceding the date it filed its Short Form. In calculating a licensee's gross revenues for purposes of the Small and Very Small Business Requirements, the FCC includes the gross revenues of the licensee's affiliates, those persons or entities that hold interests in the licensee, and the affiliates of such persons or entities.

By claiming status as a Small Business, in the case of the C- Block re-auction, and a Very Small Business in the case of the F- Block auction, the Company qualified for the Bidding Credit and the most favorable installment payment terms. If the FCC were to determine that the Company does not qualify as a Small Business or Very Small Business, the Company could, at a minimum, be forced to repay the portion of the Bidding Credit to which it was not entitled. Further, the FCC could revoke the Company's Entrepreneurs' Blocks licenses, fine the Company or take other enforcement actions, including imposing the Unjust Enrichment Penalties. Although the Company has structured itself to meet the Small Business or Very Small Business Requirements, there can be no assurance that it will remain in compliance with these requirements or that, if it fails to continue to meet such requirements, the FCC will not take action against the Company, which could include revocation of its Entrepreneurs' Blocks licenses.

*Control Group Requirements.* If an Entrepreneurs' Blocks licensee meets the Control Group Requirements, the FCC excludes certain assets and revenues from such licensee's total revenues and assets, making it easier for the licensee to meet the Entrepreneurs Requirements and the Small Business and Very Small Business Requirements. The Control Group Requirements mandate that the Control Group, among other things, have both actual and legal control of the licensee. Further, the FCC permits licensees to qualify under the Control Group

160721.5                                    -39-

GST-WARTA0013285

05/15/98(FRI) 13:51   [TX/RX NO 8153]

Case 1:04-cv-01380-GMS   Document 45-5   Filed 04/05/2005   Page 3 of 11

06/19/98 FRI 16:40 FAX 604 643 7900   MCARTHY TETRAULT                    ⌐047
To: BYRON GIBSON                From: DANIEL J GALLAGHER      5-15-98  1:58pm  p. 17 of 55

Requirements pursuant to the Qualifying Investor Option if its Control Group is comprised of the following: (i) Qualifying Investors that own at least 15% of the total equity interest on a fully diluted basis and 50.1% of the voting power in the Entrepreneurs' Blocks licensee and (ii) Additional Control Group Members that hold at least 10%, on a fully diluted basis, of the total equity interest in the Entrepreneurs' Blocks licensee. Additional Control Group Members must be either: (a) the same Qualifying Investors in the Control Group, (b) members of the licensee's management or (c) non-controlling institutional investors, including venture capital firms. To take advantage of the FCC's Qualifying Investor Option, an Entrepreneurs' Blocks licensee must have met the Qualifying Investor Option requirements at the time it filed its Short Form and must continue to meet the Qualifying Investor Option requirements for five years following the License Grant Date. Commencing the fourth year of the license term, the FCC rules allow the licensee to reduce the minimum required equity interest held by the Control Group's Qualifying Investors from 15% to 10%. At that time, the remaining 15% of the Control Group's former equity may be held by non-qualifying investors in compliance with the FCC's 25% non-attributable equity limitations.

In order to meet the Control Group Requirements, the Company's Certificate of Incorporation provides that the Company's Class A Common Stock, as a class, must constitute 50.1% of the voting power of the Company. See "Description of Capital Stock." There can be no assurance that the Company will remain in compliance with the Control Group Requirements or, if it fails to continue to meet such requirements, that the FCC will not take action against the Company, which could include revocation of its Entrepreneurs' Blocks licenses. Although the Company has taken these and other steps to meet the Control Group Requirements, there can be no assurance that the Company has or will continue to meet the Control Group Requirements, and the failure to meet such requirements would have a material adverse effect on the Company.

*Asset and Revenue Calculation.* In determining whether an entity qualifies as an Entrepreneur and/or as a Small Business or Very Small Business, the FCC counts the gross revenues and assets of the entity's "financial affiliates" toward the entity's total gross revenues and total assets. Financial affiliation can arise from common investments, familial or spousal relationships, contractual relationships, voting trusts, joint venture agreements, stock ownership, stock options, convertible debentures and agreements to merge. Affiliates of noncontrolling investors with ownership interests that do not exceed the applicable FCC "passive" investor ownership thresholds are not attributed to Entrepreneurs' Blocks licensees for purposes of determining whether such licensees financially qualify for the applicable Entrepreneurs' Blocks Auction preferences. The Entrepreneurs Requirements and the Small Business and Very Small Business Requirements provide that, to qualify as a passive investor, an entity may not own more than 25% of the Company's total equity on a fully diluted basis. Although the Company will use its best efforts to comply with the FCC's Entrepreneur Requirements, there can be no assurance that the Company will not exceed these passive investor limits or otherwise violate the Entrepreneur Requirements and/or the Small Business Requirements.

In addition, if an entity makes bona fide loans to a Entrepreneurs' Blocks licensee, the assets and revenues of the creditor would not be attributed to the licensee unless the creditor is otherwise deemed an affiliate of the licensee, or the loan is treated by the FCC as an equity investment and such treatment would cause the creditor/investor to exceed the applicable ownership interest thresholds (for purposes of both the financial affiliation and foreign ownership rules). Although the FCC permits a creditor/investor to use standard terms to protect its investment in Entrepreneurs' Blocks licensees, such as covenants, rights of first refusal and super-majority voting rights on specified issues, the FCC has stated that it will be guided but not bound by criteria used by the Internal Revenue Service to determine whether a debt investment is bona fide debt. The FCC's application of its financial affiliation rules is largely untested and there can be no assurance that the FCC or the courts will not treat

160721.5                                -40-

Case 1:04-cv-01380-GMS    Document 45-5    Filed 04/05/2005    Page 4 of 11

06/19/98 FRI 16:41 FAX 604 643 7900    MCARTHY TETRAULT    ⌀048
To: BYRON GIBSON    FROM: DANIEL J GALLAGHER    5-15-98 1:45pm p. 99 of 55

certain of the Company's lenders or investors as financial affiliates of the Company.

*Foreign Ownership Limitations.* The Communications Act requires that non-U.S. citizens, their representatives, foreign governments or corporations otherwise subject to domination and control by non-U.S. citizens may not own of record or vote (i) more than 20% of the capital contribution to a common carrier radio station directly, or (ii) more than 25% of the capital contribution to the parent corporation of a common carrier radio station licensee if the FCC determines such holding are not within the public interest. Because the FCC classifies PCS as a common carrier offering, PCS licensees are subject to the foreign ownership limits. Congress recently eliminated restrictions on non-U.S. citizens serving as members on the board of directors and officers of a common carrier radio licensee or its parent. The FCC also recently adopted rules that, subject to a public interest finding by the FCC, could allow additional indirect foreign ownership of CMRS companies to the extent that the relevant foreign states extend reciprocal treatment to U.S. investors. The Company's Long Form filed by the Company with the FCC after the completion of the F-Block Auction indicates that the Company is in compliance with the FCC foreign-ownership rules. However, if the foreign ownership of the Company were to exceed 25% in the future, the FCC could revoke the Company's PCS licenses or impose other penalties. Further, the Company's Certificate of Incorporation enables the Company to redeem shares from holders of Common Stock whose acquisition of such shares results in a violation of such limitation. The restrictions on foreign ownership could adversely affect the Company's ability to attract additional equity financing from entities that are, or are owned by, non-U.S. entities. The recent WTO agreement on basic telecommunications services could eliminate or loosen foreign ownership limitation but could also increase the Company's competition. Under this agreement, the United States and other members of the WTO committed themselves to opening their telecommunications markets to competition and foreign ownership and to adopting regulatory measures to protect competitors against anticompetitive behavior by dominant telephone companies, effective as early as January 1, 1998. Pursuant to the WTO Agreement, the FCC will permit foreign entities to hold up to a 100% indirect ownership interest in common carrier radio licensees, subject to prior fee approval. The 20% limitation on direct foreign ownership interests remains unaffected.

<u>Transfer Restrictions</u>.

*License Transfer Restrictions.* During the first five years after the License Grant Date, transfer or assignment of an Entrepreneurs' Blocks license is prohibited to any entity that fails to satisfy the Entrepreneurs Requirements. If such a transfer occurs to an entity that does not qualify for Bidding Credits, such a sale would be subject to payment of the Bidding Credit and the licensee must adjust its installment payments to the FCC to effect the Bidding Credits and payment plan applicable to the new entity (e.g., an enterprise that is not a Very Small Business). After five years, all such transfers and assignments of the licenses remain subject to the Unjust Enrichment Penalties.

*Unjust Enrichment.* Any transfer during the full license term (10 years) may require certain costs and reimbursements to the government of Bidding Credits and/or outstanding principal and interest payments (the "Unjust Enrichment Penalties"). In addition, if the Company wishes to make any change in ownership structure during the initial license term involving the de facto and de jure control of the Company, it must seek FCC approval and may be subject to the same costs and reimbursement conditions indicated above.

<u>Entrepreneurs' Blocks Rules</u>.

The Company (i) believes that it has structured itself to satisfy the Entrepreneurs Requirements, (ii) intends to diligently pursue and maintain its qualification as a Small Business and Very Small Business and (iii) has

160721.5    -41-

GST-WARTA0013287

06/19/98 FRI 16:41 FAX 604 643 7900    MCARTHY TETRAULT                                    049
To: BYRON GIBSON             From: DANIEL J GALLAGHER           5-15-98  4:49pm  p. 49 of 55

structured its securities, including certain restrictions on ownership, in a matter intended to ensure compliance with the applicable FCC Rules. The Company has relied on representations of its investors to determine its compliance with the FCC's rules applicable to Entrepreneurs' Blocks licenses. There can be no assurance, however, that the Company's investors or the Company itself will continue to satisfy these requirements during the term of any PCS license granted to the Company or that the Company will be able to successfully implement divestiture or other mechanisms included in the Company's Certificate of Incorporation that are designed to ensure compliance with FCC rules. Any non-compliance with FCC rules could subject the Company to serious penalties, including revocation of its PCS licenses.

Other Ongoing Requirements.

*Build-Out Requirements.* The FCC has mandated that recipients of PCS licenses adhere to build-out requirements. All 30 MHz PCS licensees (such as A-, B- or C-Block licensees) must construct facilities to offer adequate service to at least one-third of the population in their service area within five years from the applicable License Grant Date, and to offer adequate service to at least two-thirds of the population in their service area within ten years from the applicable License Grant Date. All 10 MHz PCS licensees (such as F-Block licensees) must construct facilities to offer adequate service to at least one-quarter of the population in their service area within five years from the date of initial license grants or make a showing of substantial service in its licensed areas within five years of the initial license grants. Violation of these regulations could result in license non-renewals, revocations, forfeitures or fines.

*Additional Requirements.* As an A-, C- and F-Block licensee, the Company will be subject to certain restrictions that limit, among other things, the number of PCS licenses it may hold as well as certain cross-ownership restrictions pertaining to cellular and other wireless investments.

*Penalties for Payment Default.* In the event that the Company were to become unable to meet its obligations under the Government Financing, the FCC could in such instances reclaim some or possibly all of the Company's Entrepreneurs' Blocks licenses, reauction them, and subject the Company to a penalty comprised of the difference between the price at which it acquired its license and the amount of the winning bid at reauction, plus an additional penalty of 3% of the lesser of the subsequent winning bid and the defaulting bidders bid amount.

Employees

As of December [ ], 1997, the Company had [six] full-time employees. None of such employees is covered by a collective bargaining agreement. The Company considers its relations with its employees to be good.

Properties

[Please provide a description of the sublease arrangement at 4001 Main Street.]

160721.5                                -42-

GST-WARTA0013288

05/15/98(FRI) 13:51   [TX/RX NO 8153]

MANAGEMENT

The following table sets forth certain information concerning the directors, executive officers and other key personnel of the Company:

| Name | Age | Position |
|---|---|---|
| John Warta | 50 | Chairman of the Board |
| Robert L. Olson | 47 | Director; President and Chief Executive Officer |
| Stephen Irwin | 56 | Director; Secretary |
| Clifford V. Sander | 60 | Treasurer |
| Matthew Wetzel | 26 | Director of Business Development |

John Warta has been Chairman of the Board of the Company since October 1997. Mr. Warta has been Chairman of the Board of GST since March 1997 and has been its Chief Executive Officer since March 1995. Mr. Warta was President and a director of GST from March 1995 to March 1997. From June 1994 to April 1995, he was the President and Chief Executive Officer of GST Telecom Inc. ("GST Telecom"). Mr. Warta co-founded Electric Lightwave, Inc. ("ELI") in 1988, which operates fiber optic competitive access networks in various states, and served as its President and Chief Executive Officer from June 1989 to June 1993. From June 1993 to June 1994, Mr. Warta was developing the competitive access networks of Pacwest Network, L.L.C. ("Pacwest"). From December 1986 to January 1988, he was Senior Vice President, Marketing, Sales and Corporate Development for NorLight, a regional fiber optic carrier in the Midwest, and from August 1980 to December 1986 he was Senior Vice President of The American Network Group, Inc., a long distance carrier.

Robert L. Olson has been a director, President and Chief Executive Officer of the Company since October 1997. Mr. Olson is a director of NACT Telecommunications, Inc. ("NACT"). Mr. Olson was President of GST Telecom from January 1997 to August 1997 and was Vice President and General Manager of Exchange and Wireless at GST Telecom from March 1995 until January 1997. Mr. Olson was Vice President and General Manager of Metroplex Communications Corporation (now TDS), a holding company which owned various communications companies from 1986 to 1995. Mr. Olson's past experience included providing telecommunications consulting services to the industry as a supervisor with Ernst and Whinney.

Stephen Irwin has been a director and Secretary of the Company since October 1997. Mr. Irwin has been Vice Chairman of the Board and a director of GST since September 1995 and has been its Secretary since November 1992 and is a director of NACT. Mr. Irwin is an attorney specializing in corporate matters including finance, securities regulation, international business and mergers and acquisitions, and has been of counsel to the New York law firm of Olshan Grundman Frome & Rosenzweig LLP since 1990. Mr. Irwin was a senior partner of Greenberg, Irwin and Weisinger, a New York law firm specializing in securities, business and corporate matters, from 1968 to 1990.

Clifford V. Sander has been Treasurer of the Company since October 1997. Mr. Sander has been Senior Vice President and Treasurer of GST since March 1995 and is a director of NACT. From 1962 to 1994, Mr. Sander was in private accounting practice in Portland, Oregon. He was acting Chief Financial Officer of ELI during its formation in 1988 and continued to provide accounting and

160721.5                                -43-

Case 1:04-cv-01380-GMS   Document 45-5   Filed 04/05/2005   Page 7 of 11

06/19/98 FRI 16:42 FAX 604 643 7900   MCARTHY TETRAULT                      ⌀051
To: BYRON GIBSON           From: DANIEL J GALLAGHER     5-15-98 4:48pm p. 51 of 53

financial consulting services to ELI through 1993. Mr. Sander is a Certified Public Accountant.

Matthew Wetzel has been Director of Business Development of the Company since October 1997. Mr. Wetzel was Senior Analyst of the Exchange and Wireless Division of GST Telecom Inc. ("GST Telecom") from June 1996 to September 1997 and a Senior Analyst in the Business Development Division of GST Telecom from June 1994 to May 1996. From June 1993 to June 1994 Mr. Wetzel was employed by Pacwest Network, L.L.C. and assisted in developing competitive access networks.

Each director holds office until the next annual meeting or until his successor is duly elected, unless his office is vacated earlier in accordance with the Company's by-laws. Subject to the terms of applicable employment agreements, the Company's executive officers serve at the pleasure of the Board of Directors.

## CERTAIN TRANSACTIONS

The Company has entered into the Reseller Agreement, providing for, among other things, that (i) GST will serve as a non-exclusive reseller of PCS minutes in the markets in which the Company has obtained licenses and (ii) [where technically and economically feasible,] the Company will utilize GST [on an exclusive basis] to provide switched local and long distance services as well as other enhanced telecommunications services to all of the Company's resellers located in markets in which GST has commercially operational networks, in each case for a period of 12 years. In connection with the Reseller Agreement, as of December 1, 1997, GST has paid the Company approximately $14.4 million as prepayments for future PCS minutes. Additionally, the Company and GST are presently negotiating the Preferred Provider Agreement, pursuant to which the Company and GST will [purchase certain products and services from each other at preferred rates.]

In October 1997, the Company borrowed an aggregate of $424,165.72 (the "PNI Loan") from Pacwest Network, Inc., a company controlled by Mr. Warta, and an aggregate of $150,000.00 (the "Olson Loan") from Mr. Olson and entities affiliated therewith. Each of the PNI Loan and the Olson Loan is evidenced by a promissory note payable upon demand, bears interest at 10% per annum and is unsecured.

## PRINCIPAL STOCKHOLDERS

The following table sets forth certain information regarding the ownership of the Common Stock as of December [ ], 1997.

| Name | Shares Beneficially Owned | Percentage |
|---|---|---|
| [To Be Provided] | | |

## DESCRIPTION OF SECURITIES

The following description of the capital stock of the Company is a summary and is qualified in its entirety by reference to the provisions of the Company's Certificate of Incorporation.

The authorized capital stock of the Company consists of [       ] shares of Common Stock.

**Common Stock**

The holders of Common Stock are entitled to one vote per share and are entitled to vote on all matters subject to stockholder approval. The holders of outstanding shares of Common Stock are entitled to receive dividends as and when declared by the Board of Directors, out of funds legally available therefor. The holders of Common Stock have no cumulative voting rights and no rights to convert their shares of Common Stock into any other securities. All of the shares of Common Stock being offered by the Company hereby will be, upon the receipt of payment therefor, fully paid and nonassessable. On liquidation, dissolution or winding up of the Company, the holders of Common Stock are entitled to receive pro rata the net assets of the Company remaining after the payment of all creditors.

*Antitakeover Effect of Provisions of the Certificate of Incorporation, Bylaws, Delaware Law and Control Group Requirements*

[Bylaws and Certificate of Incorporation.]

The Bylaws provide that the Company's stockholders may call a special meeting of stockholders only upon a request of stockholders owning at least a majority of the Company's capital stock. These provisions could discourage potential acquisition proposals and could delay or prevent a change in control of the Company. In addition, the Certificate of Incorporation provides that any stockholder action may only be taken at a duly called meeting of stockholders and that special meetings of stockholders may be called only by the Board of Directors. These provisions are intended to enhance the likelihood of continuity and stability in the composition of the Board of Directors and in the policies formulated by the Board of Directors and to discourage certain types of transactions that may involve an actual or threatened change of control of the Company. These provisions are designed to reduce the vulnerability of the Company to an unsolicited acquisition proposal. These provisions are also intended to discourage certain tactics that may be used in proxy fights. However, such provisions could have the effect of discouraging others from making tender offers for the Company's shares and, as a consequence, they also may inhibit fluctuations in the market price of the Company's shares that could result from actual or rumored takeover attempts. Such provisions also may have the effect of preventing changes in the management of the Company.

Delaware Takeover Statute.

The Company is subject to Section 203 of the Delaware General Corporation Law ("Section 203"), which, subject to certain exceptions, prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years following the date that such stockholder became an interested stockholder, unless: (i) prior to such date, the Board of Directors of the corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder; (ii) upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned (a) by persons who are directors and also officers and (b) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer, or (iii) on or subsequent to such date, the business combination is approved by the Board of Directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66⅔% of the outstanding voting stock that is owned by the interested stockholder.

160721.5                              -45-

GST-WARTA0013291

Case 1:04-cv-01380-GMS    Document 45-5    Filed 04/05/2005    Page 9 of 11

06/19/98 FRI 16:43 FAX 604 643 7900    MCARTHY TETRAULT    ⌀053
To: BYRON GIBSON    From: DANIEL J GALLAGHER    5-15-98  1:48pm  p. 53 of 55

Section 203 defines business combination to include: (i) any merger or consolidation involving the corporation and the interested stockholder; (ii) any sale, transfer, pledge or disposition of 10% or more of the assets of the corporation involving the interested stockholder, (iii) subject to certain exceptions, any transaction that results in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder; (iv) any transaction involving the corporation that has the effect of increasing the proportionate share of the stock of any class or series of the corporation beneficially owned by the interested stockholder; or (v) the receipt by the interested stockholder of the benefit of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation. In general, Section 203 defines an interested stockholder as an entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation and any entity or person affiliated with or controlling or controlled by such entity or person.

<u>Control Group Requirements</u>.

In order to meet the Control Group Requirements, the Company's Certificate of Incorporation provides that the Company's Class A Common Stock, as a class, must constitute 50.1% of the voting power of the Company. The structure that the Company has adopted to ensure compliance with the Control Group Requirements will likely deter and delay unsolicited changes in control of the Company.

### DESCRIPTION OF CERTAIN INDEBTEDNESS

The total amount of Government Financing in respect of the PCS licenses for which the Company has either been named the winning bidder or has purchased is $119,046,475. Under preferential financing terms, the Company paid an initial deposit of 10% of the license fee (or $11,423,125) for the C-Block licenses, (an additional $571,000 was paid by Telecom Wrap-Up, whose 6 C-Block licenses were subsequently purchased by the Company. See "— Telecom Wrap-Up Indebtedness.") An initial deposit of 20% of the license fee (or $2,774,600) for the F-Block licenses was also paid by the Company. The total payments made by the Company to the U.S. Government for initial deposits on the C- and F-Block license is $14,197,725. Under the preferential C-Block financing terms, the Company will pay interest only for the first six years of the license term at a fixed annual interest rate (6.5% for Eugene, OR, Salem, OR, Tucson, AZ, Santa Fe, NM, and Albuquerque NM licenses; 7% for the Gallup, NM, Farmington, NM, St. George, UT, Hot Springs, AR, Harrison, AR, and Russellville, AR licenses), with principal amortized during the seventh through tenth years of the license term. Under the preferential F-Block financing terms, the Company will pay interest only for the first two years of the license term at a fixed annual interest rate (estimated at 6.5%), with principal amortized during the third through tenth years of the license term. As a C- and F-Block licensee, however, the Company may incur substantial financial penalties, license revocation or other enforcement measures at the FCC's discretion, in the event that it fails to make timely quarterly installment payments. If a C- or F-Block licensee anticipates defaulting on any required payment, it may request a three to six-month grace period before the FCC cancels its license(s). In the event of default by a C- or F-Block licensee, the FCC could reclaim and reauction the licenses and subject the defaulting party to a penalty equal to the sum of the difference between the price at which such licenses acquired its licenses and the amount of the winning bids at reauction, plus an additional penalty of 3% of the subsequent winning bid.

**Acquisition Indebtedness**

On October 16, 1997, the Company purchased from Telecom Wrap-Up six C-Block licenses for a purchase price of $1,142,400 (the "Purchase Price"). In addition, the Company agreed to reimburse Telecom Wrap-Up a maximum of $300,000 for management fees and up-front costs associated with the successful bid on the six acquired C-Block licenses. In connection with such acquisition, the Company

160721.5                        -46-

06/19/98  FRI 16:44 FAX 604 643 7900    MCARTHY TETRAULT                                   ☒054
To: BYRON GIBSON                From: DANIEL J GALLAGHER            5-15-98  1:51pm  p. 34 of 35

issued a promissory note (the "Note") to Telecom Wrap-Up in the principal amount equal to the Purchase Price, bearing interest at the rate of 8% per annum and maturing on December 31, 1997.

PLAN OF DISTRIBUTION

[To Be Provided]

INVESTOR SUITABILITY

An investment in the Shares involves a high degree of risk and possible loss by investors of their entire investment. The Shares will be offered and sold only to prospective investors who (i) represent, among other things, that they are acquiring Shares for their own account, for investment only and not with a view toward the resale or distribution thereof, that such acquisition has been duly authorized and that they are aware that the Shares have not been registered under the Securities Act and that their transfer rights are restricted by the Securities Act, applicable state securities laws and (ii) are investors meeting the suitability standards for Accredited Investors hereinafter set forth.

The Company will require as a general investor suitability standard that each investor represent in writing that: (i) he or she is a natural person who has a net worth or joint net worth with his or her spouse in excess of $1,000,000 at the time of his or her purchase; or (ii) he or she is a natural person who had an individual income in excess of $200,000 in both 1995 and 1996 or a joint income with his or her spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in 1997; or (iii) it is either (a) a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity, (b) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (c) an insurance company as defined in Section 2(13) of the Securities Act, (d) an investment company registered under the Investment Company Act of 1940 (e) a business development company as defined in Section 2(a)(48) of such act, (f) a Small Business Investment Company licensed by the United States Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, (g) a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5 million, or (g) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, or a "Keogh" plan for self-employed individuals and owner-employees under Section 401(c) of the Internal Revenue Code of 1986, as amended (the "Code"), if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which plan fiduciary is a bank, a savings and loan association, an insurance company or a registered investment advisor, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons who otherwise meet these suitability standards; or (iv) it is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940; or (v) it is an organization described in Section 501(c)(3) of the Code as a corporation, a Massachusetts a similar business trust or a partnership, not formed for the specific purpose of acquiring Shares, with total assets in excess of $5 million; or (vi) it is a trust not formed for the specific purpose of acquiring Shares (the purchase of which is directed by a sophisticated person, as described in Rule 506(b)(2)(ii) under the Securities Act), with total assets in excess of $5 million; or (vii) any entity (including an individual retirement account) in which each and every equity owner of such entity certifies that he, she or it is an Accredited Investor.

160721.5                                   -47-

GST-WARTA0013293

05/15/98(FRI) 13:51  [TX/RX NO 8153]

06/19/98 FRI 16:44 FAX 604 643 7900   MCARTHY TETRAULT   ⌀055
To: BYRON GIBSON   FROM: DANIEL J GALLAGHER

As used in this Memorandum, the term "net worth" means the excess of total assets over total liabilities. In determining income, an investor should add to his or her adjusted gross income any amounts attributable to tax-exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

The suitability standards referred to above represent minimum suitability requirements for investors and the satisfaction of such standards by an investor does not necessarily mean that Shares are a suitable investment for such prospective investor. The Company may make or cause to be made such further inquiry and obtain such additional information as it deems appropriate with regard to the suitability of investors. The Company reserves the right to modify the suitability standards and minimum investment with respect to certain investors, in order to comply with any applicable state or local laws, rules or regulations or otherwise.

THE SUITABILITY STANDARDS DISCUSSED ABOVE REPRESENT MINIMUM SUITABILITY STANDARDS FOR PROSPECTIVE INVESTORS. EACH PROSPECTIVE INVESTOR, TOGETHER WITH HIS OR HER INVESTMENT, TAX, LEGAL, ACCOUNTING AND OTHER ADVISERS, SHOULD DETERMINE WHETHER THIS INVESTMENT IS APPROPRIATE FOR SUCH INVESTOR.

### SUBSCRIPTION PROCEDURE

[To Be Provided]

Each prospective investor must deliver to the Company a fully completed and executed Subscription Agreement and Offeree Questionnaire. Forms of such agreements have been delivered to prospective investors.

### REPORTS TO INVESTORS

Until the Company files reports under the Exchange Act, each investor will be furnished by the Company with unaudited quarterly balance sheets, statements of income and statements of changes in financial position, and an annual audited balance sheet, statement of income and statement of changes in financial position, in each case with comparisons to the comparable period in the prior fiscal year. The Company's firm of certified public accountants is [       ].

### LEGAL MATTERS

Certain legal matters in connection with the validity of the Shares offered hereby will be passed upon for the Company by Olshan Grundman Frome & Rosenzweig LLP, 505 Park Avenue, New York, New York 10022, which also serves as counsel to GST. [Disclose ownership and affiliation of relevant parties.]

GST-WARTA0013294

05/15/98(FRI) 13:51   [TX/RX NO 8153]