# EXHIBIT 11

# MASTER SERVICES AND FACILITIES AGREEMENT
## BETWEEN
## GST TELECOM, INC.
## AND
## PCS PLUS HOLDING CO.

This Master Services and Facilities Agreement (the "Agreement") is made and entered into on the 27th day of March, 1998, (the "Effective Date"), between GST Telecom, Inc., ("GST"), a Delaware corporation with its principal place of business at 4001 Main Street, Vancouver, Washington and PCS Plus Holding Co., a Delaware corporation ("PCS Plus") with its principal place of business at 4001 Main Street, Vancouver, Washington.

WHEREAS, GST through its affiliates and subsidiaries provides telecommunications services, systems, facilities, equipment and related services, and

WHEREAS, PCS Plus through its affiliates and subsidiaries provides wireless telecommunications services, equipment and facilities; and

WHEREAS, GST and PCS Plus both desire to negotiate favorable terms and conditions with each other for such goods and Services to the mutual benefit of GST, PCS Plus and their respective affiliates and subsidiaries.

NOW THEREFORE, in consideration of the mutual covenants herein set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GST and PCS Plus (the "Parties") hereto agree as follows:

## ARTICLE 1 - COMPOSITION OF AGREEMENT

This Agreement shall also include the following exhibits:

Exhibit A - Services and Facilities
Exhibit B - Rate Schedule/Pricing Methodology
Exhibit C - Service Standards
Exhibit D - Insurance Provisions
Exhibit E - Service Order

## ARTICLE 2 - DEFINITIONS

2.1   "Affiliate" or "Affiliated Company" shall mean any allied company or entity in which a Party owns or controls at least five percent (5%) of the voting securities, whether directly or indirectly.

03/27/98

**EXHIBIT U**



GST-WARTA0010313

2.2    "Availability" shall mean, the percentage of time that each individual service is available for the use of the purchasing Party. The following formula will be used to determine availability of the Services:

$$\left[ \frac{\text{Scheduled Hours - Total Outage Hours}}{\text{Scheduled Hours}} \right] \times 100 = \text{Availability Percentage}$$

2.3    "Chronic Trouble" shall mean any Service or Facility that experiences an Interruption at least three (3) times within thirty (30) consecutive days.

2.4    "Expedite" shall mean an order(s) for the Services with a requested due date that is less than the current Service Standards as stated in Exhibit C.

2.5    "Facilities" shall mean, individually or collectively, the circuits, equipment, hardware and software described in Exhibit A hereto, including all associated components thereof, for which a Party is responsible hereunder, together with supporting documentation and any other materials.

2.6    "Improvements" shall mean changes to or replacement of Service or Facilities that provide new or advanced technological features and capabilities.

2.7    "Interruptions" shall mean the period of time during which there is an interruption in Service that causes a significant loss of continuity or that has rendered the Service or Facilities unfit for a Party's use. An Interruption begins when the Service Provider receives a major fault alarm on its network management system or the adversely affected Party reports that the Service is interrupted, whichever occurs sooner, provided the Service is released for testing and repair. An Interruption concludes when the Service Provider notifies the adversely affected Party that the Service has been repaired and returns the Service to the affected Party, unless the affected Party promptly notifies the Service Provider that the restoration of the Service is unsuccessful, in which case the Interruption period will continue until the Parties agree that the Service is functional. An Interruption shall be deemed to have occurred only when it is a result of a failure of the Service Provider's Facilities, employees, or contractors and not the result: (i) the negligent or intentional acts of the adversely affected Party (including its employees, agents, and contractors) or other third parties; (ii) the failure or malfunction of the equipment, facilities or systems provided by the adversely affected Party or any third parties; or (iii) any Interruption due to the prearranged alteration, maintenance or modification of the Services or any equipment or facilities of either Party.

2.8    "Service Order" shall refer to an Order mutually executed by both Parties under this Agreement for a specific Service or Facilities at the prices set forth in Exhibit B.

2.9    "Services" shall mean any and all telecommunications services including, without limitation, design, engineering, maintenance, management, operator, repair, transmission, switching, and other related services as more fully described in Exhibit A.

03/27/98

2.10 "Service Standards" shall mean levels of service performance to be provided as set forth in Exhibit C.

2.11 "Service Provider" shall mean the Party making Services and Facilities available to the other Party.

2.12 "Subsidiary" shall mean any company or entity in which a Party owns or controls a majority of the voting securities, whether directly or indirectly.

## ARTICLE 3 - TERM AND RENEWAL

3.1 Unless terminated earlier in accordance with Article 16, the initial term of this Agreement shall commence on the Effective Date and shall continue for five (5) years following such date ("Term").

3.2 Subject to Article 16, this Agreement may be extended for additional five (5) year periods upon written notification by the interested Party at least thirty (30) days in advance of the commencement of any such extension ("Extension") provided the other Party provides written acceptance of the Extension within thirty (30) days. In lieu of agreeing to an Extension, or at the end of the final Extension term, either Party may extend this Agreement at the prices, terms and conditions in this Agreement on a month-to-month basis for up to six (6) months. If either Party elects to exercise this right, it will so notify the other Party in writing at least (30) days in advance of the start of the month-to-month period. On the first day of each separate one-month term, the Party shall be deemed to elect an additional one-month term (subject to the six (6) month limitation) unless it notifies the other Party on or before that date of its intent to terminate this Agreement.

## ARTICLE 4 - AVAILABILITY; SERVICE INTERRUPTIONS

4.1 The adversely affected Party shall be entitled to receive credit from the Service Provider for Interruptions to the Service or Facilities ("Credits Allowances"). A Credit Allowance shall be calculated and credited in thirty (30) minute increments, or major portion thereof, provided that such Credit Allowance does not exceed the recurring charges paid by the adversely affected Party during the applicable invoice period for the Interrupted Service or Facilities in question. A Credit Allowance will only be issued if: (i) the adversely affected Party provides the Service Provider with unimpeded access to its premises, subject to reasonable security procedures, to conduct the appropriate maintenance, repairs and testing of the Service and Facilities, (ii) and (iii) the adversely affected Party does not continue to use the Service or Facilities on an impaired basis after notifying the Service Provider unless, in the Service Provider's reasonable judgment following the adversely affected Party's request, temporarily using the Service or Facilities on an impaired basis will not further harm the Service Provider's Facilities or continued provisioning of the Services. In the event that a Service or Facilities interruption is caused by a third party provider, the Service Provider agrees to pass through the proportional credits it receives from

- 3 -

GST-WARTA0010315

such third party provider to the adversely affected Party, if any. The foregoing states an adversely affected Party's sole remedy for any Interruption under this Agreement.

4.2    In the event there is Chronic Trouble to any Service or Facility of the Service Provider, the adversely affected Party shall be entitled to one hundred percent (100%) of the value of the Credit Allowances the Party would otherwise be entitled to receive hereunder. If any Services or Facilities experiencing Chronic Trouble fail to meet the Availability requirements set forth in Exhibit C, the minimum annual commitment for such Service or Facilities, if any, shall be reduced by an amount equal to the charges the adversely affected Party would have otherwise owed during the period of Chronic Trouble. The foregoing states an adversely affected Party's sole remedy for any Chronic Trouble under this Agreement.

## ARTICLE 5 - NEW TECHNOLOGY AND BUSINESS CHANGE

5.1    During the Term of this Agreement, or any Extension, a Party may request that the Service be upgraded or changed to benefit from any Improvements upon forty-five (45) days prior written notice provided all of the following conditions are met: (i) the Improvements are then offered by the Service Provider to similarly situated customers in the same geographic location(s); (ii) the monthly recurring charges ("MRC") for the improved Service must be equal to, or greater than, those of the existing Service; (iii) standard nonrecurring charges for the improved Service will apply unless specifically discounted by the Service Provider at the time a substitute Order is executed in accordance with this Agreement; and (iv) the originating and terminating location(s) of the improved Service must be identical to the existing Service location(s). In the event that such Improvements increase the efficiencies of providing any Service, the Parties will equitably reflect those increased efficiencies in a new Service Order.

5.2    As appropriate and necessary, each Party will promptly file tariff revisions to implement Service restructuring, subject to all applicable legal and regulatory requirements.

## ARTICLE 6 - SERVICE ORDERS

6.1    During the Term of this Agreement, and any Extension, each Service Provider shall provide the other Party with specified Services and Facilities pursuant to the attached order form ("Service Order") set forth in Exhibit E, incorporated into this Agreement by this reference, and signed by both Parties authorized representatives. No Services may be performed, or Facilities provided, hereunder, without a validly authorized Service Order. Each Service Order shall include (i) the Parties' name, or that of their Affiliates and Subsidiaries, (ii) the Service location(s), (iii) the particular type and quantity of Service, (iv) the Term, and (v) all applicable Service charges. Should Customer cancel any discounted Service or Facilities prior to completing the applicable Service Order term at the required quantities, if any, for any reason not permitted herein, all discounts will be equitably revised from the date the Service was accepted

GST-WARTA0010316

to reflect the appropriate discount associated with the term actually completed and quantities actually used.

6.2 In the event that there are any outstanding Service Orders with terms that extend beyond the Term of this Agreement, including any Extensions, the term of the applicable Service Order(s) shall end coterminously with the latter of (i) the conclusion of the Term of this Agreement, or (ii) the expiration of the last Extension.

6.3 Expedited Service Orders will be available pursuant to each Service Provider's standard operating procedures at the rates normally charged other telecommunications carriers, if any.

## ARTICLE 7 - PRICING

The recurring and nonrecurring charges for all Services and Facilities, including any discounts shall be set forth in Exhibit B. The Parties acknowledge that certain costs, such as those associated with special construction, will be mutually determined on an individual case basis prior to executing a Service Order. Any Services and Facilities not included in Exhibit B shall be charged at the tariffed rate, if any. In the event that the Service Provider offers a Service or Facility that is not included in either Exhibit B or an appropriate tariff, the Parities shall agree upon a mutually acceptable price (collectively referred to as "Price").

## ARTICLE 8 - RATE ASSURANCE

If, during the Term of this Agreement or any Extension, a Service Provider either (i) files a new tariff or other tariff revision, or (ii) establishes wholesale rates for services or facilities substantially similar to those provided hereunder, it shall give prompt notice to the other Party and a copy of such rates. If, within thirty (30) days, the other Party determines that the new or revised rates are, in fact, more favorable than the rates provided in Exhibit B, such Party may request the more favorable rates in writing. After receiving such request, the Service Provider shall amend the rates charged for the particular Services and Facilities, in accordance with this Article, within thirty (30) days from the date of request.

## ARTICLE 9 - WARRANTIES

9.1 EXCEPT FOR THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT, THERE ARE NO WARRANTIES, REPRESENTATIONS OR AGREEMENTS, EXPRESSED OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, STATUTORY OR OTHERWISE, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.2 Subject to Article 14, "Tariff/Regulatory Restrictions," both Parties when providing Service or Facilities warrant that the other Party may use the Service and/or Facilities without disturbance provided (i) that such Party is not otherwise in default of this Agreement; and (ii)

GST-WARTA0010317

that such Party in no way misuses the Service or Facilities in violation of any federal, state or local law or regulation.

9.3    Both Parties, when providing Service and/or Facilities, warrant that the quality of the Service and Facilities shall conform to the specifications set forth in Exhibit B. Unless otherwise stated in this Agreement, each Party's performance shall be consistent with telecommunications industry standards, government regulations, and sound business practices. Both Parties also warrant that all Services will be performed, and Facilities provided, in a professional manner by qualified and properly trained personnel who are experienced and capable of performing such Party's obligations hereunder. Any manufacturers' warranties applicable to a particular Facility shall be offered, proportionally, to the purchasing Party by the Service Provider, as applicable. Each Party also warrants that it will neither undertake, nor cause or permit, any activity which is either (i) illegal or (ii) which would have the effect of causing the other Party to be in violation of any laws or regulations in effect in the appropriate jurisdiction.

9.4    Each party, as customer, warrants that: (i) it shall only use the Service and Facilities in compliance with all applicable state and federal laws and regulations, and shall use reasonable efforts to require the same of its own customers, if any; and (ii) that it will not knowingly use, alter or provision the Service in a way that will violate any patent, copyright or other intellectual property rights of the other Party or any third party.

9.5    PCS Plus agrees to use only GST's services and facilities for its own network requirements in providing retail service to its end user customers and will not act as a reseller of solely GST services or facilities to any other entity, including telecommunication providers. This provision is not applicable to PCS Plus products which incorporate GST's services and facilities.

9.6    In accordance with that certain Reseller Agreement executed between the Parties on October 30, 1996, PCS Plus agrees to provide to GST services and facilities at a rate of not more than five cents ($.05) per minute of PCS telephone service; provided, however, that at no time shall PCS Plus be required to set its rates at a level which is below cost. This five cents ($.05) per minute rate, or cost per minute, shall apply to the first fourteen and one-half million dollars ($14,500,000) of PCS telephone service PCS Plus provides to GST, at which time the total usage exceeds such amount, PCS Plus will then provide GST with minutes of PCS telephone service on a most favored nation basis.

## ARTICLE 10 - LIABILITY & INDEMNIFICATION

10.1    Subject to 10.4 below, each Party shall indemnify, defend, and hold harmless the other Party, including its officers, employees, Affiliates, Subsidiaries and agents, from and against all claims, actions, demands and damages including costs, litigation expenses, and reasonable attorneys' fees and expenses incurred in connection therewith, arising out of injury to, or death

GST-WARTA0010318

of, any person, or damage to real or tangible personal property of any kind, to the extent caused by the negligent acts, errors, omissions or misconduct of the indemnifying Party, or of any firm or other person directly or indirectly employed by it or acting as its agent or subcontractor, while engaged in the performance of the Services or any activity associated therewith under this Agreement, provided however, that such indemnification and hold harmless obligation shall apply only to proven damages; and provided further, that such indemnification and hold harmless obligation is expressly conditioned on the following: (i) that the indemnifying Party shall be notified in writing promptly of any such claim or demand; (ii) that the indemnifying Party shall have sole control of the defense of any action, claim or demand and of all negotiations for its settlement or compromise; and (iii) that the indemnified Party shall cooperate with the indemnifying Party in a reasonable way to facilitate the settlement or defense of such claim or demand.

10.2   Each of the Parties also hereby indemnifies, defends, and holds harmless the other from all claims, actions, demands and damages including reasonable attorneys' fees and expenses, arising out of any third party claims of infringement by the indemnifying Party of any patents, copyrights, licenses, trademarks, service marks or any other intellectual property right provided the action does not arise from the indemnified Party's unlicensed modifications and further provided that: (i) the indemnified Party shall promptly notify the indemnifying Party in writing; (ii) the indemnifying Party shall have the sole right to control the defense of any action, claim, demand and of all negotiations for its settlement or compromise; and (iii) the indemnified Party shall reasonably cooperate with the indemnifying Party to facilitate the defense or settlement at the indemnifying Party's expense. In no event shall the indemnified Party settle any such claim, lawsuit, or proceeding without the indemnifying Party's prior approval.

10.3   Each Party shall indemnify and hold the other Party, including its Affiliates, Subsidiaries, customers and those for whom it may act as agent, harmless with respect to any claims, actions, demands and damages of any kind or nature ("Claims") insofar as such Claims arise out of or are based on: (i) any breach of any of the warranties made by that Party in this Agreement; (ii) any misrepresentation of fact or fraud by a Party; and (iii) any negligent act, omission or misconduct by a Party, including its employees or agents, in connection with the Service or Facilities provided hereunder.

10.4   IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS, LOST SAVINGS, CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL OR PUNITIVE DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

ARTICLE 11 - PROPRIETARY INFORMATION

11.1   The Parties agree that proprietary information provided under this Agreement and in contemplation thereof, in written, graphic, or other tangible form, furnished, or disclosed by one

GST-WARTA0010319

Party (the "Disclosing Party") to the other Party (the "Receiving Party") which is indicated by appropriate markings or written statements or otherwise identified as confidential or proprietary, including oral information identified as confidential or proprietary at the time of disclosure (collectively, "Proprietary Information") shall be treated in accordance with the terms hereof. For purposes of this Agreement, the term "Proprietary Information" includes all information and documents which the Parties furnish or disclose to one another, databases generated pursuant to this Agreement, all customer proprietary network information, this Agreement, and any other information which is discovered by the Receiving Party. The Receiving Party expressly agrees to keep in confidence and prevent disclosure to any persons or organizations outside its respective organization, and to any persons within its organization not having a need to know, all Proprietary Information that comes into its possession or that it produces while performing hereunder provided, however, that the Receiving Party shall not be liable for disclosure or use of such Proprietary Information if it: (i) was in or becomes part of the public domain at the time it was disclosed or during the Term of this Agreement, including any Extension; (ii) is disclosed to the U.S. Government in the performance of the obligations of either Party related to this Agreement; (iii) was independently developed by the Receiving Party without the benefit, directly or indirectly, of any Proprietary Information; or (iv) was disclosed pursuant to the order of a duly qualified judicial or administrative body, provided that the Party so compelled to disclose provides prior notice to the other Party promptly upon the receipt of such order and affords such Party a reasonable opportunity to respond thereto.

11.2   If the Proprietary Information is provided orally, it must be identified as proprietary at the time of disclosure, and the Disclosing Party shall reduce the Proprietary Information to writing and provide such writing to the Receiving Party identified as confidential or proprietary within thirty (30) days of the date of disclosure.

11.3   The Proprietary Information shall be held in confidence for a period of three (3) years following receipt of such information, or for a period of three (3) years after the termination of this Agreement, whichever is longer. Proprietary Information shall not be disclosed, duplicated or used, in whole or in part, for any purpose other than in connection with the provision of the Services and Facilities hereunder without the express, written permission of the Disclosing Party.

11.4   If either Party contracts with a third party to perform any portion of the Services provided to the other Party under this Agreement, which involves the disclosure of Proprietary Information, that Party shall require the third party to agree in its contract to protect the confidentiality of Proprietary Information with substantially similar standards and procedures as those specified in this Agreement and to use such information only in connection with the work performed under the contract between said Party and its third party provider.

11.5   Notwithstanding anything to the contrary in this Agreement, the Parties agree that in the event of a breach or threatened breach of this Article, the resulting damages may be irreparable and difficult to accurately ascertain making money damages, alone, an insufficient remedy. Accordingly, the Disclosing Party shall also be entitled to equitable relief, including an

GST-WARTA0010320

immediate injunction and specific performance, as may be ordered by a court of competent jurisdiction. Upon expiration or early termination of this Agreement, or upon judicial enforcement of this Article, the Parties expressly agree to return all Proprietary Information, regardless of the medium, immediately.

## ARTICLE 12 - INSURANCE

12.1 Each party shall maintain throughout the term of this Agreement, and all Extensions, the minimum types and amounts of insurance as set forth in Exhibit D.

12.2 Each insurance policy obtained by, or provided on behalf of, the insured Party in accordance with Exhibit D shall designate such Party as the named insured and shall be endorsed to provide: (i) that the other Party, including its assignees, Affiliates, Subsidiaries, partners, employees, officers and directors shall be named as additional insured; (ii) that such insurance shall be primary without right of contribution from any other insurance maintained by the other Party; (iii) that all provisions of such policies, except the limits of liability, shall operate in the same manner as if there were a separate policy covering each additional insured; (iv) that the other Party shall receive thirty (30) days advance written notice of any cancellation, expiration, modification or reduction in the amount or scope of such insurance; and (v) a waiver of any right of subrogation against such other Party, including its assignees, Affiliates, Subsidiaries, partners, employees, officers and directors, for any act or omission not amounting to gross negligence or willful misconduct, on all policies except workers' compensation, disability benefits and other similar state-required workers' benefit insurance.

12.3 All insurance required by this Section shall only be issued by insurance companies (i) authorized to conduct business in the state(s) in which the Services are being performed, or the Facilities are located, and (ii) reasonably acceptable to the other Party.

12.4 Before commencing any Service, or the provision of any Facilities, both Parties shall provide the other with valid certificates of insurance certifying the required types and coverage amounts and referencing the Effective Date of this Agreement. All certificates must be updated as necessary.

12.5 In the event of any expiration, cancellation, or reduction, in either the type or amount, of insurance required hereunder, the insured Party shall promptly procure an acceptable substitute satisfactory to the other Party. If, within twenty-five (25) days of the date of any expiration, cancellation or reduction notice, the insured Party fails to procure such new insurance, the other Party may secure substitute insurance at the insured Party's sole expense either by (i) recouping the amount spent from the amount owed to such other Party hereunder or (ii) terminating this Agreement in accordance with Article 15, provided that the cancellation is effective on the date of such notice and the insured Party shall not have any period thereafter to remedy its default.

12.6 The insolvency, bankruptcy or failure of any insurance company providing insurance to

GST-WARTA0010321

the insured Party hereunder, including the failure of any such company to pay the insured Party's legitimate claims when due, shall not relieve the insured Party of any of its indemnification or insurance obligations under this Agreement.

## ARTICLE 13 - INVOICING; PAYMENT

13.1 Each Service Provider shall provide separate invoices for every Affiliate and Subsidiary of the other Party using the Services and/or Facilities at the location(s) specified by mutual agreement of the Parties. Each Party may, at its sole discretion, elect to receive invoices via electronic or paper media, or both. All invoices shall be charged and paid in U.S. Dollars.

13.2 All charges shall be invoiced in arrears. Invoices shall be payable within thirty (30) days from receipt of invoice. Each invoice shall include (i) the applicable Service Order number, (ii) a description of Services and/or Facilities provided, (iii) quantities, (iv) unit prices; (v) extended totals, (vi) itemization of reimbursable expenses, if any, (vii) taxes, when applicable; and (viii) applicable discounts and Credit Allowances. All other applicable supporting documentation (such as receipts for expenses) are to be attached to the invoice.

13.3 All disputed amounts shall be resolved in accordance with Article 33. Any undisputed payments not submitted by the payment deadline, as set forth in this Article, shall be charged simple interest at one percent (1%) per month, or any portion thereof, until paid unless otherwise prohibited by law (in which case it shall be the maximum amount allowed by law).

## ARTICLE-14 - TARIFF/REGULATORY RESTRICTIONS

14.1 The Services provided by each Service Provider hereunder may be subject to said Service Provider obtaining, and retaining, (i) the approval of either the Federal Communications Commission ("FCC") or the appropriate state regulatory agency, or both, and (ii) such other approvals, licenses and permits as may be required or deemed necessary by such Service Provider. Each Service Provider shall use reasonable efforts to obtain, and retain, said approvals and permits. However, each Service Provider shall be entitled to take, and shall have no liability whatsoever for, any action necessary to bring the Services and Facilities into conformance with any changes or modifications required by such regulatory agencies including, without limitation, assessing mandatory charges, provided such changes were not due to the negligence or misconduct of the Service Provider, its employees, agents and contractors. For domestic interstate and any intrastate Services, this Agreement incorporates the relevant terms and conditions of GST's applicable tariff(s) by reference which may be modified, periodically, in accordance with applicable law or regulation. In the event of a conflict between this Agreement and any tariff, this Agreement shall control unless otherwise prohibited by said regulatory agencies or by law.

14.2 Either Party may terminate the applicable Service Orders without liability if: (i) the Service Provider files any approved tariff or tariff modification(s) which, in the reasonable

- 10 -

GST-WARTA0010322

opinion of the other Party, would materially impair the use of the specified Services; (ii) any regulatory approvals, licenses or permits are ultimately denied the Service Provider which would materially affect its ability to perform hereunder, or (iii) if a government regulation has been initiated or revised so as to materially and adversely affect any Service or Facilities provided pursuant to this Agreement.

14.3   Each Party shall exercise its right to terminate this Agreement hereunder within thirty (30) days of receiving knowledge of the act or omission triggering this right, by written notice given to the other Party. Termination shall be effective thirty (30) days after such notice is received. No damages or remedies shall be available between the Parties for the act or omission triggering the right to terminate, except as specifically provided in the Agreement.

14.4   In the event of the deregulation of any Services provided under this Agreement, the Parties will determine if any changes in the Agreement are required in order to maintain the benefits of the current Agreement. If it is determined that changes are required, the Parties will negotiate in good faith to amend this Agreement or replace it, as the case may be, in a manner which maintains the benefits of this Agreement for both Parties. In the event that the Parties cannot agree on such an amendment within thirty (30) days, the Parties may treat the matter as a dispute pursuant to Article 33 herein.

## ARTICLE 15 - TERMINATION

15.1   For the purpose of this Agreement, a default shall have occurred with respect to either Party if such Party:

   (a)   Ceases to do business as a going concern; or

   (b)   Makes a general assignment for the benefit of creditors; or

   (c)   Becomes insolvent, bankrupt, or the subject of receivership; or

   (d)   Authorizes, applies for, or consents to the appointment of a trustee or liquidation of all or a substantial part of its assets or has proceedings seeking such appointment commenced against it which are not resolved within sixty (60) days of such commencement; or

   (e)   Failure to maintain the confidentiality of a Party's Proprietary Information as prescribed in Article 11 herein, which default, at the affected Party's election, may result in immediate termination of this Agreement without provision of cure; or

   (f)   Failure to observe or perform any material term or condition of this Agreement, excluding the payment for Services and Facilities, provided such default remains uncured for more than thirty (30) days; or

GST-WARTA0010323

(g)     Failure to pay all undisputed amounts within ten (10) days of receiving written notice from the Service Provider following the due date.

15.2    Further, and notwithstanding the foregoing, a default shall have occurred with respect to the Service Provider if any material acts by such Service Provider or any of its agents, employees, Subsidiaries, or Affiliates, excluding all contractors and third party providers, are adjudged a violation of law by legal or administrative authorities of competent jurisdiction, including but not limited to, criminal and civil (statutory and common) laws; as well as government regulations, provided that such material acts arise out of, or in connection with, the Services provided under this Agreement.

15.3    If Service Provider is in default under this Agreement, the non-defaulting Party shall have the right: (i) to procure from any other person or entity (or to perform such Services itself or through an Affiliate or Subsidiary), for a commercially reasonable period (which period may extend through the remainder of the Term of this Agreement including any Extensions, but shall not exceed the remainder of such Term, including Extensions), and for a commercially reasonable cost consistent with the obligations hereunder, all or any portion of the Services and/or Facilities to be performed by the Service Provider ("Substituted Performance"); and (ii) to recover any portion of the cost for such Substituted Performance that both exceeds the costs of the Services and/or Facilities to be provided hereunder and does not exceed the lowest priced commercially reasonable and responsive bid by a qualified potential provider of Substituted Performance, if any, made in accordance with this Article.

(a)     Upon receipt of Notice of Default, the Service Provider shall have the right to identify and prequalify up to three (3) potential vendors acceptable to the non-defaulting Party, provided that such vendors are deemed by the non-defaulting Party to be responsible (with respect to financial, technical, staffing, and equipment qualifications). The non-defaulting Party may solicit from such potential vendors, bids for the Substituted Performance.

(b)     In the event that the non-defaulting Party elects to provide the Substituted Performance itself or through an Affiliate or Subsidiary, then the charges for such Substituted Performance shall be its actual costs, including applicable overhead provided such Substituted Performance is no more costly than the lowest priced commercially reasonable third party provider referred to above.

(c)     The rights and remedies provided to the non-defaulting Party herein shall not be exclusive but are cumulative and in addition to any other rights or remedies provided by law or equity or otherwise under this Agreement provided the affected Party is not permitted to seek duplicative remedies or damages.

15.4    In the event a Service Provider is unable to cure any Chronic Trouble, following thirty (30) days prior written notice, the other Party shall have the right to terminate only the affected Service and/or Facilities without further liability other than that already incurred prior to

GST-WARTA0010324

termination, provided that such termination does not have the effect of termination either (i) this Agreement or (ii) any other Service or Facilities provided pursuant to existing Service Orders. Failure to cure any Chronic Trouble shall not be a material default under this Agreement.

15.5   In accordance with 15.1 and 15.2 above, the non-defaulting Party may also terminate this Agreement for default provided that it has notified the defaulting Party of such default in writing and that within thirty (30) days of receipt of the notice of default, the defaulting Party has failed to (a) cure such default or (b) notify the non-defaulting Party in writing of its intent to treat the matter as a dispute under Article 33 herein and demand arbitration. In the event the non-defaulting Party's position is upheld in Arbitration, the non-defaulting Party may terminate this Agreement immediately after the issuance of the Arbitration decision, unless the defaulting Party cures such default as provided for herein. Such termination for default shall be effective upon receipt of a written notice of termination for default which references the notices given and lack of cure. A termination notice which does not reference such notice(s) or lack of cure shall not be effective to terminate this Agreement for default.

## ARTICLE 16 - WORK ON PREMISES

16.1   The Parties shall be subject to reasonable rules and regulations promulgated by each Party for the safe, orderly, and efficient conduct of operations on each Party's property or premises including that of its Affiliates, Subsidiaries or customers provided that the Service Provider is given copies of applicable rules and regulations. The Party shall enforce and observe such rules and regulations and shall maintain discipline and good order among its employees, agents, and representatives while performing the Services required hereunder. While on a premise, or visiting a premise for any purpose, the Parties shall be subject to such security regulations as may be enforced at that location, and shall abide by the same rules and regulations with respect to fire protection and safety that govern the purchasing Party's employees and customers. In the event of any conflict between (i) the rules and regulations described above and (ii) relevant federal and state labor laws and regulations or any applicable labor relations agreements, the Service Provider shall promptly so notify the other Party, and the Parties shall on their best efforts reconcile such conflict.

16.2   Subject to the foregoing, each Party shall be provided reasonable access to the other Party's premises for the purpose of providing the Services pursuant to this Agreement. Each Party agrees to provide adequate work and equipment space to the Service Provider, in a secured location suitable for such equipment, and all required electrical power to operate such equipment without cost. Each Party, as Service Provider, shall be responsible for its own supplies and tools. Insofar as access to a facility is integral to a Service Provider's performance at a location, its responsibility to provide Services shall be excused to the extent hindered by denial of access, except where such denial is due to the Service Provider's, including its agents,' employees' and contractors,' acts or omissions.

## ARTICLE 17 - SERVICE CHANGES

- 13 -

GST-WARTA0010325

17.1   At any time during the term of this Agreement, should either Party desire the other, as Service Provider, to modify, add or change the Services provided pursuant to Exhibit A, the Parties shall comply with the following:

(a)   All requests by either Party for any such additional or modified Services shall be shall be submitted in writing to the Service Provider.

(b)   The Service Provider shall evaluate and process such request in accordance with its standard procedures for processing any Service Order. After assessing the reasonable costs of the change or modification, the Service Provider shall submit a written assessment to the requesting Party of the costs and the time needed for performance. If, after due negotiations and consideration, the Parties mutually agree upon the terms and charges associated with the change or modification, they shall execute a substitute Service Order to cover agreed-to change or modification provided that it is otherwise permitted by this Agreement.

(c)   Upon such authorization of the substituted Service Order, the Party shall commence performance in accordance with the Change Request schedule.

17.2   For the purposes of this Agreement, each substitute Service Order, duly authorized in writing, shall be incorporated by reference into and made part of this Agreement as though it was written herein, and each such Order shall constitute a formal change to this Agreement. In no event shall the Services provided in this Agreement be altered, amended, enhanced or otherwise modified except through written authorization by both Parties on a substitute Service Order in accordance with this Article.

## ARTICLE 18 - STANDARDS OF PERFORMANCE

18.1   Each Party, as Service Provider, shall provide the Services and Facilities in accordance with the Service Standards set forth in Exhibit C. Subject to Articles 15, "Termination" and 19, "Force Majeure," if a Service Provider fails to meet these obligations and standards, such Party shall, without additional compensation, correct any errors or deficiencies in the Service and/or Facilities so as to achieve such standards.

18.2   At any time during the term of this Agreement, should a Service Provider fail to meet an applicable Service Standard, then the following resolution process will be used by the Parties prior to the exercise of the rights offered the parties in Article 33 herein.

a.   Immediately upon notification by the Party receiving services that the other Service Provider has failed to meet an applicable Standard, the Parties designated representatives shall meet to discuss the failure. Each Party shall provide the other Party with an escalation list of appropriate contracts for each Service offered. If the designated individuals agree that a failure has occurred, the Parties shall, at such time, identify the cause of the failure and determine

GST-WARTA0010326

a mutually agreeable course of action to resolve the failure. If the Parties do not agree that a failure has occurred, either party may treat the matter as a dispute and immediately exercise its rights under Article 33 herein.

b. If, five (5) days after implementation of the course of action, the failure persists for reasons other than Force Majeure, Article 19, the problem shall be referred to a team of qualified specialists representing the Parties to review all previous measures used to resolve the failure, determine a plan for eliminating the failure, and who shall, together, implement the plan. The Parties shall review the results within ten (10) days of the implementation of the new course of action established during the escalation review. If the implementation of these new methodologies fail to resolve the Standards failure, the remedies in Article 33 shall become available to the Parties.

18.3  Any course of action set forth in this Article agreed to and implemented by the Service Provider shall be at no additional charge to the other Party.

## ARTICLE 19 - FORCE MAJEURE

19.1  Neither Party shall be liable for any loss or damage hereunder due to acts of God or the public enemy, acts of the Government in its sovereign capacity, fire, explosion, floods, earthquake, epidemic, strikes or labor disputes or other causes beyond the Party's reasonable control, whether or not similar to the foregoing, to the extent such events were not caused by the affected Party's negligence or misconduct, including its' employees, agents and contractors, but excluding any other third party providers.

19.2  Upon the occurrence of any event described in this Article and to the extent such occurrence interferes with a Party's performance of this Agreement, the Party's performance shall be suspended during the period of such interference, provided that it uses commercially diligent efforts to avoid or eliminate such causes of nonperformance. In the event that the Service Provider's performance is delayed beyond thirty (30) days, the other Party may seek alternate performance at its own expense provided that its payment obligations for the delayed Service and/or Facilities shall be suspended during such delay.

19.3  In the event that either Party shall become aware of the presence of any hazardous material (e.g., asbestos) or other hazardous condition at any work site that may be reasonably expected to adversely affect performance of work under this Agreement, the Party discovering the presence of such hazardous material or condition shall promptly notify the other Party. The Parties shall then jointly and promptly take reasonable steps (i) to ascertain the responsible Party, and (ii) to ensure that the responsible Party removes the hazardous material and/or remediates the hazardous condition expeditiously. For this purpose, the term "responsible party" shall mean the owner and/or other entity which is responsible under applicable law for such hazardous material or condition at the affected work site. In the event that such hazardous material is not removed and/or such hazardous condition is not remediated, performance under this Agreement shall be

GST-WARTA0010327