excused in part to the extent the existence of such hazardous material or condition precludes performance required under this Agreement to the extent that neither the Service Provider nor its agents, employees, or contractors is responsible for such hazardous material.

## ARTICLE 20 - ADDITIONAL SERVICES AND FACILITIES

During the Term of this Agreement and any Extensions, either Party may request the prospective Service Provider to furnish proposals for services and facilities not included in Exhibit A. Such proposals shall contain (i) a definition (ii) a detailed statement of services and facilities, (iii) proposed service standards, and (iv) a price for each service and/or facility. Each Party shall retain sole discretion to accept or reject such proposal. In the event the Parties mutually agree to expand the Services and/or Facilities provided hereunder, such Services and Facilities shall be furnished in accordance with Article 22.

## ARTICLE 21 - DELIVERY/REMOVAL OF EQUIPMENT

All policies and procedures for delivering and removing Facilities from the premises of each Party, including their customers' premises, must be strictly adhered to, and the Service Provider bears the sole liability for its failure and/or negligence in this regard, including the negligence of its agents, employees and contractors.

## ARTICLE 22 - MOST FAVORED CUSTOMER

22.1    Each Service Provider warrants that the Price it charges the other Party for the Services and/or Facilities shall be equal to or better than the Price offered to its most favored telecommunications carrier customer with substantially similar (i) services, (ii) geographical locations, (iii) quantity requirements, and (iv) service periods. If a Service Provider offers more favorable rates to another telecommunications carrier customer, in violation of this warranty, it will credit the other Party the difference from the date the lower rates became effective and the Parties agree to revise Exhibit B accordingly. This shall be Customer's sole remedy for any claims under this warranty.

22.2    In exchange for the "Most Favored Customer" pricing, PCS Plus grants GST a five (5) business day right of first refusal to agree to furnish PCS Plus with any portion of the Services and Facilities offered by GST during the term of this Agreement, including any Extensions, that are specified in a third-party provider's proposal, provided (i) that GST's Services and Facilities are substantially similar to those required by PSC Plus, and (ii) that GST's Prices are no more than five percent (5%) greater than those offered to PCS Plus by a third-party provider. GST's five (5) business day option period shall commence on the date that GST receives written notice of a bona fide documented proposal, provided to PCS Plus by a third-party provider, which contains substantially similar services or facilities as those capable of being provided by GST

- 16 -

GST-WARTA0010328

hereunder. GST's failure to respond within the option period, in writing, shall only be construed as an election by GST not to provide any Services and/or Facilities in that particular instance. The Parties expressly agree that any failure by GST to exercise its right of first refusal shall not be deemed to be a waiver of such right any time thereafter. In providing that GST's right of first refusal applies to any portion of the services and facilities offered by GST, the Parties acknowledge and agree that this right permits GST to select to provide such services on an unbundled and geographically practicable basis.

## ARTICLE 23 - INSPECTION AND ACCEPTANCE

23.1   Final inspection and acceptance will be accomplished by the appropriate personnel of each Party, at the designated location of the other Party, in compliance with this Article.

23.2   Before the Service Provider releases the Service to the other Party, the Service Provider will test the quality and performance of such Service to ensure that it meets the Service Standards at a mutually acceptable time. Both Parties' designated technical personnel shall be present for all testing and will have the authority to verify, in writing, that the Service met or exceeded such Standards. In the event that the other Party elects not to provide a technician to witness the compliance testing, it shall deliver a written waiver to the Service Provider before the Service will be released for such Party's use.

23.3   Subject to Article 9, "Warranties," any Service-related equipment furnished by the Service Providers shall also conform to the applicable Service Standards in Exhibit C. Prior to releasing such equipment, the receiving Party shall issue the Service Provider a written acceptance after sampling the equipment for compliance. Equipment which does not so conform may be rejected in whole or in part at the receiving Party's option. Payment shall not, in and of itself, signify acceptance, nor does acceptance itself impair any other legal or equitable remedy each Party retains for nonconforming performance. Acceptance may be revoked at any reasonable time if it was made with the reasonable assumption that any nonconforming performance would be cured, the nonconforming performance was difficult to discover before acceptance, or is otherwise permitted by law. Revocation of acceptance is equivalent to rejection. If rejected, a Party may, at its option: (i) require the Service Provider to arrange delivery of replacement equipment; or (ii) require a refund for the rejected Service-related equipment. This Article sets forth the exclusive remedies for nonconforming Service-related equipment.

## ARTICLE 24 - TAXES

Each Party will pay the Service Provicer the amount of all sales, use, excise, VAT or other similar tax (excluding income and ordinary personal property taxes) applicable to the furnishing of Services hereunder, provided such tax is included on the initial invoice for such Services and to the extent a tax exemption certificate is not issued to the Service Provider. Such taxes must be separately identified items on each invoice and must be broken down by locality (Federal, State,

GST-WARTA0010329

and Local) and type of tax.

## ARTICLE 25 - CANCELLATION OF SERVICE ORDERS

Each Party shall have the right to cancel a Service Order prior to installation and acceptance of the Services and/or Facilities for any reason. Upon the effective date of cancellation, the Service Provider shall cease installing the ordered Services and/or Facilities as approved and instructed in the notice of cancellation. In no event shall the ordering Party be liable to the Service Provider for any anticipated profits on any portion of the canceled Services or Facilities. However, the canceling Party shall pay all documented costs that the Service Provider incurred in preparing to deliver the Service and/or Facilities prior to such cancellation including, without limitation, special construction costs and installation costs (notwithstanding any prior discounts or waiver of installation fees). Services and Facilities canceled after the date of installation and acceptance shall be construed as being terminated and shall be subject to termination fees outlined in Exhibit B.

## ARTICLE 26 - PATENTS/TRADEMARKS/SERVICE MARKS

The Parties agree that if, pursuant to the Services performed hereunder, either alone or in concert with the other Party's employees, inventions are made, copyrightable material created and/or authorized and/or trademarks or service marks suggested, the Parties shall cooperate to properly secure the necessary patent, copyright and/or trademark or service mark rights in such inventions, copyrightable material and/or trademarks or service marks for the Party which will own such rights.

## ARTICLE 27 - CONFLICT OF INTEREST

Each Party agrees to immediately notify the other Party in writing should it enter into any other agreement or contract which would thereafter preclude its rendering Services and/or Facilities hereunder as such relates to a conflict of interest.

## ARTICLE 28 - AUDITS

Each Party shall have the right to periodically audit the other Party's books, records and other relevant documentation as it relates to the operation of this Agreement. The Party seeking an audit shall: (i) give at least thirty (30) days prior written notice of a request for audit; (ii) perform any audits in a manner which will not unduly interrupt the business of the audited Party and in the continual presence of its designated representative; (iii) comply with the terms of any valid confidentiality agreement protecting such information even if it means hiring an independent auditor and protecting the identity of a third party provider; and (iv) bear the entire cost of the audit provided no material improprieties are discovered. Notwithstanding anything to the contrary in Article 11, all information related to the audit shall be Proprietary Information whether or not such information is marked confidential or proprietary. However, if the audit

GST-WARTA0010330

reveals that the Service Provider has overcharged the auditing Party by more than five percent (5%), the Service Provider shall reimburse the auditing Party the amount of the overcharge for the time the excess charges are assessed, including simple interest as set forth in Article 13, and shall pay for the documented and reasonable cost of the audit.

## ARTICLE 29 - ORDER OF PRECEDENCE

This Agreement should be interpreted reasonably to give effect to all of its terms and avoid any unnecessary conflict. In the event a conflict cannot be avoided and/or reconciled, the following order of precedence shall apply: (i) this Agreement and any Exhibits to the extent not prohibited by state and federal regulations, (ii) the Service Order, (iii) the applicable tariff.

## ARTICLE 30 - NEWS RELEASES/ANNOUNCEMENTS

Neither Party shall use the other Party's, including all Affiliates and Subsidiaries, names, trademarks, service mark or any other identifying symbol, directly or indirectly, in any advertising, news release, marketing presentation or any other professional or trade publication without the prior express written consent of the owning Party. However, subject to any applicable restrictions relating to the disclosure of proprietary information contained in Article 11, this provision does not preclude any disclosure of the Parties' relationship to any entities providing financing to either Party.

## ARTICLE 31 - GOVERNING LAW

Subject to Article 33, the construction, interpretation and performance of this Agreement, and any cause of action arising out of this Agreement (whether in contract, indemnity, warranty, strict liability, tort, or otherwise) shall be governed by the laws of the State of Washington without regard to its conflicts of law principles. Any dispute arising from this Agreement shall be brought solely within the courts of Clark County, City of Vancouver, Washington.

## ARTICLE 32 - NOTICES

Any notice required or desired to be given, by either Party, under this Agreement shall be given in writing and (i) delivered by hand to the individual addressee or such addressee's designated agent, (ii) sent by registered or certified United States mail, postage prepaid, (iii) send by nationally recognized overnight courier service, or (iv) transmitted by facsimile provided the original paper copy is also sent by one of the other methods, herein, within forty-eight (48) hours, to the following address or facsimile number:

    If to GST:

    GST Telecom, Inc.
    Legal Department

GST-WARTA0010331

> 4001 Main Street
> Vancouver, WA 98663
> Attn: Contract Manager
> Phone: (360) 906-7149
> Fax: (360) 906-7165
>
> If to PCS Plus:
>
> PSC Plus, Inc.
> 4001 Main Street
> Vancouver, WA 98663
> Attn: Robert Olson
> Phone: (360) 694-9772
> Fax: (360) 694-0879

The name, address or facsimile number for notice may be changed by giving notice in accordance with this Article. If mailed in accordance with this Article, notice shall be deemed given when actually received by the individual addressee or designated agent or three (3) business days after mailing, whichever is earlier. If transmitted by facsimile in accordance with this Article, notice shall be deemed given one (1) business day after transmission provided the original paper copy is sent as set forth above. If delivered by hand, notice shall be deemed given upon receipt provided a written receipt is obtained. If delivered by overnight courier, notice shall be deemed to be given one (1) business day after sending provided it was sent one (1) day delivery and provided a written receipt is obtained.

## ARTICLE 33 - DISPUTE RESOLUTION; ARBITRATION

33.1  Any controversy or claim ("Dispute") arising under this Agreement that cannot be resolved by the Parties will be resolved in accordance with this Article.

33.2  Any Dispute shall first be escalated within management levels of each Party as follows:

  (i)  Within fifteen (15) days of written notice by one Party to the other requesting escalation, the next level of management within each Party will consider the Dispute and attempt resolution.

  (ii)  If the Dispute is not resolved within fifteen (15) days after consideration by management identified in (i), the Dispute will be further escalated to the next level of management within each Party for resolution. If the matter is not resolved by these Parties within fifteen (15) days of the date of such further escalation, the Dispute will be handled in accordance with the procedures outlined below.

33.3  If the Dispute cannot be resolved by the management of the Parties as outlined above, the

GST-WARTA0010332

Parties shall submit the Dispute to binding arbitration as set forth below. The law of the State of Washington will govern the terms and procedures for arbitration of all Disputes.

(i) No arbitration shall commence until after the Party wishing to commence arbitration proceedings shall have given the other Party thirty (30) days written notice setting forth the issues to be arbitrated. During the thirty (30) day period, the Parties shall continue to attempt to resolve the remaining issues of the Dispute amicably by negotiation.

(ii) Three arbiters engaged in the practice of law and knowledgeable about the telecommunications field and its related laws and regulations will conduct the arbitration. Each party shall have the right to choose one arbiter and the selected arbiters shall choose a third arbiter, none of whom shall be an officer, director or employee of the Parties, including their Affiliates or Subsidiaries. The arbiter's decision and award will be final and binding and may be entered in any court with jurisdiction. The arbiters will not have authority to modify or expand any of the provisions of this Agreement.

(iii) Arbitration proceedings shall not be held at the premises of either Party but will be held at a mutually agreeable place in Vancouver, Washington. The expense of the actual proceedings will be shared equally by the Parties. The Parties will conduct the arbitration under the then current rules and supervision of the American Arbitration Association (AAA) and the U.S. Arbitration Act, if applicable. Each Party shall bear its own attorneys' fees and costs of the Arbitration.

(iv) Each Party may submit a written request for any combination of up to thirty-five (35) interrogatories, demands to produce documents, and requests for admission provided that there are no subparts to any of the requests. Each Party shall also be entitled to take the oral deposition of up to five (5) individuals of the other Party. Additional discovery may be permitted upon mutual agreement of the Parties. Written briefs may also be submitted by both Parties to aid the arbiters in rendering an opinion.

(v) The arbiters shall hold the first hearing within thirty (30) days after the selection of the arbiters. If additional hearings are required, they shall be held as promptly as possible thereafter so that all hearings required will be concluded within ninety (90) days after the selection of the third arbiter. The arbiters shall render their decision, in writing, within thirty (30) days after the last hearing setting forth finds of fact, conclusions of law and the rational for the decision. The arbiters shall adhere to the provisions of this Agreement and all applicable laws and regulations in rendering their decision. Any award made by the Arbiters shall be subject to the limitations of liability in the Agreement. The arbiters' decision and award shall be final and binding, and judgment upon such award may be entered in any court of competent jurisdiction.

33.4 This procedure applies only to the extent that a regulatory authority or court of competent jurisdiction does not require either Party to resolve a Dispute in accordance with the provisions of any U.S. or other applicable telecommunications law or regulation.

GST-WARTA0010333

33.5 During the Dispute resolution process and arbitration proceedings described in this Article, the Parties shall continue in good faith to perform their obligations under this Agreement.

## ARTICLE 34 - GENERAL PROVISIONS

34.1 The Parties agree that each is an independent contractor with respect to the services performed for the other and not an employee of the other, and that in accordance with such status as an independent contractor, each Party agrees that neither it nor its employees or agents shall hold themselves out as, nor claim to be, officers or employees of the other and that they shall not make any claim, demand, or application to or for any right or privilege applicable to an officer or employee of the other Party, including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security coverage, or employee retirement membership or credit.

34.2 No claim whatsoever shall be made by either Party against any individual officer, agent, or employee of the other for, or on account of, any act or omission in connection with this Agreement.

34.3 If any provision of this Agreement, or the application of such provision, including any term, Article(s), or subsection(s) within any individual Article, Exhibit, Service Order or other attachment of this Agreement, is held by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable under any applicable statute or rule of law, it is to that extent deemed to be omitted, and the validity, legality, and enforceability of the remaining provisions, Articles, Exhibits, Service Orders and attachments shall in no way be affected or impaired thereby.

34.4 Either Party may, at its election, set-off against any amounts payable to other Party hereunder any undisputed claim or charge such Party may have against the other Party or any amounts due under the terms of this Agreement.

34.5 No Party may assign this Agreement, or any portion thereof, without the express, prior written consent of the other Party which may be withheld, provided, either Party may assign its rights and delegate its obligations hereunder pursuant to any sale or transfer of all, or substantially all, the business of the assigning Party and, further, provided that the acquiring third party must agree to abide by all the terms and conditions of this Agreement in writing.

34.6 The title of this Agreement, and the captions contained in the Articles, the Exhibits and the attachments hereto shall be read as references only and shall not be read as affecting, contradicting, negating, or explaining the meaning or interpretation of this Agreement.

34.7 Any ambiguity in this Agreement shall not be strictly construed, but will be resolved by applying the most reasonable interpretation under the circumstances, giving full consideration to

GST-WARTA0010334

the intentions of the Parties at the time of contracting. Notwithstanding the above, if one Article of this Agreement or if one reference document is silent on a matter discussed in another Article or document, it shall not be deemed as an inconsistency or conflict solely for that reason; such instances should be negotiated by the Parties in good faith.

34.8  This Agreement shall not be deemed to provide any third party with any remedy, claim, right of action, or other right, except that the terms of this Agreement shall inure to the benefit of the Parties' Affiliates, Subsidiaries and its permissible successors and/or assigns.

34.9  If either Party fails, at any time, to enforce any right or remedy available to it under this Agreement, that failure shall not be construed to be a waiver of the right or remedy with respect to any other breach or failure by the other Party.

34.10  The Parties' rights and obligations under those Articles which by their nature and context are intended to survive, shall survive the expiration or earlier termination of this Agreement.

34.11  This Agreement sets forth the entire agreement of the Parties hereto and supersedes all prior agreements, written or oral, between them on the subject. Any modification of this Agreement must be made in writing and signed by of the authorized representative of both Parties.

34.12  The Parties have expressly authorized the signatories to this Agreement to bind their respective corporations to this Agreement. Either Party may, at any reasonable time, require the other Party to provide a copy of such express written authorization.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first mentioned

**GST TELECOM, INC.**                              **PCS PLUS HOLDING CO.**

By: _Daniel L Tramposh_                            By: _RS Olson_

Print: _Daniel L Tramposh_                         Print: _Robert L. Olson_

Title: _Chief Financial Officer_                   Title: _President_

Date: _March 27, 1998_                             Date: _27 March 1998_

GST-WARTA0010335

# Exhibit A - Services and Facilities

I. Long Distance Services - Domestic

   Interstate Dedicated One Plus Service

   Interstate Dedicated 800/888 Service

   (The above services as defined in GST Net, Inc. Tariff F.C.C. No. 1)

II. Long Distance Services - International

   Dedicated One Plus Service

   (As defined in GST Net, Inc. Tariff No. 2)

III. Private/Special Access Services

   DSO, DS1 and DS3 Service

   (As defined in GST Telecom Companies Tariff F.C.C. No. 1)

IV. Switched Access Services

   Access One Service

   (As defined in GST Telecom Companies Tariff F.C.C. No.1)

V. Central Office Space and Power as specified herein.

GST-WARTA0010336

# Exhibit B - Rate Schedule/Pricing Methodology

## PRICING METHODOLOGY

### ARTICLE B.1 - GENERAL PARAMETERS

B.1.1 Both Parties reserve the right to periodically increase the rates for the Services and/or Facilities provided under this Agreement in the event that any court or other regulatory agency, with jurisdiction, issues an order, decision or directive either mandating such increase or imposing additional costs that are directly related to providing any Service or Facility hereunder.

B.1.2 In the event either Party cancels or terminates any circuit which has been installed and operational for less than one (1) year, it shall pay the other Party a termination fee equal to fifty percent (50%) of the Price for such circuit and related Facilities for the remaining months of the Service Order Term. Notwithstanding the foregoing, the terminating Party shall be solely liable for all third party carriers' fees associated with the canceled or terminated circuit provided the non-terminating Party cooperates with the terminating Party to mitigate such fees when possible.

### ARTICLE B.2 - SPECIAL ACCESS PRICING COMPONENTS

B.2.1 "Primary Channel Termination" shall mean the dedicated connection between a Network Interface Unit ("NIU") at an PCS Plus serving office and a GST hub. Primary Channel Termination can only be service that is defined as DS-3 or higher. The fill factor for DS-1's and for multiplexing services assumes that the facilities are 85% utilized.

B.2.2 "Secondary Channel Termination" shall mean the dedicated connection between a Network Interface Unit at a customer premise or other secondary location and a GST hub.

B.2.3 "Transport Mileage (Fixed and Mileage)" is the dedicated connection between two channel terminations. The pricing is based on both a fixed rate and mileage rate and is priced according to LEC V & H coordinates.

B.2.4 "Multiplexing" (or "Muxing") shall mean a Service that combines twenty-eight (28) DS-1 circuits into a single 45 Megabit circuit.

### ARTICLE B.3 - SPECIFIC PRICING GUIDELINES

B.3.1 During the Term of this Agreement, the Parties may use the resold services or facilities of other telecommunications carriers including the Local Exchange Carrier ("LEC"). The pricing for LEC services is based on the price of similar service provided by the incumbent LEC. LEC prices vary by zone and area. Specific pricing guidelines are provided below:

(a) Discount level: The Primary Channel Termination, Secondary Channel Termination, Transport Mileage, and Multiplexing Service will be provided at a thirty percent (30%) discount off of the LEC rate.

(b) Indexed Pricing Term: The Primary Channel Termination pricing, Transport Mileage pricing, and the Multiplexing pricing are based on a five (5) year term. The Secondary Channel Termination pricing is based on the Service Order Term selected.

(c) Unit pricing: The Primary Channel Termination pricing is based on twelve-pack pricing (DS-3x12). PCS Plus must demonstrate to GST that they have enough DS-3 circuits to qualify for twelve-pack pricing in the thirteenth month. If, in the thirteenth month, PCS Plus has less than a twelve pack, the rates will be indexed to the appropriate LEC pricing. GST may, in its sole discretion, determine whether it will offer the higher pack pricing (greater than a twelve pack) on an Individual Case Basis ("ICB"). The Secondary Channel Termination pricing, Transport Mileage pricing, and the Multiplexing pricing are based on individual units of similar LEC service.

(d) Mileage: Only Transport Mileage less than twenty (20) miles is included in the discount pricing set forth above. Discount pricing refers to the percentage discount below LEC pricing. Transport Mileage that is twenty (20) miles or more is priced on an Individual Case Basis (ICB).

(e) Type 3 Circuits (i.e., leased circuits): GST will provide Type 3 circuits at its cost plus five percent (5%). GST may elect not to accept the order if it is not within GST's fiber network.

B.3.2 Pricing Examples:

(a) DS-3 service from PCS Plus Serving Office NIU to Secondary Location NIU:



(b) DS-1 service from PCS Plus Serving Office NIU to Secondary Location NIU:

GST-WARTA0010338