the letter of intent was signed by Grupo Varo and GST to negotiate in good faith and enter into a final agreement pursuant to which the parties would jointly own (through a company called Cableados y Sistemas, S.A. de C.V. ("Cystel"), and subsequently renamed Bestel S.A. de C.V. ("Bestel")) and finance construction and operation of the Network.

34. On or about May 21, 1996, the GST Board met with Grupo Varo representatives at a Special Joint Meeting of the Boards of Directors of GST and GST USA, Inc. in Vancouver, Washington. Each of the individual Defendants attended the meeting. Manuel Vasquez Robles of Grupo Varo provided the Board with a description of the proposed joint venture between GST and Grupo Varo. The joint venture was to design, construct, and operate a fibre optic network consisting of approximately 2,200 kilometers linking Nuevo Laredo, Mexico City, Guadalajara and Manzanillo. Moreover, GST would be able to link this network with its own network in the southern United States.

35. On or about May 22, 1996, the Board authorized GST to proceed with the joint venture through a wholly-owned subsidiary. GST appointed Warta, Irwin, and Kamsky, as a negotiating team to meet with representatives of Grupo Varo in order to negotiate joint venture agreements for consideration and approval by the Board. Thereafter, Warta, Irwin, and Kamsky traveled to Mexico to conduct due diligence of the Bestel Opportunity on behalf of GST. In total, GST expended approximately $1,000,000 to develop the Bestel Opportunity.

36. On August 20, 1996, Bestel and Eficaciones Tlaloc, S.A. de C.V. entered into an agreement pursuant to which Bestel designated GST to act on its behalf for the purpose of administering the contract. The contract was to build 2255 kilometers of fiber optic line. The contract price was $52,000,000.

37. On the same date, a subscription agreement was executed between Bestel, a Grupo Varo subsidiary known as Occidental de Telecommunicacion, S.A. de C.V. ("Odetel"), GST Mextel ("Mextel"), a wholly owned subsidiary of GST known as GST USA, and the shareholders of Odetel (the "Subscription Agreement"). Pursuant to the Subscription Agreement, Mextel subscribed for 49% of the outstanding capital stock of Bestel for the price of $3,920,000.

GST-WARTA 65888

38. When Mextel was incorporated by Olshan at GST's instructions in June of 1996, GST contemplated that Mextel would be a wholly owned subsidiary of GST USA and that GST's interest in Bestel would be held through GST USA. In the Subscription Agreement, Warta, on behalf of GST USA and Kamsky on behalf of Mextel, represented that Mextel was, in fact, wholly owned by GST USA.

### The Fraudulent Transfer of the Bestel Opportunity to Global

39. Despite the fact that Bestel was an opportunity developed by GST, that agreements had already been drafted and executed pursuant to which GST and its wholly owned subsidiaries would pursue the Bestel Opportunity, and that the Board of GST had only authorized proceeding with the Bestel Opportunity through a wholly owned subsidiary, in or about September 1996, Irwin, Warta, and Blankstein, all of whom were directors GST at the time, actually worked to convince Grupo Varo not to proceed with a transaction through GST USA, but instead to proceed through Global, which they characterized as another GST subsidiary.

40. In particular, in order to induce Grupo Varo to agree to the substitution of Global, Irwin represented that GST owned 80% of the outstanding shares of Global. This statement was false and was either known to be false by Irwin or was made with reckless indifference to the truth. As each of the individual Defendants knew, no steps had been taken by them to insure that GST had any control over Global.

41. In a September 6, 1996 conference call between Kamsky, Irwin, and representatives of Grupo Varo, Irwin told Grupo Varo that restrictions in indentures to which GST was a party did not permit GST to enter into the Bestel Opportunity through a wholly owned subsidiary without first obtaining the consent of its lenders. This statement was also false, and was either known to be false by Irwin or was made recklessly without any investigation or analysis of the issue. Irwin claimed that it would take at least 45 days to lift these restrictions and urged that the Bestel shares be vended not to a GST subsidiary, but to Global. According to Irwin, the immediate transfer of shares to Global was necessary in order for Global to raise the necessary money to fund the Bestel Opportunity.

GST-WARTA 65889

42.  A week later, at the September 16 and 17 GST Board meeting in Vancouver, Washington, Irwin and Blankstein urged the Board to give Global the Bestel Opportunity. The meeting was attended by all of the individual Defendants. Once again, Irwin falsely claimed that GST's indentures did not permit GST to enter into the Bestel Opportunity through a wholly owned subsidiary without the prior consent of its lenders. The independent directors were also informed that Grupo Varo was willing to go along with the idea of Global as the direct owner of the Bestel Opportunity and that GST would still maintain a "direct and indirect interest of 49%" in Bestel.

43.  The individual Defendants did not disclose the following at the September Board meeting:

(a)  that, as of the date of this meeting, separate and apart from the options that Global had issued to Warta, Blankstein, Irwin and Legault, each of the Defendants already held thousands of shares of Global stock and warrants to purchase thousands more;

(b)  that, as of this date, there was no written agreement between GST and Global setting out the terms on which it was proposed that Global be substituted for GST USA;

(c)  that Grupo Varo had been induced to consent to the substitution of Global by a representation that GST owned 80% of the issued shares of Global;

(d)  that GST did not own 80% of Global's shares either at this time or ever;

(e)  that the consideration which GST was supposed to receive in exchange for the transfer of the Bestel Opportunity, namely a minimum of 3 million Global shares, was not based on any reasoned investigation of the value of the Bestel Opportunity, but on a representation by Blankstein of what he thought the VSE might approve;

(f)  that GST would not receive any Global shares without VSE approval and that no steps were being taken to protect GST's interest in the Bestel Opportunity in the event that the VSE did not approve the issuance of an appropriate amount of Global shares; and

(g)  that no steps had been taken to secure GST's control of Global.

-13-

GST-WARTA 65890

44. The Board then voted on whether "the activities of Global as described at the meeting" should be ratified. While Warta, Blankstein, Irwin and Legault abstained from voting because of the options that had been issued to them, neither Hanson or Watson abstained despite the fact that both of them (unbeknownst to the Independent Directors) directly and indirectly, already held substantial amounts of Global stock.

45. Within days of the September GST Board meeting, Blankstein, Watson, Warta and Legault were appointed to the Board of Directors of Global and Kamsky was appointed President and Chief Executive Officer of Global. Irwin became Global's Secretary.

46. It was not until January 1997 that the GST Board formally approved the transfer of the Bestel Opportunity to Global. By that time, however, the Bestel Opportunity had already been transferred to Global -- for no consideration whatsoever and with no written documentation.

47. On October 2, 1996 Blankstein became Chairman of Global. On October 12, 1996, Mextel entered into an agreement with Bestel and Odetel pursuant to which Mextel was required to pay $13 million for its 49% interest in Bestel.

48. Mextel, through GST USA, was to be a wholly owned subsidiary of GST, and was incorporated by Olshan Grundman at GST's direction. Yet, on October 12, 1996, Earl Kamsky executed a subscription offer on behalf of Global to subscribe for 100 shares of Mextel, being all the issued and outstanding shares of Mextel. On the same date, Warta, Kamsky and Irwin, as directors of Mextel accepted and approved Global's offer to purchase Mextel's shares. Thus Mextel, which held GST's rights to the Bestel Opportunity, became a wholly-owned subsidiary of Global.

49. On the same date, the Subscription Agreement was amended to replace all references to GST USA with references to Global. No other term of the subscription agreement was amended. The amendment was signed by Kamsky on behalf of Mextel, on behalf of GST USA, and on behalf of Global. An amendment to the construction contract was also signed by Kamsky replacing the reference to GST's subsidiary Telecom with a reference to Mextel.

50. Thus, on October 12, 1996, Warta and Irwin, despite being respectively, the Chief Executive Officer, and the Vice Chairman of GST, together with Kamsky, the President and

-14-

1  Chief Executive Officer of Telecom, a GST subsidiary, transferred to Global for no consideration,
2  an opportunity now valued in excess of $200 million dollars. At the same time, the individual
3  Defendants were continuing both to dilute GST's existing interest in Global through the issuance
4  of new shares and to increase the amount of their own holdings.

5       51.    A Special Meeting of the GST Board was held on January 14, 15 and 16, 1997 at
6  the Mauna Launi Hotel on the Island of Hawaii. The individual Defendants were all present at
7  the meeting, together with Independent Directors Armstrong and Yoshida. A resolution was
8  adopted "with Messrs. Blankstein, Watson and Legault, being directors of GST Global,
9  abstaining", but with Warta, Irwin, Watson and Hanson (all of whom were undisclosed
10 shareholders of Global) voting as follows:

> RESOLVED, that the Company [GST] be, and it hereby is, authorized to enter into an agreement with GST Global pursuant to which the Company shall transfer its business opportunity in "Bestel" in consideration of the issuance to the Company of a minimum of 3,000,000 shares of GST Global and up to a maximum of 5,000,000 shares of GST Global capital stock, the precise amount of such additional shares to be based upon an evaluation of the business plan of Bestel and approval by the Vancouver Stock Exchange.

15 As each of the individual Defendants present at the meeting knew, and failed to disclose, even
16 5,000,000 shares would have been grossly inadequate consideration for the transfer of the Bestel
17 opportunity to Global. A recent report issued by the investment firm of Paine Webber in
18 connection with a Global debenture offering revealed that Bestel was worth $460 million. GST's
19 49% interest in that opportunity was thus $225 million. As each of the individual Defendants
20 also knew and failed to disclose, by this time, Board approval of transferring the Bestel
21 Opportunity to Global was meaningless -- the opportunity had already been transferred, without
22 consideration, and without any agreement between GST and Global concerning the transfer.

23      <u>**Failure to Prepare a Fairness Opinion or Submit the Transaction for VSE Approval**</u>

24      52.    Thereafter, the Defendants continued to conceal their fraud with false statements
25 regarding VSE approval of the transaction between GST and Global. Certain transactions
26 involving the stock of companies traded on the VSE, such as the exchange of Global stock for
27 GST's interest in the Bestel opportunity, are subject to a VSE approval requirement. The
28 nominal purpose of this requirement is to prevent any party to the transaction (e.g., Global) from

GST-WARTA 65892

self-dealing or exploiting misleading or inaccurate valuation of stock or other business assets or opportunities at the expense of its shareholders or other parties to the transaction. In furtherance of this goal, the VSE may require a fairness opinion prepared by a disinterested investment bank prior to approving a transaction.

53.     As Defendants knew, submission of the Global/GST transaction to the VSE would have required evidence that GST had provided fair value for the issuance of Global shares. Valuing the Bestel Opportunity would reveal that even 5,000,000 shares of Global was grossly inadequate consideration for the transfer. Thus, the Defendants had no intention of preparing an objective fairness opinion or submitting proper evidence of the value of the transaction to the VSE for approval. The Defendants did not disclose their intentions to the Independent Directors.

54.     On May 9, 1997, the VSE wrote to a Global attorney stating that subject to receiving further information, it was prepared to accept the acquisition of 49% of Bestel by Global. The VSE also stated that it would require a valuation of the Bestel Opportunity before it would approve the issuance of Global shares to GST.

55.     On June 2 and June 3, 1997 a GST Board of Directors meeting was held in San Francisco. In attendance were the individual Defendants and Independent Directors Sawyer and Armstong. At the meeting, Irwin reported that:

> ...no definitive resolution had been reached with respect to the receipt by the Company of 3,000,000 additional shares of capital stock of Global and up to an additional 2,000,000 shares ...in consideration of the transfer to Global of the Bestel project to the Company. Mr. Irwin *reported that application for approval of the issuance of shares to the Company had been made* to the Vancouver Stock Exchange by Global for issuance of up to 3,000,000 shares. A lengthy discussion ensued with respect to a final resolution of the number of shares to be received by the Company.

(emphasis added). In fact, no such application -- even at "up to 3,000,000 shares" -- had been made by Global and none has been made to date.

56.     At the meeting, the Board resolved to delegate Irwin and Blankstein to pursue the share issuance through the VSE and to support it by a "fairness opinion" to be prepared by First Marathon Securities. Warta, Blankstein and Legault abstained from voting on this resolution; the other conflicted directors did not. Although Blankstein had been designated by the GST Board to act on its behalf, on June 30 Blankstein told First Marathon that the agreement between GST and

-16-

GST-WARTA 65893

Global called for the issuance of *no more than* three million shares rather than the three to five million shares specified in the January 1997 GST Board resolution.

57. It was not until May 13, 1998, in connection with Global's proxy for its annual shareholders meeting, that Global first publicly questioned the existence of *any* obligation to GST, and denied the existence of an agreement. In particular, Global's Proxy Statement states:

> The Company *is negotiating* an agreement to issue to a shareholder, GST Telecommunications ...additional common shares, in consideration of the 1996 transfer by Telecom to the Company of its previous development work and interests, *if any*, in and to the telecommunications project in Mexico being developed by Bestel. The issuance of any common shares is subject to regulatory approval and approval of the directors. The number of shares, *if any*, has not been determined at this time.

(Emphasis added.)

### FIRST CLAIM FOR RELIEF
(Fraud)
(Against all Defendants except Hanson)

58. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 57 above as if fully set forth herein.

59. Defendants Blankstein, Legault, Irwin, Warta, and Watson, have, both individually and on behalf of Global, knowingly made numerous misrepresentations to, and or concealed material facts from, GST, despite their duties to, inter alia, disclose their conflicted interests as alleged above and abstain from taking actions to GST's detriment. Global, through the fraudulent actions of its agents on its behalf, is also a party to the fraudulent scheme alleged herein.

60. In particular, all of the Defendants failed to disclose, although under a duty to do so, the following material facts:

(a) that at the same time they were discussing and actually voting on the issue of whether to transfer the Bestel Opportunity to Global, each of the Defendants already owned thousands of shares of Global stock and held warrants to purchase thousands more;

(b) that no written agreement between GST and Global was ever executed, or even prepared, setting out the terms on which the Bestel Opportunity would be transferred to Global;

-17-

GST-WARTA 65894

(c) that Grupo Varo had been induced to agree that Global could participate in the Bestel Opportunity by a representation that GST owned 80% of the issued shares of Global;

(d) that GST did not own 80% of Global's shares either at that time or ever;

(e) that the consideration which GST was supposed to receive in exchange for the transfer of the Bestel Opportunity, namely a minimum of 3 million Global shares, was not based on any reasoned investigation of the value of the Bestel Opportunity, but on a representation by Blankstein of what he thought the VSE might approve;

(f) that GST would not receive any Global shares without VSE approval;

(g) that before it would approve the issuance of Global shares, the VSE would require evidence of the value of the Bestel Opportunity, but that no such evidence was prepared;

(h) that the Defendants had no intention of applying to the VSE for the issuance of three to five million Global shares to GST;

(i) that no steps were being taken to protect GST's interest in the Bestel Opportunity in the event that the VSE did not approve the issuance of an appropriate amount of Global shares;

(j) that no steps had been taken to secure GST's control of Global; and

(k) that the Bestel opportunity had been transferred to Global for no consideration months before GST's board ever approved the transfer.

61. In addition, Global, Blankstein and Irwin, in particular, falsely represented that:

(a) that a wholly owned subsidiary of GST could not own the Bestel Opportunity without the consent of GST's lenders;

(b) that an application for approval of the issuance of Global shares to GST had been submitted to the VSE for approval;

(c) that the issuance to GST of 3,000,000 to 5,000,000 shares of Global stock would be fair consideration for the transfer of the Bestel Opportunity;

GST-WARTA 65895

(d) that the transaction resulting in the transfer of the Bestel Opportunity to Global was fair and reasonable; and

(e) that the transaction would be supported by a fairness opinion

62. Plaintiffs reasonably relied to their detriment on Defendants' material misrepresentations and on Defendants' duty to disclose all material facts.

63. As a direct and proximate result of Defendants' conduct, non-disclosures and affirmative misrepresentations, GST has been damaged in an amount exceeding $225 million, but not yet fully determined.

64. In doing the acts alleged above, and in making the above representations, Defendants acted with oppression, fraud and malice and with the intent to injure GST. Accordingly, GST is entitled to punitive damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
(Negligent Misrepresentation)
(Against Global)

65. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 57 and 60 through 64 above as if fully set forth herein.

66. Defendant Global, through its agents, made false representations to the GST Board of Directors regarding the transfer of the Bestel Opportunity as alleged above. In making the representations and omissions, and in doing the acts alleged above, Global acted without any reasonable grounds for believing the representations were true, and intended by those representations to induce the reliance on the part of the GST Board of Directors. The GST Board of Directors relied upon these false representations in deciding to purchase an interest in Global and in allowing the transfer of the Bestel opportunity to Global. Given the relationship between GST and Defendants, such reliance was justified. As a result, GST has been damaged in an amount exceeding $225 million, but not yet fully determined.

///

///

///

GST-WARTA 65896

### THIRD CLAIM FOR RELIEF
(Unjust Enrichment)
(Against all Defendants)

67. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 66 above as if fully set forth herein.

68. GST is informed and believes, and based thereon alleges, that by virtue of Defendants' failure to comply with its promises and obligations to GST and Defendants' material representations and failure to disclose material information to GST, Defendants have received and will continue to receive substantial interests and revenues which they would not otherwise have received. Plaintiffs estimate the amount of Defendants' collective unjust enrichment to be in excess of $225 million.

69. Defendants have no right to any revenues or interest resulting from their misappropriation of GST's business opportunity, and Defendants have been unjustly enriched through their wrongful conduct.

70. GST is thus entitled to restitution of all legal and equitable rights in the Bestel Opportunity and all profits therefrom.

### THIRD CLAIM FOR RELIEF
(Constructive Trust)
(Against all Defendants)

71. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 70 above as if fully set forth herein.

72. The Bestel Opportunity was wrongfully misappropriated by the Defendants. GST is therefore entitled to imposition of a constructive trust over the Bestel Opportunity and all proceeds therefrom.

### FOURTH CLAIM FOR RELIEF
(Violation of Business & Professions Code §§ 17200, et. seq.)
(Against all Defendants)

73. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 72 above as if fully set forth herein.

GST-WARTA 65897

74. Defendants' fraudulent acts, misrepresentations and omissions as alleged above also constitute unfair, fraudulent and deceptive business practices in violation of California Business & Professions Code §§ 17200, et. seq.

75. GST suffered severe economic injury as a result of Defendants' unfair, fraudulent and deceptive business practices. Accordingly, GST is entitled to restitution of all money and property wrongfully obtained by Defendants.

### FIFTH CLAIM FOR RELIEF
(Accounting)
(Against all Defendants)

76. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 75 above as if fully set forth herein.

77. By reason of the wrongful misappropriation by Global and its agents of the Bestel Opportunity, and the use of that asset, the GST is entitled to a full accounting and payment of all profits of the Defendants' businesses.

WHEREFORE, Plaintiffs seek judgment as follows:

a. For an award of compensatory damages against Defendants in amount to be proven at trial;

b. For an accounting from Defendants of all profits they have made from wrongful exploitation of opportunities belonging to GST;

c. For restitution of all legal and equitable interests in the Bestel Opportunity;

d For imposition of a constructive trust on the corporate opportunities which are the property of GST;

e. For exemplary and punitive damages against Defendants in an amount sufficient to punish and deter;

///

///

///

///

-21-

GST-WARTA 65898

f.  For GST's costs of suit, including reasonable attorneys' fees; and

g.  Granting GST such other and further relief as the Court may deem just and proper.

DATED: October 20, 1998.                WILSON SONSINI GOODRICH & ROSATI

                                        By: *David S. Steuer /SDG*
                                            ―――――――――――――――――――――
                                            David S. Steuer

                                        Attorneys for Plaintiffs
                                        GST TELECOMMUNICATIONS, INC.
                                        and GST TELECOM, INC.

GST-WARTA 65899