1  Financial Officer of GST, a Director of GST, a member of the GST Finance Committee, a

2  Global shareholder, and a Global consultant.

3                                    55.

4        Earl C. Kamsky ("Kamsky") is now deceased, but was, during the course of events

5  described below, President and Chief Executive Officer of Telecom, a Director of GST,

6  President and Chief Executive Officer of Global, a Director of Global, President and Chief

7  Executive Officer of a Global subsidiary and a Global shareholder.

8                                    56.

9        Counterclaim Defendant Peter E. Legault ("Legault") is a resident of Ontario, Canada

10  and, is or was during the course of events described below, a Director of GST, a Director of

11  Global, and a Global shareholder.  Legault is also a Director and Vice-President of Thomson

12  Kernaghan & Co. Ltd. ("Thomson").

13                                    57.

14        Counterclaim Defendant Ian Watson ("Watson") is a resident of Marin County,

15  California and is, or was during the course of events described below, President and Chief

16  Executive Officer of GST, Chairman of the GST Board of Directors, Vice-President of

17  GUSA, a member of the GST Finance Committee, President and Chief Executive Officer of

18  Global (current), Vice-Chairman of the Global Board of Directors (current), and a Global

19  shareholder (current).  Watson is also the beneficial owner of Tellson Holdings Limited

20  ("Tellson").

21                                    58.

22        Counterclaim Defendant Global Light Telecommunications, Inc. ("Global"), formerly

23  known as "GST Global Telecommunications, Inc.," and before that, "Canadian Programming

24  Concepts, Inc." ("CPC"), is incorporated under the laws of Yukon Territory, Canada with its

25  "executive offices" in Vancouver, British Columbia and its principal operations in Mountain

26  View, California.  Global is a telecommunications company whose common stock is traded

1   on the American Stock Exchange and the Vancouver Stock Exchange. Apart from a few

2   employees in its Vancouver, British Columbia office, Global has no business operations in

3   Canada.

4                                              59.

5        On information and belief, each of the Counterclaim Defendants conspired with,

6   participated with, and acted in concert with, each of the other Counterclaim Defendants in

7   the activities hereinafter alleged, and, at all times herein mentioned, each of such

8   Counterclaim Defendants was the agent of and authorized to act for and was acting for and

9   on behalf of and with the knowledge and consent of each of the other Counterclaim

10  Defendants.

11                                             60.

12       Dr. Thomas E. Sawyer, Jack Armstrong, and Takashi Yoshida were directors of GST

13  during the relevant period and are not named as defendants herein. These directors are

14  hereinafter collectively referred to as the "Independent Directors." Sawyer has, since the

15  events described herein, become affiliated with Counterclaim Defendant Global.

16                                        **THE FACTS**

17                                             61.

18       In early 1996, GST had developed a significant business opportunity in Mexico (the

19  "Bestel Opportunity") whereby it could acquire a 49% interest in one of seven concessions

20  which had been granted by the Mexican telecommunications authority (the "SCT") to a

21  Mexican consortium, Grupo Varo, to construct and operate a public telecommunications

22  network in Mexico. By the fall of 1996, however, the Counterclaim Defendants - the

23  individuals of whom were not only directors and officers of GST, but also significant

24  undisclosed shareholders of Global - had fraudulently transferred the Bestel Opportunity to

25  Global for no consideration. There was not at that time, or ever, any written agreement or

26  even a term sheet between GST and Global stating the terms for transfer of the Bestel

1   Opportunity.   A May 1998 independent analyst's report has placed the value of the Bestel

2   Opportunity at $460 million.  Thus, GST's 49% interest - wrongly taken by Global - has

3   been independently valued at $225 million.  Upon information and belief, the value of Bestel

4   has increased since the date of the valuation.

5                                                 **Global**

6                                                62.

7      Global was formerly known as Canadian Programming Concepts Ltd. ("CPC").  CPC

8   was a Yukon Territory corporation incorporated in 1993 as the shell owner of a tiny existing

9   Texas business known as Programming Concepts, Inc.  Before the Counterclaim Defendants

10   caused the Bestel Opportunity to be fraudulently transferred to CPC for no consideration,

11   CPC was a lightly-traded shell corporation listed on the Vancouver Stock Exchange with no

12   material assets.

13                                                63.

14      From the time of its incorporation, CPC was controlled by Blankstein and his

15   associates.  In or about May of 1995, CPC was listed on the Vancouver Stock Exchange (the

16   "VSE").  Since approximately August of 1998, CPC, now known as Global, has been trading

17   on the American Stock Exchange.

18                                                64.

19      Blankstein, then Chairman of the GST Board, had been attempting to induce GST to

20   acquire an interest in CPC for some time.  In October of 1995, at a GST Board of Directors

21   meeting in Japan, Blankstein suggested to the GST Board that GST acquire a shell

22   corporation.  In  July of 1996, upon Blankstein's urging, and with Warta's support, the Board

23   finally authorized a significant purchase of CPC stock.

24                                                65.

25      GST purchased 2.1 million shares of CPC stock on June 3, 1996. 1,450,000 of these

26   shares were purchased by GST directly from Blankstein at a cost of $72,500 or 5 cents per

1 | share.

2 | 66.

3 | In the same transaction in which GST purchased shares from Blankstein personally,

4 | GST also purchased 125,000 CPC shares from Teleport Canada Development Corporation

5 | ("Teleport") for $87,500 ( 70 cents per share), 425,000 shares from Quest Capital

6 | Corporation for $193,750 (45 cents per share) and 100,000 shares from associates of

7 | Blankstein for $50,000 (50 cents per share). Teleport was a corporation in which Blankstein

8 | and his brother Robert Blankstein had a substantial beneficial interest. The fact that GST

9 | was purchasing shares from a company in which its Chairman had a significant financial

10 | stake was not disclosed at the time to the Independent Directors.

11 | 67.

12 | At the time of GST's acquisition of 2.1 million shares, Global had outstanding shares

13 | totaling 3,450,001. Thus, through its June 3, 1996 purchase of 2.1 million shares GST

14 | acquired approximately 60% of Global's outstanding shares.

15 | 68.

16 | The GST Board was not informed that GST had purchased CPC shares until a month

17 | later. As recorded in the minutes of a July 2, 1996 telephonic meeting of the GST Board that

18 | was chaired by Blankstein and attended by Warta, Irwin, Armstrong, Hanson, Legault,

19 | Sawyer and Watson:

20 |
> The Chairman [Blankstein] then discussed proposed
> arrangements pertaining to the acquisition of control of an
> existing Canadian corporation, Canadian Programming
> Concepts, Inc., whose shares were currently traded on the
> Vancouver Stock Exchange. The Company proposed to acquire
> 2,100,000 shares...which would result in its ownership of 37.5%
> of the outstanding capital stock. It was contemplated that the
> new corporation, with a working name of GST Global
> Communications...would be used for non-U.S.
> telecommunications projects .... The Board determined that the
> Company should cause Messrs. Blankstein, Warta, Irwin and
> Legault to be elected initially as directors of GST Global ...

1    (Emphasis supplied).  No mention was made at this meeting of the identity of the

2    sellers, Blankstein and Teleport, of the fact that it was not a "proposed" acquisition, but one

3    that had already occurred, or of the fact that, on the day of this acquisition GST had acquired

4    60%, rather than 37.5% of the then outstanding Global shares.

5                     69.

6        One day after GST's acquisition of Global shares, Blankstein caused Global to

7    announce a private placement of 1.5 million units (the "Units") at $1.50 Canadian per Unit.

8    Each Unit consisted of one share and a one-share-purchase warrant exercisable at $2.00

9    Canadian for one year.  The issuance of the Units resulted in the substantial dilution of

10    GST's interest in Global.

11                    70.

12        The placees in this private placement included Counterclaim Defendants Warta,

13    Blankstein, Irwin, Hanson and Watson (through Tellson), each of whom received 65,000

14    units.  In addition, Legault purchased 75,000 Units in the name of Thomson Kernaghan, a

15    company in which he held a material interest.  The private placement of the Units closed on

16    or about August 14, 1996.

17                    71.

18        Between June 3, 1996, when GST first acquired Global shares, and the present,

19    Warta, Blankstein, and the other Individual Counterclaim Defendants, despite being directors

20    or officers of GST, continued to cause Global to issue more shares, thereby substantially

21    diluting GST's interest in Global.  This is illustrated in the following chart:

22

### Dilution Of GST's Interest In Global

| Issue Date | Number of shares Issued by Global | GST's purchases | GST's percentage interest in Global | Global shares Outstanding |
|------------|-----------------------------------|-----------------|-------------------------------------|---------------------------|
| 7/96 | | 2.1 million | 61% | 3.45 million |

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400

| Issue Date | Number of shares Issued by Global | GST's purchases | GST's percentage interest in Global | Global shares Outstanding |
|---|---|---|---|---|
| 8/96 | 1.5 million | | 42% | 4.95 million |
| 9/96 | .32 million | | 40% | 5.27 million |
| 11/96 | 3 million | 1.5 million | 46% | 8.27 million |
| 1/97 | 2.75 million | | 33% | 11.02 million |
| 2/97 | 1.12 million | | 30% | 12.14 million |

By December 31, 1997, following various other stock issuances by Global, the 3.6 million Global shares that were owned by GST represented only 20.6% of Global's outstanding shares. This dilution, which occurred through the knowledge and acquiescence of Warta and the other Counterclaim Defendants, placed GST at risk of violating various debt covenants.

### GST Insiders Buy Into Global

#### 72.

On July 3, 1996, the day after the GST Board approved the "proposed" acquisition of Global stock, the Global Board granted 67,000 stock options each to Warta, Irwin, and Blankstein, and 20,000 options to Legault. These stock options were separate and apart from the Units that the Individual Counterclaim Defendants purchased in the Global private placement. As a result, by no later than August 14, 1996 (the date the private placement of 1.5 million Units closed), the Individual Counterclaim Defendants' holdings of Global shares included:

**Irwin**        65,000 common shares @ $1.50[1] per share

65,000 warrants exercisable for one year @ $2.00 per share

67,000 options @ $1.66 per share until June 4, 2001

---
[1]    All dollar amounts in these tables are in Canadian dollars.

| | |
|---|---|
| **Warta** | 65,000 common shares @ $1.50 per share |
| | 65,000 warrants exercisable for one year @ $2.00 per share |
| | 67,000 options @ $1.66 per share until June 4, 2001 |
| **Legault** | 20,000 options @ $1.66 per share until June 4, 2001 |
| | 75,000[2] common shares @ 1.50 per share |
| | 75,000 warrants exercisable for one year @ $2.00 per share |
| **Watson**[3] | 65,000 common shares @ $1.50 per share |
| | 65,000 warrants exercisable for one year @ $2.00 per share |
| **Blankstein** | 65,000 common shares @ $1.50 per share |
| | 65,000 warrants exercisable for one year @ $2.00 per share |
| | 67,000 options @ $1.66 per share until June 4, 2001 |
| **Hanson** | 65,000 common shares @ $1.50 per share |
| | 65,000 warrants exercisable for one year @ $2.00 per share |

73.

At the September 16, 1996 GST Board meeting held in Vancouver, Washington, which was attended by Warta, Blankstein, Irwin, Armstrong, Watson, Hanson, Sawyer and Legault, the Independent Directors were informed that Global had issued 67,000 stock options to Warta, Irwin, Blankstein and Legault. This was, at best, a half-truth. The Individual Counterclaim Defendants, for their own profit and for the benefit of Global, did not tell the Independent Directors that each of the Individual Counterclaim Defendants had previously purchased, directly and indirectly, thousands of shares of Global stock. Moreover, although the Board refused, at this meeting, to ratify the issuance of Global options to Warta, Irwin, Blankstein or Legault, these Individual Counterclaim Defendants did

---

[2]   These purchases were made through Thomson Kernaghan.

[3]   These purchases were made though Tellson, a company in which Watson held a material interest.

Page 19 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

1  not divest themselves of their Global options.

2                                        74.

3          By March of 1997, the Individual Counterclaim Defendants' holdings of Global

4  shares or stock options, which holdings were never fully disclosed to the Independent

5  Directors, included:

6
7  **Irwin**        99,896 common shares @ 96 cents per share

                   65,000 common shares @ $1.50 per share
8
                   65,000 warrants exercisable @ $2.00 per share
9
                   67,000 options @ $1.66 per share until June 4, 2001
10
   **Warta**        65,000 common shares  @ $1.50 per share
11
                   65,000 warrants exercisable @ $2.00 per share
12
                   67,000 options @ $1.66 per share until June 4, 2001
13
   **Legault**      20,000 options @ $1.66 per share until June 4, 2001
14
                   75,000[4] common shares @ $1.50 per share
15
                   75,000 warrants exercisable @ $2.00 per share
16
   **Watson**       65,000[5] common shares @ $1.50 per share
17
                   65,000 warrants exercisable @ $2.00 per share
18
                   74,000 options @ $5.30 per share until Jan. 28, 2002
19
   **Blankstein**   65,000 common shares @ $1.50 per share
20
                   65,000 warrants exercisable @ $2.00 per share
21
                   67,000 options @ $1.66 per share until June 4, 2001
22
                   65,500 options @ $5.30 per share until Jan. 28, 2002
23
   **Hanson**       65,000 common shares @ $1.50 per share

24

25  [4]    These are purchases made through Thomson Kernaghan.

26  [5]    These are purchases made though Tellson.

1    65,000 warrants exercisable for one year @ $2.00 per share

2    **Development of the Bestel Opportunity**

3    75.

4    As noted above, GST had begun developing the Bestel Opportunity in early 1996.

5    Eventually, a letter of intent was negotiated between Grupo Varo, a Mexican company, and

6    GST. Irwin was designated by GST to represent GST's interests in these negotiations. In

7    April 1996, the letter of intent was signed by Grupo Varo and GST to negotiate in good faith

8    and enter into a final agreement pursuant to which the parties would jointly own (through a

9    company called Cableados y Sistemas, S.A. de C.V. ("Cystel"), and subsequently renamed

10   Bestel S.A. de C.V. ("Bestel")) and finance construction and operation of the Network.

11   76.

12   On or about May 21, 1996, the GST Board met with Grupo Varo representatives at a

13   Special Joint Meeting of the Boards of Directors of GST and GUSA in Vancouver,

14   Washington. Each of the individual Defendants attended the meeting. Manuel Vasquez

15   Robles of Grupo Varo provided the Board with a description of the proposed joint venture

16   between GST and Grupo Varo. The joint venture was to design, construct, and operate a fibre

17   optic network consisting of approximately 2,200 kilometers linking Nuevo Laredo, Mexico

18   City, Guadalajara and Manzanillo. Moreover, GST would be able to link this network with

19   its own network in the southern United States.

20   77.

21   On or about May 22, 1996, the GST Board authorized GST to proceed with the joint

22   venture through a wholly-owned subsidiary. GST appointed Warta, Irwin, and Kamsky, as a

23   negotiating team to meet with representatives of Grupo Varo in order to negotiate joint

24   venture agreements for consideration and approval by the Board. Thereafter, Warta, Irwin,

25   and Kamsky traveled to Mexico to conduct due diligence of the Bestel Opportunity on behalf

26   of GST. In total, GST expended approximately $1,000,000 to develop the Bestel

1    Opportunity.

2                                    78.

3        On August 20, 1996, Bestel and Eficaciones Tlaloc, S.A. de C.V. entered into an

4    agreement pursuant to which Bestel designated GST to act on its behalf for the purpose of

5    administering the contract.  The contract was to build 2255 kilometers of fiber optic line.

6    The contract price was $52,000,000.

7                                    79.

8        On the same date, a subscription agreement was executed between Bestel, a Grupo

9    Varo subsidiary known as Occidental de Telecommunicacion, S.A. de C.V. ("Odetel"), GST

10   Mextel ("Mextel"), GUSA, and the shareholders of Odetel (the "Subscription Agreement").

11   Pursuant to the Subscription Agreement, Mextel subscribed for 49% of the outstanding

12   capital stock of Bestel for the price of $3,920,000.

13                                   80.

14       When Mextel was incorporated by Olshan at GST's instructions in June of 1996, GST

15   contemplated that Mextel would be a wholly owned subsidiary of GUSA and that GST's

16   interest in Bestel would be held through GUSA.  In the Subscription Agreement, Warta, on

17   behalf of GUSA and Kamsky on behalf of Mextel, represented that Mextel was, in fact,

18   wholly owned by GUSA.

19            **The Fraudulent Transfer of the Bestel Opportunity to Global**

20                                   81.

21       Despite the fact that Bestel was an opportunity developed by the GST Companies,

22   that agreements had already been drafted and executed pursuant to which the GST

23   Companies would pursue the Bestel Opportunity, and that the Board of GST had only

24   authorized proceeding with the Bestel Opportunity through a wholly-owned subsidiary,  in or

25   about September 1996, Warta, Irwin, and Blankstein, all of whom were directors of GST at

26   the time, actually worked to convince Grupo Varo not to proceed with a transaction through

1    GUSA, but instead to proceed through Global, which they falsely characterized as another

2    GST subsidiary.

3                                                        82.

4          In particular, in order to induce Grupo Varo to agree to the substitution of Global,

5    Irwin represented that GST owned 80% of the outstanding shares of Global.  This statement

6    was false and was either known to be false by Irwin or was made with reckless indifference

7    to the truth.   As each of the Individual Counterclaim Defendants knew, no steps had been

8    taken by them to insure that GST had any control over Global.

9                                                        83.

10         In a September 6, 1996 conference call between Kamsky, Irwin, and representatives

11   of Grupo Varo, Irwin told Grupo Varo that restrictions in indentures to which GST was a

12   party did not permit GST to enter into the Bestel Opportunity through a wholly-owned

13   subsidiary without first obtaining the consent of its lenders.  This statement was also false,

14   and was either known to be false by Irwin or was made recklessly without any investigation

15   or analysis of the issue.  Irwin claimed that it would take at least 45 days to lift these

16   restrictions and urged that the Bestel shares be vended not to a GST subsidiary, but to

17   Global.  According to Irwin, the immediate transfer of shares to Global was necessary in

18   order for Global to raise the necessary money to fund the Bestel Opportunity.

19                                                       84.

20         A week later, at the September 16 and 17 GST Board meeting in Vancouver,

21   Washington,  Irwin and Blankstein urged the Board to give Global the Bestel Opportunity.

22   The meeting was attended by all of the Individual Counterclaim Defendants.  Once again,

23   Irwin falsely claimed that GST's indentures did not permit GST to enter into the Bestel

24   Opportunity through a wholly-owned subsidiary without the prior consent of its lenders.  The

25   independent directors were also informed that Grupo Varo was willing to go along with the

26   idea of Global as the direct owner of the Bestel Opportunity and that GST would still

Page 23 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400
Seattle, WA 98101-1618

1  maintain a "direct and indirect interest of 49%" in Bestel.

2                           85.

3         The Individual Counterclaim Defendants did not disclose the following at the

4  September Board meeting:

5
6            (a)     that, as of the date of this meeting, separate and apart from the options

7                     that Global had issued to Warta, Blankstein, Irwin and Legault, each of

7                     the Individual Counterclaim Defendants already held thousands of

8                     shares of Global stock and warrants to purchase thousands more;

9           (b)     that, as of this date, there was no written agreement between GST and

10                     Global setting out the terms on which it was proposed that Global be

11                     substituted for GUSA;

12           (c)     that Grupo Varo had been induced to consent to the substitution of

13                     Global by a representation that GST owned 80% of the issued shares of

14                     Global;

15           (d)     that GST did not own 80% of Global's shares either at this time or

16                     ever;

17           (e)     that the consideration which GST was supposed to receive in exchange

18                     for the transfer of the Bestel Opportunity, namely a minimum of 3

19                     million Global shares, was not based on any reasoned investigation of

20                     the value of the Bestel Opportunity, but on a representation by

21                     Blankstein of what he thought regulators might approve;

22           (f)     that GST would not receive any Global shares without VSE approval

23                     and that no steps were being taken to protect GST's interest in the

24                     Bestel Opportunity in the event that the VSE did not approve the

25                     issuance of an appropriate amount of Global shares; and

26           (g)     that no steps had been taken to secure GST's control of Global.

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400

**86.**

The Board then voted on whether "the activities of Global as described at the meeting" should be ratified. While Warta, Blankstein, Irwin and Legault abstained from voting because of the options that had been issued to them, neither Hanson nor Watson abstained despite the fact that both of them (unbeknownst to the Independent Directors) directly and indirectly, already held substantial amounts of Global stock.

**87.**

Within days of the September GST Board meeting, Warta, Blankstein, Watson, and Legault were appointed to the Board of Directors of Global and Kamsky was appointed President and Chief Executive Officer of Global. Irwin became Global's Secretary.

**88.**

It was not until January 1997 that the GST Board formally approved the transfer of the Bestel Opportunity to Global. By that time, however, the Bestel Opportunity had already been transferred to Global - for no consideration whatsoever and with no written documentation.

**89.**

On October 2, 1996 Blankstein became Chairman of Global. On October 12, 1996, Mextel entered into an agreement with Bestel and Odetel pursuant to which Mextel was required to pay $13 million for its 49% interest in Bestel. The Global misappropriation of Bestel was finally sealed at the signing of an agreement with Odetel in Mountain View, California, on January 21, 1997.

**90.**

Mextel, through GUSA, was to be a wholly owned subsidiary of GST, and was incorporated by Olshan at GST's direction. Yet, on October 12, 1996, Earl Kamsky executed a subscription offer on behalf of Global to subscribe for 100 shares of Mextel, being all the issued and outstanding shares of Mextel. On the same date, Warta, Kamsky and

1  Irwin, as directors of Mextel, accepted and approved Global's offer to purchase Mextel's

2  shares. Thus Mextel, which held GST's rights to the Bestel Opportunity, became a wholly-

3  owned subsidiary of Global.

4                                              91.

5          On the same date, the Subscription Agreement was amended to replace all references

6  to GUSA with references to Global. No other term of the subscription agreement was

7  amended. The amendment was signed by Kamsky on behalf of Mextel, on behalf of GUSA,

8  and on behalf of Global. An amendment to the construction contract was also signed by

9  Kamsky replacing the reference to GST's subsidiary Telecom with a reference to Mextel.

10                                             92.

11         Thus, on October 12, 1996, Warta and Irwin, despite being respectively, the Chief

12  Executive Officer, and the Vice Chairman of GST, together with Kamsky, the President and

13  Chief Executive Officer of Telecom, a GST subsidiary, transferred to Global for no

14  consideration, an opportunity now valued in excess of $200 million dollars. At the same

15  time, Warta and the other Individual Counterclaim Defendants were continuing both to dilute

16  GST's existing interest in Global through the issuance of new shares and to increase the

17  amount of their own holdings.

18                                             93.

19         A Special Meeting of the GST Board was held on January 14, 15 and 16, 1997 at the

20  Mauna Launi Hotel on the Island of Hawaii. The Individual Counterclaim Defendants were

21  all present at the meeting, together with Independent Directors Armstrong and Yoshida. A

22  resolution was adopted "with Messrs. Blankstein, Watson and Legault, being directors of

23  GST Global, abstaining," but with Warta, Irwin, Watson and Hanson (all of whom were

24  undisclosed shareholders of Global) voting, as follows:

25              RESOLVED, that the Company [GST] be, and it hereby is,
                authorized to enter into an agreement with GST Global pursuant
26              to which the Company shall transfer its business opportunity in

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400

"Bestel" in consideration of the issuance to the Company of a minimum of 3,000,000 shares of GST Global and up to a maximum of 5,000,000 shares of GST Global capital stock, the precise amount of such additional shares to be based upon an evaluation of the business plan of Bestel and approval by the Vancouver Stock Exchange.

As each of the Individual Counterclaim Defendants present at the meeting knew, and failed to disclose, even 5,000,000 shares would have been grossly inadequate consideration for the transfer of the Bestel opportunity to Global. A recent report issued by the investment firm of Paine Webber in connection with a Global debenture offering revealed that Bestel is worth $460 million. GST's 49% interest in that opportunity was thus immensely valuable as of this date. As each of the Individual Counterclaim Defendants also knew and failed to disclose, by this time, Board approval of transferring the Bestel Opportunity to Global was virtually meaningless - the opportunity had already been transferred, without consideration, and without any agreement between GST and Global concerning the transfer.

### Failure to Prepare a Fairness Opinion or Submit the Transaction for VSE Approval

94.

Thereafter, the Counterclaim Defendants continued to conceal their fraud with false statements regarding VSE approval of the transaction between GST and Global. Certain transactions involving the stock of Companies traded on the VSE, such as the exchange of Global stock for GST's interest in the Bestel opportunity, are subject to a VSE approval requirement. The nominal purpose of this requirement is to prevent any party to the transaction (e.g., Global) from self-dealing or exploiting misleading or inaccurate valuation of stock or other business assets or opportunities at the expense of its shareholders or other parties to the transaction. In furtherance of this goal, the VSE may require a fairness opinion prepared by a disinterested investment bank prior to approving a transaction.

95.

As Counterclaim Defendants knew, submission of the Global/GST transaction to the

Page 27 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS