Opportunity.

78.

On August 20, 1996, Bestel and Eficaciones Tlaloc, S.A. de C.V. entered into an agreement pursuant to which Bestel designated GST to act on its behalf for the purpose of administering the contract. The contract was to build 2255 kilometers of fiber optic line. The contract price was $52,000,000.

79.

On the same date, a subscription agreement was executed between Bestel, a Grupo Varo subsidiary known as Occidental de Telecommunicacion, S.A. de C.V. ("Odetel"), GST Mextel ("Mextel"), GUSA, and the shareholders of Odetel (the "Subscription Agreement"). Pursuant to the Subscription Agreement, Mextel subscribed for 49% of the outstanding capital stock of Bestel for the price of $3,920,000.

80.

When Mextel was incorporated by Olshan at GST's instructions in June of 1996, GST contemplated that Mextel would be a wholly owned subsidiary of GUSA and that GST's interest in Bestel would be held through GUSA. In the Subscription Agreement, Warta, on behalf of GUSA and Kamsky on behalf of Mextel, represented that Mextel was, in fact, wholly owned by GUSA.

**The Fraudulent Transfer of the Bestel Opportunity to Global**

81.

Despite the fact that Bestel was an opportunity developed by the GST Companies, that agreements had already been drafted and executed pursuant to which the GST Companies would pursue the Bestel Opportunity, and that the Board of GST had only authorized proceeding with the Bestel Opportunity through a wholly-owned subsidiary, in or about September 1996, Warta, Irwin, and Blankstein, all of whom were directors of GST at the time, actually worked to convince Grupo Varo not to proceed with a transaction through

Page 22 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400
Seattle, WA 98101-1618
Telephone (206) 292-8930

GUSA, but instead to proceed through Global, which they falsely characterized as another GST subsidiary.

82.

In particular, in order to induce Grupo Varo to agree to the substitution of Global, Irwin represented that GST owned 80% of the outstanding shares of Global. This statement was false and was either known to be false by Irwin or was made with reckless indifference to the truth. As each of the Individual Counterclaim Defendants knew, no steps had been taken by them to insure that GST had any control over Global.

83.

In a September 6, 1996 conference call between Kamsky, Irwin, and representatives of Grupo Varo, Irwin told Grupo Varo that restrictions in indentures to which GST was a party did not permit GST to enter into the Bestel Opportunity through a wholly-owned subsidiary without first obtaining the consent of its lenders. This statement was also false, and was either known to be false by Irwin or was made recklessly without any investigation or analysis of the issue. Irwin claimed that it would take at least 45 days to lift these restrictions and urged that the Bestel shares be vended not to a GST subsidiary, but to Global. According to Irwin, the immediate transfer of shares to Global was necessary in order for Global to raise the necessary money to fund the Bestel Opportunity.

84.

A week later, at the September 16 and 17 GST Board meeting in Vancouver, Washington, Irwin and Blankstein urged the Board to give Global the Bestel Opportunity. The meeting was attended by all of the Individual Counterclaim Defendants. Once again, Irwin falsely claimed that GST's indentures did not permit GST to enter into the Bestel Opportunity through a wholly-owned subsidiary without the prior consent of its lenders. The independent directors were also informed that Grupo Varo was willing to go along with the idea of Global as the direct owner of the Bestel Opportunity and that GST would still

Page 23 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400
Seattle, WA 98101-1618
Telephone (206) 292-8930

maintain a "direct and indirect interest of 49%" in Bestel.

85.

The Individual Counterclaim Defendants did not disclose the following at the September Board meeting:

(a) that, as of the date of this meeting, separate and apart from the options that Global had issued to Warta, Blankstein, Irwin and Legault, each of the Individual Counterclaim Defendants already held thousands of shares of Global stock and warrants to purchase thousands more;

(b) that, as of this date, there was no written agreement between GST and Global setting out the terms on which it was proposed that Global be substituted for GUSA;

(c) that Grupo Varo had been induced to consent to the substitution of Global by a representation that GST owned 80% of the issued shares of Global;

(d) that GST did not own 80% of Global's shares either at this time or ever;

(e) that the consideration which GST was supposed to receive in exchange for the transfer of the Bestel Opportunity, namely a minimum of 3 million Global shares, was not based on any reasoned investigation of the value of the Bestel Opportunity, but on a representation by Blankstein of what he thought regulators might approve;

(f) that GST would not receive any Global shares without VSE approval and that no steps were being taken to protect GST's interest in the Bestel Opportunity in the event that the VSE did not approve the issuance of an appropriate amount of Global shares; and

(g) that no steps had been taken to secure GST's control of Global.

Page 24 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400
Seattle, WA 98101-1618
Telephone (206) 292-8930

86.

The Board then voted on whether "the activities of Global as described at the meeting" should be ratified. While Warta, Blankstein, Irwin and Legault abstained from voting because of the options that had been issued to them, neither Hanson nor Watson abstained despite the fact that both of them (unbeknownst to the Independent Directors) directly and indirectly, already held substantial amounts of Global stock.

87.

Within days of the September GST Board meeting, Warta, Blankstein, Watson, and Legault were appointed to the Board of Directors of Global and Kamsky was appointed President and Chief Executive Officer of Global. Irwin became Global's Secretary.

88.

It was not until January 1997 that the GST Board formally approved the transfer of the Bestel Opportunity to Global. By that time, however, the Bestel Opportunity had already been transferred to Global - for no consideration whatsoever and with no written documentation.

89.

On October 2, 1996 Blankstein became Chairman of Global. On October 12, 1996, Mextel entered into an agreement with Bestel and Odetel pursuant to which Mextel was required to pay $13 million for its 49% interest in Bestel. The Global misappropriation of Bestel was finally sealed at the signing of an agreement with Odetel in Mountain View, California, on January 21, 1997.

90.

Mextel, through GUSA, was to be a wholly owned subsidiary of GST, and was incorporated by Olshan at GST's direction. Yet, on October 12, 1996, Earl Kamsky executed a subscription offer on behalf of Global to subscribe for 100 shares of Mextel, being all the issued and outstanding shares of Mextel. On the same date, Warta, Kamsky and

Page 25 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400
Seattle, WA 98101-1618
Telephone (206) 292-8930

1  Irwin, as directors of Mextel, accepted and approved Global's offer to purchase Mextel's
2  shares. Thus Mextel, which held GST's rights to the Bestel Opportunity, became a wholly-
3  owned subsidiary of Global.

4                                       91.

5  On the same date, the Subscription Agreement was amended to replace all references
6  to GUSA with references to Global. No other term of the subscription agreement was
7  amended. The amendment was signed by Kamsky on behalf of Mextel, on behalf of GUSA,
8  and on behalf of Global. An amendment to the construction contract was also signed by
9  Kamsky replacing the reference to GST's subsidiary Telecom with a reference to Mextel.

10                                      92.

11  Thus, on October 12, 1996, Warta and Irwin, despite being respectively, the Chief
12  Executive Officer, and the Vice Chairman of GST, together with Kamsky, the President and
13  Chief Executive Officer of Telecom, a GST subsidiary, transferred to Global for no
14  consideration, an opportunity now valued in excess of $200 million dollars. At the same
15  time, Warta and the other Individual Counterclaim Defendants were continuing both to dilute
16  GST's existing interest in Global through the issuance of new shares and to increase the
17  amount of their own holdings.

18                                      93.

19  A Special Meeting of the GST Board was held on January 14, 15 and 16, 1997 at the
20  Mauna Launi Hotel on the Island of Hawaii. The Individual Counterclaim Defendants were
21  all present at the meeting, together with Independent Directors Armstrong and Yoshida. A
22  resolution was adopted "with Messrs. Blankstein, Watson and Legault, being directors of
23  GST Global, abstaining," but with Warta, Irwin, Watson and Hanson (all of whom were
24  undisclosed shareholders of Global) voting, as follows:

25          RESOLVED, that the Company [GST] be, and it hereby is,
            authorized to enter into an agreement with GST Global pursuant
26          to which the Company shall transfer its business opportunity in

Page 26 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400
Seattle, WA 98101-1618
Telephone (206) 292-8930

"Bestel" in consideration of the issuance to the Company of a minimum of 3,000,000 shares of GST Global and up to a maximum of 5,000,000 shares of GST Global capital stock, the precise amount of such additional shares to be based upon an evaluation of the business plan of Bestel and approval by the Vancouver Stock Exchange.

As each of the Individual Counterclaim Defendants present at the meeting knew, and failed to disclose, even 5,000,000 shares would have been grossly inadequate consideration for the transfer of the Bestel opportunity to Global. A recent report issued by the investment firm of Paine Webber in connection with a Global debenture offering revealed that Bestel is worth $460 million. GST's 49% interest in that opportunity was thus immensely valuable as of this date. As each of the Individual Counterclaim Defendants also knew and failed to disclose, by this time, Board approval of transferring the Bestel Opportunity to Global was virtually meaningless - the opportunity had already been transferred, without consideration, and without any agreement between GST and Global concerning the transfer.

### Failure to Prepare a Fairness Opinion or Submit the Transaction for VSE Approval

94.

Thereafter, the Counterclaim Defendants continued to conceal their fraud with false statements regarding VSE approval of the transaction between GST and Global. Certain transactions involving the stock of Companies traded on the VSE, such as the exchange of Global stock for GST's interest in the Bestel opportunity, are subject to a VSE approval requirement. The nominal purpose of this requirement is to prevent any party to the transaction (e.g., Global) from self-dealing or exploiting misleading or inaccurate valuation of stock or other business assets or opportunities at the expense of its shareholders or other parties to the transaction. In furtherance of this goal, the VSE may require a fairness opinion prepared by a disinterested investment bank prior to approving a transaction.

95.

As Counterclaim Defendants knew, submission of the Global/GST transaction to the

Page 27 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400
Seattle, WA 98101-1618
Telephone (206) 292-8930

1  VSE would have required evidence that issuance of Global shares would provide GST with a
2  fair value for the Bestel Opportunity. Valuing the Bestel Opportunity would reveal that even
3  5,000,000 shares of Global was grossly inadequate consideration for the transfer. Thus, the
4  Counterclaim Defendants had no intention of preparing an objective fairness opinion or
5  submitting proper evidence of the value of the transaction to the VSE for approval. The
6  Counterclaim Defendants did not disclose their intentions to the Independent Directors.

                                              96.

8  On May 9, 1997, the VSE wrote to a Global attorney stating that, subject to receiving
9  further information, it was prepared to accept the acquisition of 49% of Bestel by Global.
10 The VSE also stated that it would require a valuation of the Bestel Opportunity before it
11 would approve the issuance of Global shares to GST.

                                              97.

13 On June 2 and June 3, 1997 a GST Board of Directors meeting was held in San
14 Francisco. In attendance were the Individual Counterclaim Defendants and Independent
15 Directors Sawyer and Armstrong. At the meeting, Irwin reported that:

> ...no definitive resolution had been reached with respect to the receipt by the Company of 3,000,000 additional shares of capital stock of Global and up to an additional 2,000,000 shares ...in consideration of the transfer to Global of the Bestel project to the Company. Mr. Irwin *reported that application for approval of the issuance of shares to the Company had been made* to the Vancouver Stock Exchange by Global for issuance of up to 3,000,000 shares. A lengthy discussion ensued with respect to a final resolution of the number of shares to be received by the Company.

(emphasis added). In fact, no such application — even at "up to 3,000,000 shares" — had been made by Global and none has been made to date.

                                              98.

At the meeting, the Board resolved to delegate Irwin and Blankstein to pursue the share issuance through the VSE and to support it by a "fairness opinion" to be prepared by

Page 28 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

1  officer of Magnacom.

2                                   101.

3  On information and belief, in or about July 1996, and prior to any Board approval, Warta, who was then President and CEO of GST, and Irwin, who was GST's Vice Chairman, caused GST to advance approximately $5.9 million to Magnacom. Magnacom used the $5.9 million advanced to it by GST as a deposit to acquire licenses for C Block Broadband Personal Communications Services ("Broadband PCS"). Warta, as the owner of Magnacom, and Irwin, as a legal advisor to Magnacom and an officer of Magnacom, each suffered from debilitating conflicts of interest that prevented them from protecting GST's interests in its dealings with Magnacom.

                                    102.

Warta and Irwin knowingly permitted and caused further advances by GST to Magnacom. In January of 1997, Irwin reported to GST that $14.4 million had been advanced to Magnacom for the PCS licenses. Although the first $5.9 million had been advanced by GST to Magnacom in July of the previous year, GST still had not been provided even a term sheet explaining how GST's advances to Magnacom would be repaid if the PCS networks were never built or if Magnacom forfeited to the FCC either the licenses or the funds Magnacom had paid the FCC for the licenses. Warta and Irwin did cause GST to enter into a "Reseller Agreement" with Magnacom, under which GST's cash advances to Magnacom are characterized as a prepayment for airtime. This agreement was prepared by Irwin with Warta's approval, and contains no provisions for repayment by Magnacom to GST if Magnacom forfeits the licenses and funds advanced to the FCC or fails to construct the networks. The Reseller Agreement was executed on GST's behalf by Irwin -- <u>after</u> GST had advanced $14.4 million to Magnacom.

                                    103.

Magnacom has now filed for bankruptcy. As a direct and proximate result of Irwin

Page 30 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

First Marathon Securities. Warta, Blankstein and Legault abstained from voting on this resolution; the other conflicted directors did not. Although Blankstein had been designated by the GST Board to act on its behalf, on June 30 Blankstein told First Marathon that the agreement between GST and Global called for the issuance of *no more than* three million shares rather than the three to five million shares specified in the January 1997 GST Board resolution.

99.

It was not until May 13, 1998, in connection with Global's proxy for its annual shareholders meeting, that Global first publicly questioned the existence of *any* obligation to GST, and denied the existence of an agreement. In particular, Global's Proxy Statement states:

> The Company *is negotiating* an agreement to issue to a shareholder, GST Telecommunications ... additional common shares, in consideration of the 1996 transfer by Telecom to the Company of its previous development work and interests, *if any*, in and to the telecommunications project in Mexico being developed by Bestel. The issuance of any common shares is subject to regulatory approval and approval of the directors. The number of shares, *if any*, has not been determined at this time.

(Emphasis added.)

**Magnacom and Guam Net**

100.

Magnacom Wireless, LLC ("Magnacom"), a Delaware Limited Liability Company, is owned by John Warta through Pacwest, Inc. Irwin and Olshan acted as legal counsel to GST in connection with its dealings with Magnacom. Yet, at the same time Irwin and Olshan were counseling GST in its interactions with Magnacom, they were providing advice to Magnacom on its dealings with GST. This conflict was never fully disclosed and never waived by GST. In addition, Irwin is or was at the time of the events described below, and

Page 29 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

and Warta's breach of fiduciary duty, GST has effectively no recourse against Magnacom and has been damaged in an amount not less than $15 million.

104.

Warta's fraudulent diversion of GST's resources to Magnacom is similar to his conduct with respect to another Warta company formerly know as Guam Net, Inc. ("Guam Net"), and now known as PCS Plus Pacific, Inc. ("PCS Pacific"). In 1996, Warta negotiated for the puchase of A Block PCS licences from Poka Lambro Telephone Cooperative, Inc. for the market consisting of Guam and the Northern Marianas Islands. For the benefit of himself and his marital community, Warta caused GST to advance $415,000 to Guam Net -- his own personal company -- without taking adequate -- or any -- steps to recognize or protect GST's interest in the payment for the investment. As a result, GST has yet to receive any consideration for the investment, even though the licenses were purchased in February, 1997. As with Magnacom, GST has effectively no recourse against PCS Pacific and has been damaged in an amount not less than $415,000.

**FIRST COUNTERCLAIM**
(Fraud)
(Against all Counterclaim Defendants)

105.

Counterclaim Plaintiffs repeat and reallege the allegations of paragraphs 1 through 104 above as if fully set forth herein.

106.

Counterclaim Defendants Warta, Blankstein, Legault, Irwin, Hanson, and Watson, have, both individually and on behalf of Global, knowingly made numerous misrepresentations to, and or concealed material facts from, GST, despite their duties to, *inter alia*, disclose their conflicted interests as alleged above and abstain from taking actions to GST's detriment. Global, through the fraudulent actions of its agents on its behalf, is also

Page 31 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
BULLIVANT HOUSER BAILEY
A Professional Corporation
1601 Fifth Avenue, Suite 2400
Seattle, WA 98101-1618
Telephone (206) 292-8930

1 a party to the fraudulent scheme alleged herein.

2                                    107.

3   In particular, all of the Counterclaim Defendants failed to disclose, although under a
4   duty to do so, the following material facts:

(a) that at the same time they were discussing and actually voting on the issue of whether to transfer the Bestel Opportunity to Global, each of the Individual Counterclaim Defendants already owned thousands of shares of Global stock and held warrants to purchase thousands more;

(b) that no written agreement between GST and Global was ever executed, or even prepared, setting out the terms on which the Bestel Opportunity would be transferred to Global;

(c) that Grupo Varo had been induced to agree that Global could participate in the Bestel Opportunity by a representation that GST owned 80% of the issued shares of Global;

(d) that GST did not own 80% of Global's shares either at that time or ever;

(e) that the consideration which GST was supposed to receive in exchange for the transfer of the Bestel Opportunity, namely a minimum of 3 million Global shares, was not based on any reasoned investigation of the value of the Bestel Opportunity, but on a representation by Blankstein of what he thought the VSE might approve;

(f) that GST would not receive any Global shares without VSE approval;

Page 32 - DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS