Not Reported in A.2d  
(Cite as: 2001 WL 541469 (Del.Super.))

Page 1

**H**  
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

INTERNATIONAL FIDELITY INSURANCE COMPANY, Plaintiff,  
v.  
DELMARVA SYSTEMS CORPORATION, United Electric Supply Company, Inc., Mattes Electric, Inc., Delaware Technical & Community College, Pace Electric, Inc., Southern Electric Supply, Inc., Denny Electric Supply of Ambler, Cummins Power Systems, Inc., and Rental Service Corporation, Defendants.

No. 99C-10-065 WCC.

Submitted: Aug. 21, 2000.  
Decided: May 9, 2001.

On Plaintiff International Fidelity Insurance Company's Motion to Dismiss Count III of Defendant Delaware Technical & Community College's Counterclaim. Denied.

Richard L. Abbott, Esquire; Wilmington, for Plaintiff International Fidelity Insurance Company.

Marc P. Niedzielski, Deputy Attorney General; Department of Justice, Wilmington, for Defendant Delaware Technical & Community College.

Theodore J. Tacconelli, Esquire; Wilmington, for Defendant Denny Electric Supply of Ambler.

Jeffrey P. Wasserman, Esquire; Wilmington, for Defendant Southern Electric Supply, Inc.

Collins J. Seitz, Jr., Esquire; Wilmington, for Defendant Cummins Power Systems, Inc.

MEMORANDUM OPINION

CARPENTER, J.

*1 Plaintiff International Fidelity Insurance Company ("IFIC") filed a declaratory judgment action against Defendant Delaware Technical & Community College ("Del Tech") and others [FN1] regarding IFIC's rights and liabilities as to claims made under certain bonds that were issued by IFIC in connection with a construction project. Del Tech counterclaimed against IFIC, and IFIC filed a renewed motion to dismiss Count III of the counterclaim. For the reasons set forth below, the Court denies the motion.

FN1. Separate stipulations were filed for the following defendants, dismissing them as parties to the action: Delmarva Systems Corporation, United Electric Supply Company, Inc., and Pace Electric, Inc.

FACTS

In September 1997, bids were solicited for Del Tech's Educational and Training Building. On October 7, 1997, Defendant Mattes Electric, Inc. ("Mattes") submitted a bid of $1,420,000 for the electrical contract, which was accompanied by a Bid Bond issued by IFIC. On December 2, 1997, Mattes was informed in writing that its bid was accepted and was requested to start performance. On that same date, a Performance Bond, issued by IFIC, was provided, and on January 20, 1998, the State of Delaware [FN2] issued a purchase order to Mattes in the amount of $1,369,825.

FN2. Del Tech is an agency of the State of Delaware.

Del Tech asserts that on December 28, 1998, Mattes breached the construction contract by abandoning performance at the work site. Del Tech further alleges that on March 31, 1999, IFIC refused to perform its obligations under the Performance Bond, and on May 20, 1999, IFIC defaulted on its obligations and duties under the Bid Bond.

On October 7, 1999, IFIC filed a complaint for declaratory relief, requesting, *inter alia*, that this

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2001 WL 541469 (Del.Super.))

Page 2

Court declare that the Performance Bond is void and invalid and provides no source of recovery for Del Tech. In response, Del Tech filed a counterclaim against IFIC. While Del Tech alleges four counts against IFIC, the one at issue is Count III, entitled "Bad Faith Claim Handling." It states:

45. IFIC is an insurance company authorized to do business in the State of Delaware and has a duty to act in good faith.

46. IFIC has violated its obligation to deal with [Del Tech] in good faith and had engaged in malicious and bad faith conduct in denying claims of [Del Tech] in an effort to use its financial wealth to oppress and unlawfully avoid its obligation to pay the claims.

WHEREFORE, [Del Tech] demands judgment in its favor and against the Plaintiff IFIC for all that is just and proper, to include general and punitive damages, interest, attorney fees and costs.

IFIC filed a motion to dismiss Count III, and a hearing was held on March 22, 2000. The Court denied the motion without prejudice, finding that a record needed to be created before a ruling on the issue could be made. But, the Court allowed IFIC an opportunity to renew the motion under a summary judgment context at a later date. On June 1, 2000, IFIC renewed its motion to dismiss Count III, and during a June 28, 2000 hearing, the Court heard argument and allowed the parties to further brief the issue. [FN3]

> FN3. The Court accepted IFIC's motion in spite of the appearance that IFIC's counsel failed to reasonably comply with the Court's Order of March 22, 2000. Counsel's conduct is troublesome, but the Court will consider the renewed motion as a good faith attempt to bring closure to a legal issue and not as an intentional, disrespectful act of IFIC's out-of-state counsel. However, any failure in the future to comply with the orders of this Court will not be tolerated.
> The Court also granted IFIC's motion to stay discovery as it relates to Count III.

Because Count III asserts a claim for bad faith, IFIC raises the issue of whether Delaware recognizes a cause of action for punitive damages by an owner/obligee based on bad faith of a surety.

While IFIC acknowledges that a cause of action for bad faith is recognized in an insurer/insured context, it argues that the surety/obligee relationship does not share the same characteristics, and as a result, such a claim should not be recognized in Delaware. Conversely, Del Tech asserts that the same reasoning that allows bad faith claims in an insurance context is applicable here and that the majority of the jurisdictions that have addressed this issue have recognized bad faith claims in the surety context.

## STANDARD OF LAW

*2 In spite of the initial ruling in regards to this issue, the Court will consider this motion under a motion to dismiss context rather than under a motion for summary judgment. While the Court encouraged the parties to pursue discovery in this area, that simply has not occurred, and the motion only requests the Court to address the legal issue as to whether Del Tech's claim is legally recognized.

For a motion to dismiss for failure to state a claim upon which relief can be granted, all allegations in the complaint must be accepted as true. [FN4] In addition, such a motion will be granted where the plaintiff may not recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. [FN5]

> FN4. *Spence v. Funk,* Del.Supr., 396 A.2d 967 (1978).

> FN5. *Id.*

## DISCUSSION

Historically, damages for breach of contract have been limited to the non-breaching party's expectation interest, and, punitive damages are generally not recoverable for breach of contract unless the conduct also independently amounts to a tort. [FN6] However, in spite of this general prohibition, the Delaware Supreme Court has allowed punitive damages for bad faith breach of an insurance contract. [FN7] The issue now before the Court is whether to expand entitlement of punitive damages to obligees for bad faith breaches in the context of a surety bond.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2001 WL 541469 (Del.Super.))

Page 3

FN6. *E.I. DuPont de Nemours and Co. v. Pressman*, Del.Supr., 679 A.2d 436, 445 (1996).

FN7. *Id.* at 446. In *Pierce v. International Ins. Co.*, Del.Supr., 671 A.2d 1361, 1367 (1996), the Court held that "[P]unitive damages may be available in the context of a contract action if the denial of coverage is wilful or malicious...[and] when the bad faith actions of an insurer are taken with a reckless indifference or malice toward the plight of the injured employee [insured]..." Also, in *Tackett v. State Farm Fire & Cas. Ins. Co.*, Del.Supr., 653 A.2d 254, 265 (1995), the Court held that "[A]n insured may be entitled to the recovery of punitive damages in a bad faith action if the insurer's breach is particularly egregious."

As detailed by the parties' briefs, several jurisdictions have addressed the issue. However, prior to reviewing the reasoning of those cases, the Court believes it is beneficial to ensure that there is a clear understanding of the terms used in this commercial relationship. A suretyship is "an undertaking to answer for the debt, default or miscarriage of another, by which the surety becomes bound as the principal or original debtor is bound." [FN8] As such, it is "essential to the existence of a suretyship that there be a principal debtor or obligor, and a valid and subsisting debt or obligation, for which the principal is responsible." [FN9] In this case, Mattes, who was contracted to perform the work, is the principal; Del Tech, who had contracted for the work to be done by Mattes, is the owner/obligee; and IFIC, who allegedly agreed to compensate Del Tech if Mattes failed to perform, is the surety. With these general definitions in mind, the Court will now turn to the cases that have previously addressed this issue.

FN8. *W.T. Rawleigh Co. v. Warrington*, Del.Super., 199 A. 666, 667-68 (1938).

FN9. *Id.* at 668.

*A. Jurisdictions Recognizing a Bad Faith Claim*

*in a Surety Context*

The Supreme Courts of Arizona, Colorado, Ohio, and Alaska have all recognized a bad faith claim in the context of a surety contract. In one of the most cited cases on the subject, the Arizona Supreme Court in *Dodge v. Fidelity and Deposit Company of Maryland*, [FN10] held that a surety on a contractor's performance bond can be liable for the tort of bad faith and that the obligee is entitled to recover tort damages. Arizona defined "surety insurance" as, "[i]nsurance guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings and contracts of suretyship." [FN11] And, while it recognized that liability insurance was not identical in every respect with suretyship, the court found that the statutes, relevant to this area, reflected the legislature's intent to include sureties within the coverage of the insurance statutes. [FN12] As insurers, the court further held that sureties have the same duty to act in good faith and considered two key factors to reach its conclusion. First, it found that the purpose of the construction performance bond was not for a commercial advantage but to protect the plaintiffs from calamity, that is, a default on the contract. [FN13] In other words, the court found that surety insurance was obtained with the hope to avoid the financial and personal hardships associated with the principal's failure to perform under the construction contract. [FN14] Secondly, the court found that imposing tort damages on a surety who in bad faith refuses to pay a valid claim would deter such conduct. [FN15] The court stated:

FN10. Ariz.Supr., 778 P.2d 1240 (1989).

FN11. A.R.S. § 20-257(2).

FN12. *Dodge*, 778 P.2d at 1242.

FN13. *Id.*

FN14. *Id.*

FN15. *Id.*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d  
(Cite as: 2001 WL 541469 (Del.Super.))

Page 4

*3 "[t]he whole purpose of insurance is defeated if an insurance company can refuse or fail, without justification, to pay a valid claim." The same is true with construction performance bonds and other types of surety insurance. Permitting a surety to withhold performance of its obligations without reason would defeat the purpose for which surety insurance is intended. [FN16]

FN16. *Dodge*, 778 A.2d at 1243 (*quoting Noble v. National Am. Life Ins. Co.*, Ariz.Supr., 624 P.2d 866, 868 (1981)).

The Colorado Supreme Court in *Transamerica Premier Insurance Company v. Brighton School District 27J* [FN17] recognized the existence of a common law tort claim against a commercial surety who failed to reasonably proceed with the payment of a claim under a performance bond. [FN18] In an exhaustive opinion on the subject, the Colorado Supreme Court justified its decision referencing the special nature of the suretyship agreement and found that commercial sureties receiving consideration for the issuance of surety bonds serve a purpose similar to that of insurers. [FN19] The court explained:

FN17. Colo.Supr., 940 P.2d 348 (1997).

FN18. *Id.* at 349.

FN19. *Id.* at 351.

A special relationship exists between a commercial surety and an obligee that is nearly identical to that involving an insurer and an insured. When an obligee requests that a principal obtain a commercial surety bond to guarantee the principal's performance, the obligee is essentially insuring itself from the potentially catastrophic losses that would result in the event the principal defaults on its original obligation. When the principal actually defaults, the commercial surety must assume or correct any flaws in performance pursuant to the terms of the original contract, thereby eliminating the obligee's risk of loss in the venture.
Although the parties to a suretyship agreement are on equal footing in terms of bargaining power when they enter into the agreement, it is the commercial surety who controls the ultimate decision of whether to pay claims made by the obligee under the terms of the surety bond. For this reason, the commercial surety has a distinct advantage over the obligee in its ability to control performance under the secondary agreement. As with insurers, commercial sureties must proceed with the payment of claims made pursuant to a surety bond in good faith. Otherwise, the core purpose of the suretyship agreement, which is to insulate the obligee from the risk of a default, is defeated. [FN20]

FN20. *Id.* at 352-53 (citations omitted).

While the court recognized that the commercial surety's obligations may be more complex than those of an insurer, it stated that the complexity did not authorize a commercial surety to disregard its obligation to act in good faith. [FN21] It explained that the suretyship agreement provides the obligee with financial security by eliminating the risk of default in the original agreement between the principal and the obligee. [FN22]

FN21. *Transamerica*, 940 P.2d at 353, n. 4.

FN22. *Id.* at 353.

In addition, the Colorado Supreme Court recognized the unique status of surety contracts in the public sector, which is applicable to the case sub judice. The court noted that school and other public work projects are constrained by tight budgets with minimum financial flexibility and the failure to timely perform the contract may be critical to both the public entity and the public in general. [FN23]

FN23. *Id.* at 352, n. 3.

*4 Moreover, like the court in *Dodge, supra*, the Colorado Supreme Court found that the insurance statutes reflected a legislative intent to include sureties as part of the regulatory scheme governing insurance. [FN24] In addition to other insurance

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2001 WL 541469 (Del.Super.))

Page 5

related statutes, the court looked to the definition of "insurer", which stated "every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance." [FN25] The court stated:

FN24. *Id.* at 352.

FN25. § 10-1-102(8), 4A C.R.S. (1994).

These statutes indicate persuasive legislative support for treating a commercial surety contract as a form of insurance agreement and for treating a commercial surety which fails to settle its obligations in good faith in the same way that our tort law treats insurers who process a claim in bad faith. [FN26]

FN26. *Transamerica*, 940 P.2d at 352.

Finally, similar to *Dodge, supra*, the court also relied upon a deterrence argument and found that "[w]hen the commercial surety withholds payment of an obligee's claim in bad faith, contract damages do not compensate the obligee for the commercial surety's misconduct and have no deterrent effect to prevent such misconduct in the future." [FN27] As such, the court found that by recognizing a cause of action in tort for a commercial surety's breach of its duty to act in good faith, commercial sureties would be compelled to handle claims responsibly. [FN28]

FN27. *Id.* at 353.

FN28. *Id.*

The Ohio Supreme Court in *Suver v. Personal Service Insurance Company* [FN29] found that when the issuer of a financial responsibility bond commits a bad faith breach of its duty to act in good faith in the handling and payment of claims by one injured by the principal, it will give rise to a cause of action in tort, and punitive damages may be recovered upon proof of actual malice, fraud or oppression. Like the other state supreme courts above, the Ohio Supreme Court acknowledged that a financial responsibility bond is not the same as an insurance policy but found that the nature of the differences between the two was "neither complete nor absolute." [FN30] Rather, the court held that the financial responsibility bond and the insurance policy differ primarily in whom they protect and to whom the duty runs. [FN31] As such, the court found that the differences were not so pronounced as to require the creation of a cause of action in one case and its denial in the other. [FN32] It further stated:

FN29. Ohio Supr., 462 N.E.2d 415 (1984).

FN30. *Id.* at 417.

FN31. *Id.*

FN32. *Id.*

Precisely the same policy arguments and rationale hold true in both settings. In both cases there is a great disparity of financial resources. Additionally, issuers of financial responsibility bonds are companies clearly affected with a public interest. Moreover, to insulate the issuer of a financial responsibility bond from liability for the deliberate refusal to pay its obligations arising from the bond is to encourage the routine denial of payment of claims for as long as possible. This court should not provide an incentive to act in bad faith. [FN33]

FN33. *Suver*, 462 N.E.2d at 417.

Finally, the Alaska Supreme Court in *Loyal Order of Moose, Lodge 1392 v. International Fidelity Insurance Company*, [FN34] relied upon *Dodge, supra*, in finding that an implied covenant of good faith and fair dealing exists between a surety and its obligee on payment and performance bonds. The court found that the relationship of a surety to its obligee was more analogous to that of an insurer to its insured than to the relationship between an insurer and an incidental third-party beneficiary. [FN35] The court further stated, "[a] surety may satisfy its duty of good faith to its obligee by acting

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d  
(Cite as: 2001 WL 541469 (Del.Super.))

Page 6

reasonably in response to a claim by its obligee, and by acting promptly to remedy or perform the principal's duties where default is clear." [FN36]

FN34. Alaska Supr., 797 P.2d 622 (1990).

FN35. *Id.* at 628. *See also United States ex rel Don Siegel Constr. Co., Inc. v. Atul Constr. Co.,* D. N.J., 85 F.Supp.2d 414 (2000). While the District Court of New Jersey decided the issue under the context of a payment bond, the court found that the New Jersey Supreme Court would recognize a claim for bad faith delay by an obligee against a surety. The court found that while the relationship between an obligee and a surety is not identical to the relationship between an insurer and an insured, the relationships are closely analogous. *Id.* at 418. The court relied on *Transamerica, supra, Dodge, supra,* and *Suver, supra,* and agreed with their reasoning that contract damages do not compensate the obligee and have no deterrent effect to prevent such misconduct. *Id.*

FN36. *Loyal Order of Moose, Lodge 1392,* 797 P.2d at 628.

*B. Jurisdictions Not Recognizing A Bad Faith Claim in the Surety Context*

*5 IFIC mainly relies on two cases to support its position. In *Great American Insurance Company v. North Austin Municipal Utility District No. 1,* [FN37] the Texas Supreme Court held that no common law duty of good faith and fair dealing between a surety and an obligee existed that was comparable to one between an insurer and its insured. In determining the issue, the court focused on whether a special relationship existed between an obligee and a surety that would warrant such a duty and considered the following factors: unequal bargaining power between the insurer and its insured, the nature of insurance contracts, and the insurance company's exclusive control over the claim evaluation process. [FN38] In analyzing the first factor, the court found that the obligee, who was a government entity, had the ability to exercise control over the form of the bonds, and thus, there was no unequal bargaining power concern. Addressing concerns in the claims resolution process, the court explained the differences between a liability insurance contract and a surety bond:

FN37. Tex.Supr., 908 S.W.2d 415 (1995).

FN38. *Id.* at 418.

While a liability insurance contract involves only two parties, the insurer and the insured, suretyship involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to supplement an obligation of the principal owed to the bond obligee. Unlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indemnity to the insured for loss, the obligation of a surety to a bond obligee is secondary to the obligation owed by its principal. A party sustaining a loss covered under a liability insurance contract can look only to its insurer for recourse. A bond obligee has a remedy against its principal. [FN39]

FN39. *Id.* at 418-19 (citations omitted).

The court further recognized that some jurisdictions had imposed a duty of good faith and fair dealing upon commercial sureties in favor of bond obligees, premised on the conclusion that suretyship is insurance under the applicable state statutes or case law. [FN40] Notably, the court found that the Texas Legislature did not intend to include suretyship as the "business of insurance" for all purposes under the Insurance Code [FN41] and stated:

FN40. *Id.* at 419. The court cited to *Board of directors of Ass'n of Apartment Owners of the Discovery Bay Condominium v. United Pac. Ins. Co.,* Haw.Supr., 884 P.2d 1134, 1137 (1994); *Dodge,* 778 P.2d at 1242-43; *Szarkowski v. Reliance Ins. Co.,* N.D.Supr., 404 N.W.2d 502, 504-06 (1987).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2001 WL 541469 (Del.Super.))

Page 7

FN41. *Great American Ins. Co.*, 908 S.W.2d at 420.

we cannot conclude that the Legislature intended to include suretyship in the definition of the business of insurance under article 21.21. Absent a clear legislative directive, we conclude that suretyship, as historically understood in the insurance and suretyship fields, does not constitute the business of insurance under article 21.21. [FN42]

FN42. *Id.* at 424.

The second case relied upon by IFIC is the California Supreme Court case of *Cates Construction, Inc. v. Talbot Partners*. [FN43] In *Cates*, Talbot Partners ("Talbot") hired Cates Construction, Inc. ("Cates") to build a condominium project and required Cates to furnish a performance bond, which was issued by Transamerica Insurance Company ("Transamerica"). The court first found that the availability of tort recovery in the insurance policy cases derives from policy considerations pertaining to the particular characteristics of such contracts. In particular, the court found that the fiduciary relationship between the contracting parties, the inability to obtain other recourse in the marketplace, elements of adhesion, and the public interest set such contracts apart and that tort recovery has never been predicated upon the existence of legislation regulating the insurance business. [FN44]

FN43. Cal.Supr., 980 P.2d 407 (1999).

FN44. *Id.* at 417.

*6 While it acknowledged that surety is included as a class of insurance within the code, the court also stated that the parties in surety arrangements have certain rights and defenses that do not attend the typical insurance relationship. [FN45] For example, the court noted that the insurer has no right of subrogation against the insured but a surety is entitled to reimbursement from its principal . [FN46] In addition, the court stated that a surety is entitled to assert as defenses to payment of a surety bond all defenses available to its principal as well as its own independent defenses. [FN47] As such, the court stated that the inclusion of suretyship in the Insurance Code was derived from the need for control of the surety business by a state agency and did not imply that the underlying natures of insurance and suretyship were the same. [FN48] The court further relied on case law that held that the inclusion of a particular contract in the Insurance Code for regulatory purposes did not require its classification as insurance for other purposes. [FN49] As a result, the court found that the mere inclusion of surety arrangements in the Insurance Code should not be determinative of the issue, but instead, the policy considerations recognized in the common law should be considered to see if they support the availability of tort remedies in the context of a performance bond.

FN45. *Id.* at 418.

FN46. *Id.* at 419.

FN47. *Cates*, 980 P.2d at 419.

FN48. *Id.* at 419-20.

FN49. *Id.* at 421 (citing *Estate of Barr*, Cal. Ct.App., 231 P.2d 876 (1951) and *In re Pikush*, B.A.P. 9th Cir., 157 B.R. 155 (1993)).

Addressing these policy considerations, the court in *Cates* first examined whether there was unequal bargaining power. It stated that insureds generally have to accept insurance on a "take-it-or-leave-it" basis, while obligees decide the form and terms of the bond and have ample bargaining power to negotiate these terms. In addition, the court found that the performance bonds typically incorporate the underlying construction contract, which has been negotiated by the principal and the obligee, and that the nature and extent of a surety's obligations are determined with reference to these terms. [FN50] As such, the court found that the typical performance bond bears no indicia of adhesion or disparate bargaining power that might support tort

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d  
(Cite as: 2001 WL 541469 (Del.Super.))

Page 8

recovery by an obligee. [FN51]

FN50. *Cates,* 980 P.2d at 422.

FN51. *Id.*

Next, the court addressed the issue of public interest and fiduciary responsibility. The court distinguished surety from insurance in that insureds generally do not seek to obtain commercial advantages by purchasing policies, but instead they seek protection against calamity. [FN52] As a contrast, the court stated that the general purpose of a construction performance bond is to protect the owner/obligee from the principal for failing to perform under the contract. [FN53] The court observed that in this way, the obligee seeks a commercial advantage of obtaining a contract with additional financial security. [FN54] The court also found that when the surety breaches, obligees have rights of recovery through the principal and can turn to the marketplace to complete performance of the contract, which is in contrast to the insureds who have no other marketplace to find another insurance company willing to pay for losses already incurred when an insurer refused in bad faith to pay a claim. [FN55]

FN52. *See Id.* at 422.

FN53. *Id.* at 422-23.

FN54. *Cates,* 980 P.2d at 423.

FN55. *Id.* at 423.

*7 The court further found that tort remedies are not necessary for deterrent measures and that contract remedies provide adequate compensation for breach of the bond. The court explained that the Insurance Code subjects sureties to substantial administrative sanctions and penalties for violations of the Unfair Trade Practices Act and that making tort remedies available may encourage obligees to allege default more readily and would have an adverse effect of increased litigation, which may in turn increase the cost of obtaining bonds. [FN56]

FN56. *Id.* at 425-426.

In sum, the court in *Cates* concluded that tort recovery is not appropriate for a breach of an implied covenant of good faith and fair dealing in the context of a construction performance bond because (1) such a bond is not an insurance policy; (2) extracontractual remedies are unnecessary in the interests of social policy; (3) obligees have ample power to protect their interests through negotiation; and (4) sureties are deterred from acting unreasonably by statutory and administrative sanctions. [FN57] While the court acknowledged that other jurisdictions have concluded to the contrary, it found that those cases failed to give appropriate consideration to the material differences between insurance policies and performance bonds and placed undue emphasis on statutes that regulate suretyship as a class of insurance. [FN58]

FN57. *Id.* at 427.

FN58. *Cates,* 980 P.2d at 427. Both parties appear to argue that the District Court of Florida case in *Shannon R. Ginn Constr. Co. v. Reliance Ins. Co.,* S.D. Fla., 51 F.Supp.2d 1347 (1999), supports their contrary positions. However, the issue in that case was somewhat different. The main question was whether Florida statute, section 624.155(1)(b) 1, authorized a principal to sue a surety for bad faith. In contrast, the cases discussed above deal with whether an obligee has a cause of action. Under Florida statute, section 624.155(1)(b)1, a first-party cause of action against insurers for bad faith refusal to settle is permitted. *Id.* at 1351. However, only an insured can bring a bad faith action under section 624.155(1)(b)1. As such, the more precise issue was whether a principal in a surety agreement was an "insured" within the meaning of section 624.155(1)(b)1, thereby permitting an action for bad faith failure to settle claims on the performance bond. The

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2001 WL 541469 (Del.Super.))

Page 9

District Court of Florida provided a useful analysis of suretyship versus insurance. The court discussed the differences but noted that many states, like Florida, categorized suretyship under the general heading of insurance. *Id.* at 1350. It noted that the inclusion of surety and surety insurance in its insurance code was strong evidence that Florida intended to hold sureties to the same standards as ordinary insurers. *Id.* To answer the ultimate issue, the court looked to whom a surety owes a duty and found that the surety's duty runs to the obligee, not the principal. As a result, the court found that the principal was not an "insured" and could not sue the surety for bad faith under section 624.155(1)(b)1, Florida Statutes. It also noted in dicta that although the court "need not, and does not, decide the issue, one can make a strong argument that Florida treats sureties so much like ordinary insurers that sureties, in certain circumstances, may be liable for bad faith." *Id.* at 1351. As such, the Court notes that this case does not necessarily support either position since it never answered whether the obligee has a cause of action for bad faith against a surety.

*C. Bad Faith Claims in a Surety Context in Delaware*

The closest that the Delaware Supreme Court came to addressing this issue was in *E.I. DuPont de Nemours and Company v. Pressman.* [FN59] In *Pressman,* the Court considered the issue of whether punitive damages were available for a breach of an employment contract by comparing it to an insurance contract. In denying the punitive damages claim, the Court relied upon the distinctions made in the California Supreme Court decision of *Foley v. Interactive Data Corporation.* [FN60] That case held that the special relationship between the insurer and the insured was characterized by: (1) the personal interests--as opposed to commercial interests--sought to be protected by insurance; (2) the public service nature of insurance; and (3) the adhesive nature and unbalanced bargaining position between insurer and insured. [FN61] In comparing the employer/employee contract to an insurer/insured contract, the Court stated:

FN59. Del.Supr., 679 A.2d 436 (1996).

FN60. Cal.Supr., 765 P.2d 373 (1988).

FN61. *Pressman,* 679 A.2d at 447 (citing *Foley,* 765 P.2d at 390).

Insurance is different. Once an insured files a claim, the insurer has a strong incentive to conserve its financial resources balanced against the effect on its reputation of a "hard-ball" approach. Insurance contracts are also unique in another respect. Unlike other contracts, the insured has no ability to "cover" if the insurer refuses without justification to pay a claim. Insurance contracts are like many other contracts in that one party (the insured) renders performance first (by paying premiums) and then awaits the counter-performance in the event of a claim. Insurance is different, however, if the insurer breaches by refusing to render the counter-performance. In a typical contract, the non-breaching party can replace the performance of the breaching party by paying the then-prevailing market price for the counter-performance. With insurance this is simply not possible. This feature of insurance contracts distinguishes them from other contracts and justifies the availability of punitive damages for breach in limited circumstances . [FN62]

FN62. *Pressman,* 679 A.2d at 447.

*8 While the Delaware Supreme Court's analysis in *Pressman* is helpful in addressing this issue, there is a distinction between *Pressman* and the case sub judice. In *Pressman,* the Supreme Court was comparing the insurer/insured contract to the employer/employee contract. Whereas, in this case, the Court is distinguishing between the surety/obligee contract and the insurer/insured contract, which share similarities that are not present in the employer/employee context. As such, the Court is required to consider other arguments that go beyond the *Pressman* case, which take into consideration the unique similarities that are present

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2001 WL 541469 (Del.Super.))

Page 10

in a surety/obligee contract and an insurer/insured contract. The Court also notes that even though the Delaware Supreme Court in *Pressman* relied upon the analysis set forth in the California Supreme Court in *Foley, supra*, it does not require this Court to accept every decision rendered by California's highest court or to follow the logic set forth in the *Cates* decision.

The cases relied upon by both parties reflect strong contrary opinions concerning whether obligees are entitled to assert bad faith claims in the surety context and receive tort remedies. Both sides reflect well-reasoned decisions that could easily be accepted. But, after considering all the issues set forth in these decisions, the Court is most persuaded by the reasoning in the cases that recognize a bad faith claim in the surety context.

Similarly to the Arizona Supreme Court in *Dodge, supra*, and the Colorado Supreme Court in *Transamerica, supra*, this Court likewise recognizes that insurance is not identical in every respect with suretyship and that there are differences as to form and the obligations of the parties. Despite this, the Court agrees with the reasoning in *Dodge* and *Transamerica* that the presence of sureties in the insurance statutes is reflective of the Legislature's intent and deserves merit. According to 18 *Del. C.* § 102, "insurance" is defined as "a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils, called 'risks,' or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies or to act as surety." [FN63] In addition, the definition of "insurer", in part, "includes every person engaged as principal and as indemnitor, surety or contractor in the business of entering into contracts of insurance." [FN64] The Delaware Insurance Code also includes "surety insurance" as a "Kind[ ] of Insurance" in Chapter 9 of Title 18. Surety insurance includes, in part, "[i]nsurance guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings and contracts of suretyship." [FN65] Interestingly, Delaware's definition of "surety insurance" is identical to the definition in *Dodge* under the Arizona code, and Delaware's definition of "insurer" is identical to that expressed in *Transamerica* under the Colorado code.

FN63. 18 *Del. C.* § 102(2).

FN64. 18 *Del. C.* § 102(3).

FN65. 18 *Del. C.* § 905(a)(2).

*9 Moreover, the Court is not persuaded by the case law mentioned in *Cates* that the inclusion of surety in the Insurance Code did not require its classification as insurance for other purposes. There is no basis to substantiate that the Legislature only included surety under the insurance statutes to allow for regulatory supervision or limited its application in an insurance context. While the Court is mindful that this is not a statutory interpretation question, this Court will not ignore what appears to be the clear will of the Legislature.

While the Court believes that the inclusion of surety in the Delaware Insurance Code bears considerable weight to the end result, the Court also finds that it is not solely determinative of the issue. The Court agrees with the reasoning in *Dodge* in that the purpose of the construction performance bond is not for a commercial advantage but to protect the obligee from calamity that may result if the principal defaults on the contract. [FN66] The performance bond allows the obligee to respond quickly to the contractor's non- performance and to avoid delays and additional cost to the overall project. In essence, the obligee requires insurance that the project can be completed. To allow the surety to purposely delay or intentionally manipulate payment to their benefit would undermine the primary purpose of insulating the obligee from the risk of default. Further, permitting a bad faith claim in the surety context would conceivably deter such action and compel sureties to handle claims responsibly. The Court is not convinced, as the court was in *Cates*, that the Insurance Code provides the necessary and appropriate sanctions for a surety's bad faith breach or that merely recovering the contract amount sufficiently remedies the potentially catastrophic losses related to the surety's bad faith delay.

FN66. See *Dodge*, 778 P.2d at 1242.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 2001 WL 541469 (Del.Super.))

Page 11

This Court also acknowledges that the parties in a surety contract are on a more equal footing than that of a normal insurance contract. However, as the court noted in *Transamerica*, the surety has an advantage over the obligee because the surety controls the ultimate decision to pay claims and the timing when that will occur. [FN67] Those decisions will often be critical to the ability of the project to reasonably proceed forward. While cognizant that there are differences between surety/obligee and an insurer/insured, the Court is nevertheless persuaded by the similarities raised in *Transamerica's* analysis of the surety/obligee's "special relationship":

FN67. *Transamerica*, 940 P.2d at 353.

A special relationship exists between a commercial surety and an obligee that is nearly identical to that involving an insurer and an insured. When an obligee requests that a principal obtain a commercial surety bond to guarantee the principal's performance, the obligee is essentially insuring itself from the potentially catastrophic losses that would result in the event the principal defaults on its original obligation. When the principal actually defaults, the commercial surety must assume or correct any flaws in performance pursuant to the terms of the original contract, thereby eliminating the obligee's risk of loss in the venture. [FN68]

FN68. *Id.* at 352 (citations omitted).

*10 The Court finds that although the relationships between the surety/obligee and the insurer/insured are not completely identical, the differences do not warrant the denial of tort damages in the breach of a surety bond.

In regards to IFIC's final argument that Delaware rejects a theory that tort remedies are available in contract actions, the Court finds the argument meritless. While the Court concedes that tort remedies are generally not available in contract actions, there is an exception to this rule, that is, in the insurance context. While the Delaware Supreme Court in *Pressman* concluded that the exception was not warranted in the context of employer/employee, this Court finds that there is rational justification for a departure from the general rule as similarly found in the insurance context to allow punitive damages for a bad faith breach of an surety contract. [FN69]

FN69. *See also Pickett v. Llyod's*, N.J.Supr., 621 A.2d 445 (1993). In concluding that the insured could recover bad faith damages against an insurer on a first party claim, the Supreme Court characterized this cause of action for bad faith refusal to pay as sounding in both tort and contract. *Id.* at 452. However, the court emphasized that the label given to the cause of action was immaterial, "[c]ompensation should not be dependent on what label we place on an action but rather on the nature of the injury inflicted on the plaintiff and the remedies requested." *Id.*

As such, while the Court makes no findings as to the merits of the claim, Count III of Del Tech's counterclaim will remain, and IFIC's motion is DENIED.

2001 WL 541469 (Del.Super.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GST TELECOM INC., et al., | ) | Case No. 00-1982 (GMS) |
| | ) | |
| Debtors. | ) | Related Docket No. _____ |

## ORDER GRANTING MOTION OF JOHN WARTA FOR LEAVE TO FILE AMENDED PROOFS OF CLAIM

AND NOW, this _____ day of _____, 2003, having considered the Motion of John Warta ("Warta") for Leave to File Amended Proofs of Claim (the "Motion"); and having considered any response or objection thereto, and the argument of counsel, if any; and having found that due and sufficient notice of the Motion has been given; and after due deliberation and sufficient cause appearing therefore, it is hereby

ORDERED, that the Motion is granted and approved in its entirety.

_____
Gregory M. Sleet
United States District Judge

132005v1